## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| ANURAG KACHRODIA., Individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>        v.<br><br>ACADIA HEALTHCARE COMPANY, INC., DEBRA K. OSTEEN, CHRISTOPHER H. HUNTER, DAVID M. DUCKWORTH, and HEATHER DIXON,<br><br>        Defendants. | **Case No: 3:24-cv-01238**<br><br>**Judge Aleta A. Trauger**<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Anurag Kachrodia ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding Acadia Healthcare Company, Inc. ("Acadia Healthcare", "Acadia", or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Acadia Healthcare securities between February 28, 2020 and October 18, 2024 inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused

1

by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

**JURISDICTION AND VENUE**

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

6.      Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Acadia Healthcare securities during the Class Period and was economically damaged thereby.

7.      Defendant Acadia Healthcare describes itself as follows:

Acadia is a leading provider of behavioral healthcare services across the United States. As of September 30, 2023, Acadia operated a network of 253 behavioral healthcare facilities with approximately 11,100 beds in 39 states and Puerto Rico. With approximately 23,000 employees serving more than 75,000 patients daily, Acadia is the largest stand-alone behavioral healthcare company in the U.S. Acadia provides behavioral healthcare services to its patients in a variety of settings, including inpatient

2

psychiatric hospitals, specialty treatment facilities, residential treatment centers and outpatient clinics.

8. Defendant Acadia Healthcare is incorporated in Delaware and its head office is located at 6100 Tower Circle, Suite 1000, Franklin, Tennessee 37067. Acadia Healthcare common stock trades on the NASDAQ exchange ("NASDAQ") under the ticker symbol "ACHC".

9. Defendant Debra K. Osteen ("Osteen") served as the Company's Chief Executive Officer (as well as on the Board of Directors (the "Board")) from the beginning of the Class Period until her retirement from the CEO role on January 31, 2022.

10. Defendant Christopher H. Hunter ("Hunter") has served as the Company's CEO since April 2022.

11. Defendant David M. Duckworth ("Duckworth") served as the Company's Chief Financial Officer ("CFO") until July 10, 2023.

12. Defendant Heather Dixon ("Dixon") has served as the Company's CFO since July 10, 2023.

13. Defendants Osteen, Hunter, Duckworth, and Heather Dixon are collectively referred to herein as the "Individual Defendants."

14. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

3

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

15.     Acadia Healthcare is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

16.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Acadia Healthcare under *respondeat superior* and agency principles.

17.     Defendant Acadia Healthcare and the Individual Defendants are collectively referred to herein as "Defendants."

### SUBSTANTIVE ALLEGATIONS

**Materially False and Misleading
Statements Issued During the Class Period**

18.     On February 28, 2020, the Company filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2019 (the "2019 Annual Report"). Attached to the

4

2019 Annual Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Osteen and Duckworth attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

19.     The 2019 Annual Report contained the following risk disclosure:

***An incident involving one or more of our patients or the failure by one or more of our facilities to provide appropriate care could result in increased regulatory burdens, governmental investigations, negative publicity and adversely affect the trading price of our common stock.***

Because many of the patients we treat suffer from severe mental health and chemical dependency disorders, patient incidents, including deaths, sexual abuse, assaults and elopements, occur from time to time. ***If one or more of our facilities experiences an adverse patient incident or is found to have failed to provide appropriate patient care, an admissions hold, loss of accreditation, license revocation or other adverse regulatory action could be taken against us*** *. Any such patient incident or adverse regulatory action could result in governmental investigations, judgments or fines and have a material adverse effect on our business, financial condition and results of operations*. In addition, we have been and could become the subject of negative publicity or unfavorable media attention, whether warranted or unwarranted, that could have a significant, adverse effect on the trading price of our common stock or adversely impact our reputation and how our referral sources and payors view us.

(Emphasis added).

20.     The statement in ¶ 19 was materially false and misleading at the time it was made because the Company routinely held patients against their will at times when it was not medical necessary, lied to insurers about the medical necessity of keeping those patients in the Company's facilities against their will, and willfully neglected patients. The foregoing resulted in a heightened risk of regulatory investigations and negative publicity against the Company.

21.     The 2019 Annual Report contained the following risk disclosure:

***We have been and could become the subject of governmental investigations, regulatory actions and whistleblower lawsuits.***

5

Healthcare companies in both the U.S. and the U.K. may be subject to investigations by various governmental agencies. Certain of our individual facilities have received, and from time to time, other facilities may receive, subpoenas, civil investigative demands, audit reports and other inquiries from, and may be subject to investigation by, federal and state agencies and regulatory agencies in the U.K. See "Item 3. Legal Proceedings" for additional information about pending investigations. These investigations can result in repayment obligations, and violations of the False Claims Act can result in substantial monetary penalties and fines, the imposition of a corporate integrity agreement and exclusion from participation in governmental health programs. If we incur significant costs responding to or resolving these or future inquiries or investigations, our business, financial condition and results of operations could be materially adversely affected.

22.     The statement in ¶ 21 was materially false and misleading at the time it was made because it understated the Company's regulatory risk, considering that the Company routinely held patients against their will at times when it was not medical necessary, lied to insurers about the medical necessity of keeping those patients in the Company's facilities against their will, and willfully neglected patients. The foregoing resulted in a heightened risk of regulatory investigations and negative publicity against the Company.

23.     The 2019 Annual Report contained the following risk disclosure regarding litigation risk:

> ***We may be subject to liabilities from claims brought against us or our facilities.***
>
> ***We are subject to medical malpractice lawsuits and other legal actions in the ordinary course of business. Some of these actions may involve large claims, as well as significant defense costs***. We cannot predict the outcome of these lawsuits or the effect that findings in such lawsuits may have on us. All professional and general liability insurance we purchase is subject to policy limitations and in some cases, an insurance company may defend us subject to a reservation of rights. Management believes that, based on our past experience and actuarial estimates, our insurance coverage is adequate considering the claims arising from the operations of our facilities. While we continuously monitor our coverage, our ultimate liability for professional and general liability claims could change materially from our current estimates. If such policy limitations should be partially or fully exhausted in the future, or payments of claims exceed our estimates or are not covered by our insurance, it could have a material adverse effect on our business, financial condition or results of operations. Further, insurance premiums have increased year over year and insurance coverage may not be available at a reasonable cost, especially given the significant increase in insurance premiums generally experienced in the healthcare industry.

6

(Emphasis added).

24.     The statement in ¶ 23 was materially false and misleading at the time it was made because the Company understated its litigation risk, considering that the Company routinely held patients against their will at times when it was not medical necessary, lied to insurers about the medical necessity of keeping those patients in the Company's facilities against their will, and willfully neglected patients.

25.     On February 26, 2021, the Company filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2020 (the "2020 Annual Report"). Attached to the 2020 Annual Report were certifications pursuant to SOX signed by Defendants Osteen and Duckworth attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

26.     The 2020 Annual Report contained the following risk disclosure:

***An incident involving one or more of our patients or the failure by one or more of our facilities to provide appropriate care could result in increased regulatory burdens, governmental investigations, negative publicity and adversely affect the trading price of our common stock.***

Because many of the patients we treat suffer from severe mental health and chemical dependency disorders, patient incidents, including deaths, sexual abuse, assaults and elopements, occur from time to time. ***If one or more of our facilities experiences an adverse patient incident or is found to have failed to provide appropriate patient care, an admissions hold, loss of accreditation, license revocation or other adverse regulatory action could be taken against us. Any such patient incident or adverse regulatory action could result in governmental investigations, judgments or fines and have a material adverse effect on our business, financial condition and results of operations.*** In addition, we have been and could become the subject of negative publicity or unfavorable media attention, whether warranted or unwarranted, that could have a significant, adverse effect on the trading price of our common stock or adversely impact our reputation and how our referral sources and payors view us.

(Emphasis added).

7

27.     The statement in ¶ 26 was materially false and misleading at the time it was made because the Company routinely held patients against their will at times when it was not medical necessary, lied to insurers about the medical necessity of keeping those patients in the Company's facilities against their will, and willfully neglected patients. The foregoing resulted in a heightened risk of regulatory investigations and negative publicity against the Company.

28.     The 2020 Annual Report contained the following risk disclosure:

*We care for a large number of vulnerable individuals with complex needs and any care quality deficiencies could adversely impact our brand, reputation and ability to market our services effectively.*

*Our future growth will partly depend on our ability to maintain our reputation for providing quality patient care and, through new programs and marketing activities, increased demand for our services*. Factors such as increased acuity of our patients, *health and safety incidents at our facilities, regulatory enforcement actions, negative press or general customer dissatisfaction could lead to deterioration in the level of our quality ratings or the public perception of the quality of our services (including as a result of negative publicity about our industry generally), which in turn could lead to a loss of patient placements, referrals and self-pay patients or service users*. Any impairment of our reputation, loss of goodwill or damage to the value of our brand name could have a material adverse effect on our business, results of operations and financial condition.

*Many of our service users have complex medical conditions or special needs, are vulnerable and often require a substantial level of care and supervision*. There is a risk that one or more service users could be harmed by one or more of our employees, either intentionally, through negligence or by accident. Further, individuals cared for by us have in the past engaged, and may in the future engage, in behavior that results in harm to themselves, our employees or to one or more other individuals, including members of the public. *A serious incident involving harm to one or more service users or other individuals could result in negative publicity*. Such negative publicity could have a material adverse effect on our brand, reputation and ADC, which would have a corresponding negative impact on our business, results of operations and financial condition. Furthermore, the damage to our reputation or to the reputation of the relevant facility from any such incident could be exacerbated by any failure on our part to respond effectively to such incident.

(Emphasis added).

8

29.     The statement in ¶ 28 materially false and misleading at the time it was made because the Company routinely held patients against their will at times when it was not medical necessary, lied to insurers about the medical necessity of keeping those patients in the Company's facilities against their will, and willfully neglected patients (resulting in harm to many of those patients). As a result, the likelihood of negative publicity and reputational damage, and litigation against the Company was understated.

30.     The 2020 Annual Report stated the following about regulatory risk:

*We are and in the future could become the subject of additional governmental investigations, regulatory actions and whistleblower lawsuits.*

Healthcare companies in the U.S. may be subject to investigations by various governmental agencies. ***Certain of our individual facilities have received, and from time to time, other facilities may receive, subpoenas, civil investigative demands, audit reports and other inquiries from, and may be subject to investigation by, federal and state agencies***. See Note 17— Commitments and Contingencies in the accompanying notes to our consolidated financial statements beginning on Page F-1 of this Annual Report on Form 10-K for additional information about pending investigations. These investigations can result in repayment obligations, and violations of the False Claims Act can result in substantial monetary penalties and fines, the imposition of a corporate integrity agreement and exclusion from participation in governmental health programs. ***If we incur significant costs responding to or resolving these or future inquiries or investigations, our business, financial condition and results of operations could be materially adversely affected***.

(Emphasis added).

31.     The statement in ¶ 30 was materially false and misleading at the time it was made because it understated the Company's regulatory risk, considering that the Company routinely held patients against their will at times when it was not medical necessary, lied to insurers about the medical necessity of keeping those patients in the Company's facilities against their will, and willfully neglected patients. The foregoing resulted in a heightened risk of regulatory investigations and enforcement actions against the Company.

9

32.     The 2020 Annual Report contained the following risk disclosure about litigation risk:

> **We are and in the future may become involved in legal proceedings based on negligence or breach of a contractual or statutory duty from service users or their family members or from employees or former employees.**
>
> **From time to time, we are subject to complaints and claims from service users and their family members alleging professional negligence, medical malpractice or mistreatment. We are also subject to claims for unlawful detention from time to time when patients allege they should not have been detained under applicable laws and regulations or where the appropriate procedures were not correctly followed**.

*     *     *

> The incurrence of substantial legal fees, damage awards or other fines as well as the potential impact on our brand or reputation as a result of being involved in any legal proceedings could have a material adverse impact on our business, results of operations and financial condition.

> (Emphasis added).

33.     The statement in ¶ 32 was materially false and misleading at the time it was made because the Company understated its litigation risk, considering that the Company routinely held patients against their will at times when it was not medical necessary, lied to insurers about the medical necessity of keeping those patients in the Company's facilities, and willfully neglected its patients.

34.     On March 1, 2022, Acadia Healthcare filed with the SEC its annual report on Form 10-K for the year ended December 31, 2021 (the "2021 Annual Report"). Attached to the 2021 Annual Report were certifications pursuant to SOX signed by Defendants Osteen and Duckworth attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

35.     The 2021 Annual Report contained the following risk disclosure:

*An incident involving one or more of our patients or the failure by one or more of our facilities to provide appropriate care could result in increased regulatory burdens, governmental investigations, negative publicity and adversely affect the trading price of our common stock.*

Because many of the patients we treat suffer from severe mental health and chemical dependency disorders, patient incidents, including deaths, sexual abuse, assaults and elopements, occur from time to time. *If one or more of our facilities experiences an adverse patient incident or is found to have failed to provide appropriate patient care, an admissions hold, loss of accreditation, license revocation or other adverse regulatory action could be taken against us. Any such patient incident or adverse regulatory action could result in governmental investigations, judgments or fines and have a material adverse effect on our business, financial condition and results of operations*. In addition, we have been and *could become the subject of negative publicity or unfavorable media attention*, whether warranted or unwarranted, that could have a significant, adverse effect on the trading price of our common stock or adversely impact our reputation and how our referral sources and payors view us.

(Emphasis added).

36.     The statement in ¶ 35 was materially false and misleading at the time it was made because the Company routinely held patients against their will at times when it was not medical necessary, lied to insurers about the medical necessity of keeping those patients in the Company's facilities, and willfully neglected patients. The foregoing resulted in a heightened risk of regulatory investigations and negative publicity against the Company.

37.     The 2021 Annual Report contained the following risk disclosure:

*We care for a large number of vulnerable individuals with complex needs and any care quality deficiencies could adversely impact our brand, reputation and ability to market our services effectively.*

*Our future growth will partly depend on our ability to maintain our reputation for providing quality patient care and, through new programs and marketing activities, increased demand for our services*. Factors such as increased acuity of our patients, *health and safety incidents at our facilities, regulatory enforcement actions, negative press or general customer dissatisfaction could lead to deterioration in the level of our quality ratings or the public perception of the quality of our services (including as a result of negative publicity about our industry generally), which in turn could lead to a loss of patient placements, referrals and self-pay patients or service users*. Any impairment of our reputation, loss of goodwill or damage to the value of our brand name

11

could have a material adverse effect on our business, results of operations and financial condition.

***Many of our service users have complex medical conditions or special needs, are vulnerable and often require a substantial level of care and supervision***. There is a risk that one or more service users could be harmed by one or more of our employees, either intentionally, through negligence or by accident. Further, individuals cared for by us have in the past engaged, and may in the future engage, in behavior that results in harm to themselves, our employees or to one or more other individuals, including members of the public. ***A serious incident involving harm to one or more service users or other individuals could result in negative publicity. Such negative publicity could have a material adverse effect on our brand, reputation and ADC, which would have a corresponding negative impact on our business, results of operations and financial condition***. Furthermore, the damage to our reputation or to the reputation of the relevant facility from any such incident could be exacerbated by any failure on our part to respond effectively to such incident.

(Emphasis).

38.     The statement in ¶ 37 materially false and misleading at the time it was made because the Company routinely held patients against their will at times when it was not medical necessary, lied to insurers about the medical necessity of keeping those patients in the Company's facilities against their will, and willfully neglected patients (resulting in harm to many of those patients). As a result, the likelihood of negative publicity and reputational damage, and litigation against the Company was understated.

39.     The 2021 Annual Report contained the following risk disclosure regarding regulatory risk:

***We are and in the future could become the subject of additional governmental investigations, regulatory actions and whistleblower lawsuits.***

***Healthcare companies in the U.S. may be subject to investigations by various governmental agencies. Certain of our individual facilities have received, and from time to time, other facilities may receive, subpoenas, civil investigative demands, audit reports and other inquiries from, and may be subject to investigation by, federal and state agencies***. See Note 20— Commitments and Contingencies in the accompanying notes to our consolidated financial statements beginning on Page F-1 of this Annual Report on Form 10-K for additional information about pending investigations. These investigations can result in repayment obligations, and violations of the False Claims Act

can result in substantial monetary penalties and fines, the imposition of a corporate integrity agreement and exclusion from participation in governmental health programs. *If we incur significant costs responding to or resolving these or future inquiries or investigations, our business, financial condition and results of operations could be materially adversely affected*.

(Emphasis added).

40. The statement in ¶ 39 was materially false and misleading at the time it was made because it understated the Company's regulatory risk, considering that the Company routinely held patients against their will at times when it was not medical necessary, lied to insurers about the medical necessity of keeping those patients in the Company's facilities against their will, and willfully neglected patients. The foregoing resulted in a heightened risk of regulatory investigations and enforcement actions against the Company.

41. The 2021 Annual Report contained the following risk disclosure:

*We are and in the future may become involved in legal proceedings based on negligence or breach of a contractual or statutory duty from service users or their family members or from employees or former employees.*

*From time to time, we are subject to complaints and claims from service users and their family members alleging professional negligence, medical malpractice or mistreatment. We are also subject to claims for unlawful detention from time to time when patients allege they should not have been detained under applicable laws and regulations or where the appropriate procedures were not correctly followed.*

\* \* \*

The incurrence of substantial legal fees, damage awards or other fines as well as the potential impact on our brand or reputation as a result of being involved in any legal proceedings could have a material adverse impact on our business, results of operations and financial condition.

(Emphasis added).

42. The statement in ¶ 41 was materially false and misleading at the time it was made because the Company understated its litigation risk, considering that the Company routinely held patients against their will at times when it was not medical necessary, lied to insurers about

13

the medical necessity of keeping those patients in the Company's facilities, and willfully neglected its patients.

43. On February 28, 2023, the Company filed with the SEC its annual report on Form 10-K for the year ended December 31, 2022 (the "2022 Annual Report"). Attached to the 2022 Annual Report were certifications pursuant to SOX signed by Defendants Hunter and Duckworth attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

44. The 2022 Annual Report contained the following risk disclosure:

*An incident involving one or more of our patients or the failure by one or more of our facilities to provide appropriate care could result in increased regulatory burdens, governmental investigations, negative publicity and adversely affect the trading price of our common stock.*

Because many of the patients we treat suffer from severe mental health and chemical dependency disorders, patient incidents, including deaths, sexual abuse, assaults and elopements, occur from time to time. *If one or more of our facilities experiences an adverse patient incident or is found to have failed to provide appropriate patient care, an admissions hold, loss of accreditation, license revocation or other adverse regulatory action could be taken against us. Any such patient incident or adverse regulatory action could result in governmental investigations, judgments or fines and have a material adverse effect on our business, financial condition and results of operations*. In addition, we have been and could become the subject of negative publicity or unfavorable media attention, whether warranted or unwarranted, that could have a significant, adverse effect on the trading price of our common stock or adversely impact our reputation and how our referral sources and payors view us.

(Emphasis added).

45. The statement in ¶ 44 was materially false and misleading at the time it was made because the Company routinely held patients against their will at times when it was not medical necessary, lied to insurers about the medical necessity of keeping those patients in the

Company's facilities, and willfully neglected patients. The foregoing resulted in a heightened risk of regulatory investigations and negative publicity against the Company.

46.     The 2022 Annual Report contained the following risk disclosure:

*We care for a large number of vulnerable individuals with complex needs and any care quality deficiencies could adversely impact our brand, reputation and ability to market our services effectively.*

*Our future growth will partly depend on our ability to maintain our reputation for providing quality patient care and, through new programs and marketing activities, increased demand for our services*. Factors such as increased acuity of our patients, *health and safety incidents at our facilities, regulatory enforcement actions, negative press or general customer dissatisfaction could lead to deterioration in the level of our quality ratings or the public perception of the quality of our services (including as a result of negative publicity about our industry generally), which in turn could lead to a loss of patient placements, referrals and self-pay patients or service users*. Any impairment of our reputation, loss of goodwill or damage to the value of our brand name could have a material adverse effect on our business, results of operations and financial condition.

Many of our service users have complex medical conditions or special needs, are vulnerable and often require a substantial level of care and supervision. *There is a risk that one or more service users could be harmed by one or more of our employees, either intentionally, through negligence or by accident*. Further, individuals cared for by us have in the past engaged, and may in the future engage, in behavior that results in harm to themselves, our employees or to one or more other individuals, including members of the public. *A serious incident involving harm to one or more service users or other individuals could result in negative publicity*. *Such negative publicity could have a material adverse effect on our brand, reputation and ADC, which would have a corresponding negative impact on our business, results of operations and financial condition. Furthermore, the damage to our reputation or to the reputation of the relevant facility from any such incident could be exacerbated by any failure on our part to respond effectively to such incident*.
(Emphasis added).

47.     The statement in ¶ 46 materially false and misleading at the time it was made because the Company routinely held patients against their will at times when it was not medical necessary, lied to insurers about the medical necessity of keeping those patients in the Company's facilities against their will, and willfully neglected patients (resulting in harm to

15

many of those patients). As a result, the likelihood of negative publicity and reputational damage, and litigation against the Company was understated.

48. The 2022 Annual Report contained the following risk disclosure regarding regulatory risk:

> ***We are and in the future could become the subject of additional governmental investigations, regulatory actions and whistleblower lawsuits.***
>
> ***Healthcare companies in the U.S. may be subject to investigations by various governmental agencies. Certain of our individual facilities have received, and from time to time, other facilities may receive, subpoenas, civil investigative demands, audit reports and other inquiries from, and may be subject to investigation by, federal and state agencies***. See Note 20— Commitments and Contingencies in the accompanying notes to our consolidated financial statements beginning on Page F-1 of this Annual Report on Form 10-K for additional information about pending investigations. These investigations can result in repayment obligations, and violations of the False Claims Act can result in substantial monetary penalties and fines, the imposition of a corporate integrity agreement and exclusion from participation in governmental health programs. ***If we incur significant costs responding to or resolving these or future inquiries or investigations, our business, financial condition and results of operations could be materially adversely affected***.
>
> (Emphasis added).

49. The statement in ¶ 48 was materially false and misleading at the time it was made because it understated the Company's regulatory risk, considering that the Company routinely held patients against their will at times when it was not medical necessary, lied to insurers about the medical necessity of keeping those patients in the Company's facilities against their will, and willfully neglected patients. The foregoing resulted in a heightened risk of regulatory investigations and enforcement actions against the Company.

50. The 2022 Annual Report contained the following risk disclosure:

> ***We are and in the future may become involved in legal proceedings based on negligence or breach of a contractual or statutory duty from service users or their family members or from employees or former employees.***

*From time to time, we are subject to complaints and claims from service users and their family members alleging professional negligence, medical malpractice or mistreatment. We are also subject to claims for unlawful detention from time to time when patients allege they should not have been detained under applicable laws and regulations or where the appropriate procedures were not correctly followed*.

*     *     *

The incurrence of substantial legal fees, damage awards or other fines as well as the potential impact on our brand or reputation as a result of being involved in any legal proceedings could have a material adverse impact on our business, results of operations and financial condition.

(Emphasis added).

51.     The statement in ¶ 50 was materially false and misleading at the time it was made because the Company understated its litigation risk, considering that the Company routinely held patients against their will at times when it was not medical necessary, lied to insurers about the medical necessity of keeping those patients in the Company's facilities, and willfully neglected its patients.

52.     On February 28, 2024, the Company filed with the SEC its annual report on Form 10-K for the year ended December 31, 2023 (the "2023 Annual Report"). Attached to the 2024 Annual Report were certifications pursuant to SOX signed by Defendants Hunter and Dixon attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

53.     The 2023 Annual Report contained the following risk disclosure:

*An incident involving one or more of our patients or the failure by one or more of our facilities to provide appropriate care could result in increased regulatory burdens, governmental investigations, litigation, negative publicity and adversely affect the trading price of our common stock.*

Because many of the patients we treat suffer from severe mental health and chemical dependency disorders, patient incidents, including deaths, sexual abuse, assaults and elopements, have occurred in the past and could continue to occur in the future. *As a result of adverse patient incidents, we have experienced admissions holds, adverse*

17

*regulatory action, civil litigation, negative publicity and negative impacts on referrals.*
*If one or more of our facilities experiences an adverse patient incident in the future or*
*is found to have failed to provide appropriate patient care, an admissions hold, loss of*
*accreditation, license revocation or other adverse regulatory action could be taken*
*against us.* Any such patient incident or adverse regulatory action could result in
governmental investigations, judgments or fines and have a material adverse effect on
our business, financial condition and results of operations. In addition, we have been and
could become the subject of negative publicity or unfavorable media attention, whether
warranted or unwarranted, that could have a significant, adverse effect on the trading
price of our common stock or adversely impact our reputation and how our referral
sources and payors view us.

(Emphasis added).

54.     The statement in ¶ 53 was materially false and misleading at the time it was made
because the Company routinely held patients against their will at times when it was not medical
necessary, lied to insurers about the medical necessity of keeping those patients in the
Company's facilities, and willfully neglected patients. The foregoing resulted in a heightened
risk of regulatory investigations and negative publicity against the Company.

55.     The 2023 Annual Report contained the following risk disclosure:

*We care for a large number of vulnerable individuals with complex needs and any*
*care quality deficiencies could adversely impact our brand, reputation and ability to*
*market our services effectively.*

*Our future growth will partly depend on our ability to maintain our reputation for*
*providing quality patient care and, through new programs and marketing activities,*
*increased demand for our services. Factors such as increased acuity of our patients,*
*health and safety incidents at our facilities, regulatory enforcement actions, negative*
*press, civil liability or general customer dissatisfaction could lead to deterioration in*
*the level of our quality ratings or the public perception of the quality of our services*
*(including as a result of negative publicity about our industry generally), which in*
*turn could lead to a loss of patient placements, referrals and self-pay patients or*
*service users.* Any impairment of our reputation, loss of goodwill or damage to the value
of our brand name could have a material adverse effect on our business, results of
operations and financial condition.

Many of our service users have complex medical conditions or special needs, are
vulnerable and often require a substantial level of care and supervision. Our service
users have in the past been harmed by one or more of our employees, and could in the
future be harmed by our employees, either intentionally, through negligence or by

accident. Further, individuals cared for by us have in the past engaged, and may in the future engage, in behavior that results in harm to themselves, our employees or to one or more other individuals, including members of the public. A serious incident involving harm to one or more service users or other individuals could result in negative publicity. Such negative publicity could have a material adverse effect on our brand, reputation and ADC, which would have a corresponding negative impact on our business, results of operations and financial condition. ***Furthermore, the damage to our reputation or to the reputation of the relevant facility from any such incident could be exacerbated by any failure on our part to respond effectively to such incident***.

(Emphasis added).

56.     The statement in ¶ 55 materially false and misleading at the time it was made because the Company routinely held patients against their will at times when it was not medical necessary, lied to insurers about the medical necessity of keeping those patients in the Company's facilities against their will, and willfully neglected patients (resulting in harm to many of those patients). As a result, the likelihood of negative publicity and reputational damage, and litigation against the Company was understated.

57.     The 2023 Annual Report contained the following risk disclosure:

***We are and in the future could become the subject of additional governmental investigations, regulatory actions and whistleblower lawsuits.***

***Healthcare companies in the U.S. may be subject to investigations by various governmental agencies. Certain of our individual facilities have received, and from time to time, other facilities may receive, subpoenas, civil investigative demands, audit reports and other inquiries from, and may be subject to investigation by, federal and state agencies***. See Note 11 — Commitments and Contingencies in the accompanying notes to our consolidated financial statements beginning on Page F-1 of this Annual Report on Form 10-K for additional information about pending investigations. These investigations can result in repayment obligations, and violations of the False Claims Act can result in substantial monetary penalties and fines, the imposition of a corporate integrity agreement and exclusion from participation in governmental health programs. ***If we incur significant costs responding to or resolving these or future inquiries or investigations, our business, financial condition and results of operations could be materially adversely affected***.

(Emphasis added).

19

58. The statement in ¶ 57 was materially false and misleading at the time it was made because it understated the Company's regulatory risk, considering that the Company routinely held patients against their will at times when it was not medical necessary, lied to insurers about the medical necessity of keeping those patients in the Company's facilities against their will, and willfully neglected patients. The foregoing resulted in a heightened risk of regulatory investigations and enforcement actions against the Company.

59. The 2023 Annual Report contained the following risk disclosure:

*We are and in the future may become involved in legal proceedings based on negligence or breach of a contractual or statutory duty from service users or their family members or from employees or former employees.*

*We have been in the past and will continue in the future to be subject to complaints and claims from service users and their family members alleging professional negligence, medical malpractice or mistreatment. We are also subject to claims for unlawful detention from time to time when patients allege they should not have been detained under applicable laws and regulations or where the appropriate procedures were not correctly followed.* Similarly, we have been in the past and will continue in the future to be subject to substantial claims from employees in respect of personal injuries sustained in the performance of their duties. Current or former employees may also make claims against us in relation to breaches of employment laws. There may also be safeguarding incidents at our facilities which, depending on the circumstances, may result in custodial sentences or other criminal sanctions for the member of staff involved.

\*    \*    \*

*The incurrence of substantial legal fees, damage awards or other fines as well as the potential impact on our brand or reputation as a result of being involved in any legal proceedings could have a material impact on our business, results of operations and financial condition.*

(Emphasis added).

60. The statement in ¶ 59 was materially false and misleading at the time it was made because the Company understated its litigation risk, considering that the Company routinely held patients against their will at times when it was not medical necessary, lied to insurers about

20

the medical necessity of keeping those patients in the Company's facilities, and willfully neglected its patients.

61. The statements contained in ¶¶ 19, 21, 23, 25, 28, 30, 32, 35, 37, 39, 41, 44, 46, 48, 50, 53, 55, 57 and 59 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Acadia Healthcare's business model centered on holding vulnerable people against their will in its facilities, including in cases where it was not medically necessary to do so; (2) while in Acadia Healthcare facilities, many patients were subjected to abuse; (3) Acadia Healthcare deceived insurance providers into paying for patients to stay in its facilities when it was not medically necessary; and (4) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**THE TRUTH BEGINS TO EMERGE**

62. On September 1, 2024, *The New York Times* (the "Times") published an article entitled "How a Leading Chain of Psychiatric Hospitals Traps Patients." (the "Article").

63. The Article noted that Acadia Healthcare is "one of America's largest chains of psychiatric hospitals" and that "[s]ince the pandemic exacerbated a national mental health crisis, the company's revenue has soared." However, the Article stated that Times' "investigation found that some of that success was built on a disturbing practice: ***Acadia has lured patients into its facilities and held them against their will, even when detaining them was not medically necessary***." (Emphasis added).

21

64. The Article stated that "[i]n at least 12 of the 19 states where Acadia operates psychiatric hospitals, **dozens of patients, employees and police officers have alerted the authorities that the company was detaining people in ways that violated the law**[.] In some cases, judges have intervened to force Acadia to release patients." (Emphasis added).

65. The Article stated that "[s]ome patients arrived at emergency rooms seeking routine mental health care, only to find themselves sent to Acadia facilities and locked in."

66. The Article stated the following:

A social worker spent six days inside an Acadia hospital in Florida after she tried to get her bipolar medications adjusted. A woman who works at a children's hospital was held for seven days after she showed up at an Acadia facility in Indiana looking for therapy. And after police officers raided an Acadia hospital in Georgia, 16 patients told investigators that they had been kept there "with no excuses or valid reason," according to a police report.

**Acadia held all of them under laws meant for people who pose an imminent threat to themselves or others. But none of the patients appeared to have met that legal standard, according to records and interviews**.

(Emphasis added).

67. The Article noted that "[m]ost doctors agree that people in the throes of a psychological crisis must sometimes be detained against their will to stabilize them and prevent harm. These can be tough calls, balancing patients' safety with their civil rights."

68. In contrast to legitimate medical reasons to detain a patient against his or her will, however, the Article noted that "**at Acadia, patients were often held for financial reasons rather than medical ones, according to more than 50 current and former executives and staff members**." (Emphasis added).

69. The Article stated the following:

**Acadia, which charges $2,200 a day for some patients, at times deploys an array of strategies to persuade insurers to cover longer stays, employees said. Acadia has exaggerated patients' symptoms**. It has tweaked medication dosages, then claimed

22

patients needed to stay longer because of the adjustment. And it has argued that patients are not well enough to leave because they did not finish a meal.

**Unless the patients or their families hire lawyers, Acadia often holds them until their insurance runs out**.

(Emphasis added).

70.     The Article quoted Lexie Reid, who is described as a "psychiatric nurse who worked at an Acadia facility in Florida from 2021 to 2022", as saying that **"[w]e were keeping people who didn't need to be there**[.]" (Emphasis added).

71.     The Article stated the following about conditions and safety at Acadia facilities:

Every day spent in a psychiatric hospital can be a trial. At Acadia facilities around the country, health inspectors have found that some patients **did not receive therapy, were unsupervised or were denied access to vital medications. Many inspection reports described rapes, assaults and filthy conditions**.

(Emphasis added).

72.     The Article stated the following about Acadia Healthcare's relationship with emergency rooms, and how Acadia Healthcare pressures emergency room staff to send patients to its facilities, even if that may not be the best choice for the patient:

Acadia also pitches itself to staff in hospital emergency rooms that have been inundated with patients seeking mental health care. Business-development teams make sales calls to the doctors and other hospital workers, passing out brochures and talking up the expertise of Acadia's staff and its willingness to take difficult patients. Sometimes, they come bearing doughnuts.

In a few states, Acadia has dispatched teams to overwhelmed E.R.s to help them determine whether patients need to be hospitalized. **These employees, known as assessors, are supposed to be objective. But several said Acadia scolded them when they suggested that patients be sent to other psychiatric hospitals**.

\*        \*        \*

LeDesha Haynes, a former human resources director at Lakeview Behavioral Health Hospital, an Acadia facility in Georgia, said that when the hospital had empty beds, "the assessors were always being pressured and told to beat the bushes." She added, "Their judgment was clouded."

23

(Emphasis added).

73.     The Times stated that it "identified eight instances of Acadia's holding people

*who had voluntarily checked themselves in but then changed their minds*." (Emphasis added).

74.     Of these eight cases, the Article stated the following:

One of those patients was the hospital worker in Indiana, who asked for anonymity because she didn't want her health issues made public. She sought treatment at an Acadia hospital in Indianapolis, *but was then held against her will when she asked to leave, according to a complaint filed with the sate's attorney general. She was released after her father went to court*.

Another was a retired city employee, who asked The Times to identify her by her initials, T.B. In March 2021, she was feeling depressed and went to her doctor's office to get a therapist recommendation. A nurse there provided her several options, including visiting Park Royal in Fort Myers, Fla., an Acadia hospital near her home. *She said an employee at Park Royal had told her that in order to get therapy, she would have to sign herself in. She arranged for her husband to pick her up that evening from the hospital.*

*But when T.B. tried to leave, Park Royal refused; it let her out six days later, after her husband went to court and a judge ordered her to be released.*

(Emphasis added).

75.     The Article stated the following regarding Acadia Healthcare's efforts to deceive

insurers into thinking that holding patients against their will is medically necessary:

Once Acadia gets patients in the door, it often tries to hold them until their insurance runs out.

*Acadia goes to great lengths to convince insurers that the patients should stay as long as possible, often around five days*.

*To do that, Acadia needs to show that patients are unstable and require ongoing intensive care*. Former Acadia *executives and staff in 10 states said employees were coached to use certain buzzwords, like "combative," in patients' charts to make that case*.

*In 2022, for example, state inspectors criticized an Acadia hospital in Reading, Pa., for having instructed workers to avoid adjectives like "calm" and "compliant" in a patient's chart*. That same year, employees at Acadia hospitals in Ohio and Michigan

24

complained to their state regulators that doctors had written false statements in patients' medical charts to justify continuing their stays.

At an Acadia hospital in Missouri, three former nurses said, ***executives pressured them to label patients whose insurance was about to run out as uncooperative. Acadia employees then would argue to insurance companies that the patients weren't ready to leave***. Sometimes, the nurses said, they wrote patients up for not finishing a meal or skipping group therapy.

(Emphasis added).

76.     The Article stated that "[o]nce Acadia won more insurance days for patients, ***it often would not release them before their insurance ran out, according to dozens of former Acadia executives, psychiatrists and other staff members***." (Emphasis added).

77.     The Article quoted Jessie Roeder, who was described as a "top executive at two Acadia hospitals in Florida in 2018 and 2019" as saying "***[i]f there were insurance days left, that patient was going to be held***[.]" (Emphasis added).

78.     The Article stated the following about Acadia Healthcare's efforts to work around state laws mandating a maximum number of days a patient can legally be involuntarily held:

Under state laws, patients generally must pose an imminent threat to themselves or others in order to be held against their will in a psychiatric facility. Even then, hospitals can hold people for just a handful of days, unless the patients agree to stay longer or a judge or a medical professional determines that they are not ready to leave.

***In Florida, the limit for holding patients against their will is 72 hours. To extend that time, hospitals have to get court approval***.

***Acadia's North Tampa Behavioral Health Hospital found a way to exploit that, current and former employees said***.

***From 2019 to 2023, North Tampa filed more than 4,500 petitions to extend patients' involuntary stays, according to a Times analysis of court records***.

Simply filing a petition allowed the hospital to legally hold the patients — and bill their insurance — until the court date, which can be several days after the petition is filed. [. . .]

(Emphasis added).

79.    The Article stated that "[j]udges granted only 54 of North Tampa's petitions, *or about 1% of the total*." (Emphasis added).

80.    The Article stated the following about one instance of a patient being held against her will:

> Kathryn MacKenzie, a school social worker, had recently moved to Tampa and didn't yet have a local psychiatrist. ***In August 2020, she visited an emergency room to have her prescriptions for bipolar disorder evaluated***. An E.R. doctor sent her to North Tampa Behavioral.
>
> Once there, Ms. MacKenzie ***was admitted and held against her will, even though her medical records stated that she was not feeling suicidal or wanting to harm others***.
>
> ***From the moment she entered the facility, Ms. MacKenzie begged to be released, according to court records and her mother, Jane Robertson***.
>
> "God please connect me back to my mom asap," Ms. MacKenzie wrote in a journal that she kept during her hospitalization and that The Times reviewed. "Every time the locked door open and slam I feel a quick feeling of fear."
>
> Instead of releasing her, the hospital went to court, seeking to extend her stay.
>
> ***While she waited for a hearing, Acadia charged her insurance about $2,200 a day, billing records show. Shortly before the hearing, Acadia agreed to release her. Acadia charged her insurance $13,200 for the six-day stay***.
>
> ***Ms. Robertson said her daughter has become terrified of seeking help because she fears she could find herself trapped back inside***. (Ms. MacKenzie later sued Acadia and reached a confidential settlement.)
>
> The involuntary stays have had lasting effects on other patients, too. One woman in Michigan said in an interview that she had lost her job while detained. A man in Utah said he had become afraid to seek help since being held at an Acadia facility for a week in 2021.

(Emphasis added).

81.     The Article then stated that in "December 2019, more than 50 police officers descended on an Acadia psychiatric hospital in an office park 30 minutes north of Atlanta", and that the "police had opened an investigation into the hospital, Lakeview Behavioral Health, after numerous incidents, according to police records."

82.     The Article stated that "[t]he previous January, a boy *staying at Lakeview was taken to a nearby emergency room. He had so many bruises that staff suspected child endangerment*." (Emphasis added). A few months later, the Article noted, "*police officers witnessed three Lakeview employees assaulting a patient*. Over the next six months, they *interviewed dozens of patients who said they had been held against their will or had seen patients, including children, being assaulted or neglected*." (Emphasis added).

83.     The incidents at Lakeview Behavioral Health were not isolated incidents. The Article stated that "[h]ealth inspectors nationwide have faulted Acadia for similar problems, including failing to provide adequate medical care and neglecting patients."

84.     The Article stated that "Acadia closed its Highland Ridge Hospital in Utah this year *after state regulators investigated reports of dozens of rapes and assaults*." (Emphasis added). Further, "[i]n 2022, Tennessee inspectors faulted Acadia *for falsely claiming in medical charts that a patient in Memphis had been checked on every 15 minutes. He was found in rigor mortis hours after he died*." (Emphasis added).

85.     The Article stated the following about a woman who, while delusional, was not a harm to herself and others, was held against her will in Georgia after the police raid described above, and how the Company did not have her evaluated by a psychiatrist, in violation of Georgia state law:

27

About a year after the raid, Kim Lupton, a wealthy widow who lived on the shore of Lake Oconee in Georgia, arrived at the emergency room of the Piedmont Athens Regional Medical Center. Hours earlier, she said, she had become convinced that someone was trying to poison her. She swam across a narrow inlet to the yard of a neighbor, who called an ambulance.

Doctors at Piedmont determined that Ms. Lupton was delusional, but not suicidal or a threat to others, according to her medical records.

But over the next few hours, still at Piedmont, she was seen by assessors employed by Acadia. They recommended that Ms. Lupton be sent to a psychiatric hospital, her records show.

Ms. Lupton said she wanted to go home. Instead, shortly after 11 p.m., she was taken to a van and driven more than an hour to Acadia's Lakeview facility. *Once there, Ms. Lupton was lucid and repeatedly asked to leave, according to her medical records*.

*One of Ms. Lupton's friends called a private investigator, Doug McDonald, who eventually showed up at Lakeview with a letter from a lawyer. The letter said Ms. Lupton had not been evaluated by a psychiatrist at Lakeview, in violation of Georgia law*.

Lakeview summoned a psychiatrist, who agreed to release her, *according to a lawsuit Ms. Lupton filed against Acadia. She had been there four days*.

*Mr. McDonald said that while he was waiting to pick up Ms. Lupton in the parking lot, another woman approached him. Her teenage daughter was stuck inside, too*.

Emphasis added).

86.     On this news, the price of Acadia Healthcare stock fell $3.72 per share, or 4.5%,

to close at $78.21 per share on September 3, 2024.

87.     Then, on September 27, 2024, before the market opened, Acadia Healthcare filed

a current report on Form 8-K with the SEC. It stated the following:

*On September 24, 2024, Acadia Healthcare Company, Inc. ("Acadia") received a voluntary request for information from the United States Attorney's Office for the Southern District of New York as well as a grand jury subpoena from the United States District Court for the Western District of Missouri* (W.D.Mo.) *related to its admissions, length of stay and billing practices*. In addition, Lakeland Hospital Acquisition, LLC, a subsidiary of Acadia, also received a grand jury subpoena from W.D.Mo. *on the same day regarding similar subject matter. Acadia anticipates receiving similar document requests from the U.S. Securities and Exchange*

***Commission*** and may receive additional document requests from other governmental agencies. Acadia is fully cooperating with authorities and, at this time, cannot speculate on whether the outcome of these investigations will have any impact on its business or operations.

(Emphasis added).

88.     On this news, the price of Acadia Healthcare stock fell by $12.38 per share, or 16.36%, to close at $63.28 on September 27, 2024.

89.     On October 18, 2024, *The New York Times* published an article entitled "Veterans Dept. Investigating Acadia Healthcare for Insurance Fraud." It stated the following:

> ***The Veterans Affairs Department is investigating whether Acadia Healthcare, one of the country's largest chains of psychiatric hospitals, is defrauding government health insurance programs by holding patients longer than is medically necessary, according to three people with knowledge of the inquiry***.
>
> \*       \*       \*
>
> [. . .] The veterans agency is looking into whether Acadia billed insurance programs for patients who were stable enough to be released and did not need intensive inpatient care, according to two of the people with knowledge of the investigation, who requested anonymity because it has not been made public.
>
> Several former Acadia employees in Georgia and Missouri have also recently been interviewed by agents from the F.B.I. and the inspector general's office of the Health and Human Services Department.

(Emphasis added).

90.     On this news, the price of Acadia Healthcare stock fell by $7.29 per share, or 12.28%, to close at $52.03 on October 18, 2024.

91.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

29

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

92.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Acadia Healthcare securities publicly traded on the NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Acadia Healthcare, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

93.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Acadia Healthcare securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

94.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

95.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

96.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of Acadia Healthcare;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused Acadia Healthcare to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of Acadia Healthcare securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

97.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

98.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Acadia Healthcare shares met the requirements for listing, and were listed and actively traded on NASDAQ, an efficient market;

- As a public issuer, Acadia Healthcare filed periodic public reports;

- Acadia Healthcare regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- Acadia Healthcare's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- Acadia Healthcare was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

99. Based on the foregoing, the market for Acadia Healthcare securities promptly digested current information regarding Acadia Healthcare from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

100. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

101.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

102.     This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

103.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

104.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Acadia Healthcare securities during the Class Period.

105.     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Acadia Healthcare were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

33

These defendants by virtue of their receipt of information reflecting the true facts of Acadia Healthcare, their control over, and/or receipt and/or modification of Acadia Healthcare's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Acadia Healthcare, participated in the fraudulent scheme alleged herein.

106.    Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Acadia Healthcare personnel to members of the investing public, including Plaintiff and the Class.

107.    As a result of the foregoing, the market price of Acadia Healthcare securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Acadia Healthcare securities during the Class Period in purchasing Acadia Healthcare securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

108.    Had Plaintiff and the other members of the Class been aware that the market price of Acadia Healthcare securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Acadia Healthcare securities at the artificially inflated prices that they did, or at all.

109.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

110.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Acadia Healthcare securities during the Class Period.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

111.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

112.    During the Class Period, the Individual Defendants participated in the operation and management of Acadia Healthcare, and conducted and participated, directly and indirectly, in the conduct of Acadia Healthcare's business affairs. Because of their senior positions, they knew the adverse non-public information about Acadia Healthcare's business practices.

113.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Acadia Healthcare's financial condition and results of operations, and to correct promptly any public statements issued by Acadia Healthcare which had become materially false or misleading.

114.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Acadia Healthcare disseminated in the marketplace during the Class Period concerning Acadia Healthcare's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Acadia Healthcare to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were

"controlling persons" of Acadia Healthcare within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Acadia Healthcare securities.

115.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Acadia Healthcare.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)    declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)    awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: October 21, 2024

**BRAMLETT LAW OFFICES**
By:  /s/ **Paul Kent Bramlett**
PAUL KENT BRAMLETT #7387
ROBERT PRESTON BRAMLETT #25895
40 Burton Hills Blvd., Suite 200
P.O. Box 150734
Nashville, TN 37215-0734

Telephone: 615-248-2828
Facsimile: 866-816-4116
Email: PKNASHLAW@AOL.COM

-and-

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com
         lrosen@rosenlegal.com

*Counsel for Plaintiff*