UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION

| | |
|---|---|
| ANURAG KACHRODIA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>ACADIA HEALTHCARE COMPANY, INC., et al.,<br><br>Defendants. | Civil Action No. 3:24-cv-01238 (Consolidated)<br><br><u>CLASS ACTION</u><br><br>Chief Judge William L. Campbell, Jr.<br>Magistrate Judge Jeffery S. Frensley<br><br>CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

## TABLE OF CONTENTS

Page


I. INTRODUCTION ....... 1

II. JURISDICTION AND VENUE ....... 3

III. PARTIES ....... 3

IV. DEFENDANTS' SCHEME AND WRONGFUL COURSE OF BUSINESS ....... 7

A. Acadia Engaged in a Pattern and Practice of Unlawfully Detaining Patients Against Their Will to Inflate Its Financial Results ....... 7

B. Acadia Intentionally Destroyed Evidence Relevant to Patient Lawsuits and Concealed It Had Been Subject to Terminating Sanctions, Ultimately Resulting in a $485 Million Jury Verdict ....... 16

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ....... 22

A. False and Misleading Statements and Omissions Regarding Acadia's Financial Results and the Drivers of Its Growth and Success ....... 22

B. False and Misleading Statements and Omissions Regarding Commitments and Contingencies ....... 46

C. False and Misleading Statements and Omissions Regarding Acadia's Risk Factors ....... 48

VI. DEFENDANTS' SEC DISCLOSURE VIOLATIONS ....... 53

A. The Impact of Defendants' Scheme and Wrongful Course of Conduct on Acadia's Reported Performance ....... 53

B. Acadia's Class Period Financial Statements Violated Generally Accepted Accounting Principles ....... 55

VII. ADDITIONAL SCIENTER ALLEGATIONS ....... 56

A. Defendants' Pervasive Destruction of Evidence and Unbridled Violations of Law Support a Strong Inference of Scienter ....... 56

1. Acadia's Systematic and Pervasive Document Destruction ....... 56

2. Acadia's Violation of SEC Whistleblower Protection Rule 21F-17(a) ....... 58

3. Defendants' History of Misconduct ....... 59

4. Defendant Osteen's History and Receipt of Warnings Concerning Similar Misconduct ..... 60

B. Defendants Closely Monitored and Reported Key Revenue Metrics ..... 61

C. Acadia Had Actual Knowledge of the *Inman* Default Judgment ..... 63

D. Defendants' Fraud Allowed Them to Reap $21 Million in Salary and Performance-Based Compensation ..... 64

VIII. LOSS CAUSATION/ECONOMIC LOSS ..... 66

IX. APPLICABILITY OF PRESUMPTION OF RELIANCE ..... 72

X. CLASS ACTION ALLEGATIONS ..... 74

XI. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ..... 76

COUNT I For Violation of §10(b) of the Exchange Act and Rule 10b-5 (Against All Defendants) ..... 76

COUNT II For Violation of §20(a) of the Exchange Act (Against the Individual Defendants) ..... 78

PRAYER FOR RELIEF ..... 78

JURY DEMAND ..... 79

## I. INTRODUCTION

1. This is a federal securities class action on behalf of all persons that purchased Acadia Healthcare Company, Inc. ("Acadia" or the "Company") securities between February 8, 2020 and February 27, 2025, inclusive (the "Class Period"), against Acadia and certain of its current and former officers and executives, seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder.

2. Acadia purports to be the leading publicly traded pure-play provider of behavioral healthcare services in the United States. As of December 31, 2024, Acadia operated 253 behavioral healthcare facilities with approximately 11,200 beds in 38 states and Puerto Rico. These facilities include: (i) acute inpatient psychiatric facilities; (ii) specialty treatment facilities; (iii) comprehensive treatment centers; and (iv) residential treatment centers.

3. Throughout the Class Period, Acadia claimed to be committed to providing high-quality, cost-effective behavioral healthcare services, while growing the Company's business, increasing profitability, and creating long-term value for shareholders. The truth was much different and far more insidious.

4. First, Acadia's revenue and EBITDA growth was fueled in material part by unlawfully detaining patients against their will.[1] As first revealed on September 1, 2024, in a *The New York Times* exposé entitled "How a Leading Chain of Psychiatric Hospitals Traps Patients," Acadia routinely held patients against their will, even when it was not medically necessary, and

---

[1] Acadia publicly reported several measures related to both EBITDA and Adjusted EBITDA, a non-Generally Accepted Accounting Principles ("GAAP") metric that included various adjustments such as "legal settlements expense." Acadia also included in its reporting various measures of "same facility" operating statistics. As described herein, both Acadia's GAAP and non-GAAP measures were materially false and misleading.

only released them when their insurance coverage ran out. Based on interviews with "more than 50 current and former [Acadia] executives and staff members," *The New York Times* revealed that "again and again . . . Acadia was making decisions in the interest of maximizing its profits, even if that meant sacrificing patient care. . . . [Dozens] of staff, executives of the various hospitals all across the country . . . outlined this pretty elaborate system at Acadia to get as many patients in the door and then keep those patients, especially the ones with insurance, in Acadia facilities for as long as possible."

5. Additional revelations followed this exposé, including the disclosure of grand jury subpoenas, an SEC investigation, a Department of Veterans Affairs investigation, multiple analyst downgrades, and admissions by Acadia that its revenue and EBITDA would be negatively impacted by declining patient referrals, higher costs, and ultimately the material downward revision of "virtually every long-term target" previously set by the Company. All told, Acadia's stock price declined over 63%, from a close of almost $82 per share before *The New York Times* exposé, to just under $30 following its 4Q24 earnings release in February 2025.[2]

6. Second, Defendants concealed the circumstances surrounding a devastating sexual abuse lawsuit filed against Acadia, former Acadia Chief Executive Officer ("CEO") Joey Jacobs ("Jacobs"), and certain Acadia subsidiaries in New Mexico. During the course of that litigation, Acadia and its co-defendants intentionally destroyed documents on multiple occasions, resulting in a default judgment against them. Remarkably, Acadia then engaged in additional acts of document destruction even after the default judgment and before the jury trial on damages, including causing "twenty-three 95-gallon containers of paper to be destroyed . . . with Acadia's

---

[2] "_Q2_" is used to denote each first, second, third, and fourth fiscal quarter of each full fiscal year ("FY"). Thus, "1Q20" refers to the first quarter of 2020, "4Q21" refers to the fourth quarter of 2021, "FY22" refers to full year 2022, and so forth.

approval." This document destruction resulted in an adverse inference jury instruction sanction with respect to the plaintiff's punitive damages claim as well. The jury ultimately returned a $485 million verdict against Acadia in July 2023. None of these developments, or even the existence of this specific litigation, were disclosed to investors until after the jury verdict, the announcement of which caused additional declines in the Company's stock price and further damages to investors.

7. This action seeks to recover the losses suffered by Plaintiff and members of the Class (defined below) as a result of Defendants' misconduct.

## II. JURISDICTION AND VENUE

8. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and SEC Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act, 15 U.S.C. §78aa.

9. Venue is proper in this District pursuant to 28 U.S.C. §1391(b). A substantial amount of the acts and omissions giving rise to the claims at issue occurred in this District. Acadia's corporate headquarters are located in this District and Defendants are subject to personal jurisdiction in this District.

10. In connection with the acts and omissions alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the NASDAQ.

## III. PARTIES

11. Lead Plaintiff California Public Employees' Retirement System ("CalPERS" or "Plaintiff") is the largest state public pension fund in the United States, with more than 2 million members and more than $500 billion in assets under management. CalPERS purchased Acadia

publicly traded securities during the Class Period and has been damaged thereby, as set forth in its certification. ECF 28-2.

12. Defendant Acadia is a publicly traded behavioral healthcare company. Acadia stock trades under the ticker symbol "ACHC" on the NASDAQ, in an efficient market, and did so throughout the Class Period. Acadia's corporate headquarters are located in Franklin, Tennessee. As of February 28, 2024, Acadia had over 92 million shares of common stock outstanding.

13. Defendant Christopher H. Hunter ("Hunter") has served as Acadia's CEO since April 2022. Prior to joining Acadia, Hunter served in senior leadership positions at Humana, most recently as President of Humana's Group, Military & Specialty and previously as Humana's Chief Strategy Officer.

14. Defendant Heather Dixon ("Dixon") has served as Acadia's Chief Financial Officer ("CFO") since July 2023. Prior to joining Acadia, Dixon served as the CFO of Everside Health since June 2021. Prior to that, Dixon served as the Senior Vice President, Global Controller, and Chief Accounting Officer of Walgreens Boots Alliance, Inc. from March 2019 to May 2021. From August 2016 to March 2019, Dixon served in various roles at Aetna, including Assistant Controller and later as Vice President, Controller, and Chief Accounting Officer.

15. Defendant Debra K. Osteen ("Osteen") served as Acadia's CEO from December 2018 until her retirement in April 2022. Prior to joining Acadia, Osteen served as Senior Vice President of Universal Health Services, Inc. ("UHS") and previously as President, Behavioral Health Division.

16. Defendant David M. Duckworth ("Duckworth") served as Acadia's CFO from July 2012 until his resignation in July 2023. Duckworth joined Acadia as its Controller in April 2011 and became Chief Accounting Officer in January 2012 before being promoted to CFO. From May

2010 to April 2011, Duckworth served as Director of Finance at Emdeon Inc. Prior to joining Emdeon, Mr. Duckworth was a Manager with Ernst & Young LLP, which he joined in 2002.

17. The defendants referenced above in ¶¶13-16 are also referred to herein as the "Individual Defendants" and are liable under §§10(b) and 20(a) of the Exchange Act for Acadia's misleading Class Period statements and omissions and for their participation in a fraudulent scheme and course of business. Acadia and the Individual Defendants are collectively referred to as "Defendants."

18. During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Acadia, were privy to confidential, proprietary information concerning Acadia, its finances, operations, financial condition, and present and future business prospects. The Individual Defendants also had access to adverse material non-public information concerning Acadia, as discussed in detail below. Because of their positions with the Company, the Individual Defendants had access to non-public information about its finances, business, markets, products, and present and future business prospects via internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

19. The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful

conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Acadia's business.

20. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases, and presentations to securities analysts and, through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

21. As senior executive officers and/or directors and as controlling persons of a publicly traded company whose stock was, and is, registered with the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Acadia's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Acadia stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

22. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Acadia securities. The scheme: (i) deceived the investing public regarding Acadia's business, operations, and management, and the intrinsic value of Acadia securities; and (ii) caused Plaintiff and members of the Class to purchase Acadia securities at artificially inflated prices.

## IV. DEFENDANTS' SCHEME AND WRONGFUL COURSE OF BUSINESS

23. Acadia derives most of its revenue from acute inpatient psychiatric facilities. As of December 31, 2023, the Company derived 51% of its revenue from acute inpatient psychiatric facilities and 21%, 17%, and 11% of its revenue from specialty treatment facilities, comprehensive treatment centers ("CTCs"), and residential treatment centers ("RTCs"), respectively.

24. According to the Company, Acadia's acute inpatient psychiatric facilities provide a high level of care to stabilize patients that are a threat to themselves or others, including by providing 24-hour observation, daily intervention, and monitoring by psychiatrists. The Company claims that typical lengths of stay for "crisis stabilization" and "acute care" range from three to five days and from five to twelve days, respectively.

25. Acadia's revenues come from various sources for services rendered in its facilities, including: (i) state governments under their respective Medicaid and other programs; (ii) commercial insurers; (iii) the federal government under the Medicare program administered by the Centers for Medicare and Medicaid Services ("CMS"); and (iv) individual patients and clients. As of December 31, 2023, the Company received 54%, 28%, 15%, and 3% of its revenue from Medicaid, commercial payors, Medicare, and other payors, respectively.

### A. Acadia Engaged in a Pattern and Practice of Unlawfully Detaining Patients Against Their Will to Inflate Its Financial Results

26. Throughout the Class Period, Acadia stated that it sought to "improve the operating results of [its] facilities by providing high-quality services, expanding referral networks and marketing initiatives while meeting the increased demand for behavioral healthcare services through expansion of [its] current locations as well as developing new services within existing locations." Indeed, Defendants admitted in their public filings that the Company's future growth depended in part on the "ability to maintain [its] reputation for providing quality patient care."

27. Notwithstanding historical quality issues that had come to light under former CEO Jacobs (who was abruptly fired in December 2018), with new management at the helm, it appeared that Acadia's strategy was largely successful – as Acadia's U.S. revenue showed double-digit annualized growth, increasing by 45% from $2.0 billion in FY19 to over $2.9 billion in FY23. Likewise, Acadia's Adjusted EBITDA increased from $585.8 million in FY19 to $677.7 million in FY23.

28. In truth, however, Acadia's growth during the Class Period was the product of the undisclosed, improper, and unsustainable practices detailed herein, including unlawfully detaining patients against their will, even when it was not medically necessary, to inflate reported results.

29. On September 1, 2024, *The New York Times* published an exposé entitled "How a Leading Chain of Psychiatric Hospitals Traps Patients." Based on interviews with "more than 50 current and former [Acadia] executives and staff members" from at least 10 states, interviews with patients and their families, as well as a review of court files, police reports, complaints to state authorities, and health inspections, the article revealed that Acadia routinely held patients against their will, even when it was not medically necessary, and only released them when their insurance ran dry. As the article explained:

> In at least 12 of the 19 states where Acadia operates psychiatric hospitals, dozens of patients, employees and police officers have alerted the authorities that the company was detaining people in ways that violated the law, according to records reviewed by The Times. In some cases, judges have intervened to force Acadia to release patients.

30. As Jessica Silver-Greenberg, the Pulitzer Prize finalist author who co-wrote the exposé, described:

> We found again and again that Acadia was making decisions in the interest of maximizing its profits, even if that meant sacrificing patient care. And to really understand what was happening, we called hundreds of people. And we ultimately got 55 current and former employees, and that's a mix of staff, executives of the various hospitals all across the country, to talk to us. And they outlined this pretty

elaborate system at Acadia to get as many patients in the door and then keep those patients, especially the ones with insurance, in Acadia facilities for as long as possible.

31. For example, the article recounted the experiences of several patients who "arrived at emergency rooms seeking routine mental health care, only to find themselves sent to Acadia facilities and locked in." It recounted a police raid at an Acadia hospital in Georgia where:

> 16 patients told investigators that they had been kept there "with no excuses or valid reason," according to a police report.
>
> Acadia held all of them under laws meant for people who pose an imminent threat to themselves or others. But none of the patients appeared to have met that legal standard, according to records and interviews.

32. The article went on to describe how Acadia deployed numerous strategies to keep patients locked up and insurance payments flowing. "Acadia has exaggerated patients' symptoms. It has tweaked medication dosages, then claimed patients needed to stay longer because of the adjustment. And it has argued that patients are not well enough to leave because they did not finish a meal." Employees were also "coached to use certain buzzwords, like 'combative,' in patients' charts," in order to make patients appear unstable and justify longer stays and more insurance payments:

> In 2022, for example, state inspectors criticized an Acadia hospital in Reading, Pa., for having instructed workers to avoid adjectives like "calm" and "compliant" in a patient's chart. That same year, employees at Acadia hospitals in Ohio and Michigan complained to their state regulators that doctors had written false statements in patients' medical charts to justify continuing their stays.
>
> At an Acadia hospital in Missouri, three former nurses said, executives pressured them to label patients whose insurance was about to run out as uncooperative. Acadia employees then would argue to insurance companies that the patients weren't ready to leave.

33. And while state laws generally provide that patients "must pose an imminent threat to themselves or others in order to be held against their will in a psychiatric facility," Acadia found

ways to circumvent certain of these laws and keep patients locked up by filing meritless court petitions to extend their stays:

> From 2019 to 2023, North Tampa filed more than 4,500 petitions to extend patients' involuntary stays, according to a Times analysis of court records.
>
> Simply filing a petition allowed the hospital to legally hold the patients – and bill their insurance – until the court date, which can be several days after the petition is filed. . . .
>
> Judges granted only 54 of North Tampa's petitions, or about 1 percent of the total.

34. These practices were countertherapeutic and antithetical to providing quality patient care. Jessie Roeder, who worked at Acadia's Park Royal Hospital before serving as Chief Operating Officer at Acadia's North Tampa Behavioral Health Hospital, recounted to a Tampa Bay news outlet the experience of a veteran suffering from PTSD who came to the hospital seeking therapy and treatment and ended up being held at the facility: "'He was Baker Acted for five days . . . . It limits them from ever coming back for treatment. None of those people are going to come back and think that mental health is actually for them when they got institutionalized the one time they tried to ask and speak up.'" *The New York Times* described another patient who was held against her will at an Acadia facility after simply visiting "an emergency room to have her prescriptions for bipolar disorder evaluated," causing the patient to become "terrified of seeking help because she fears she could find herself trapped back inside." A man in Utah "said he had become afraid to seek help since being held at an Acadia facility for a week in 2021." Moreover, as *The New York Times* described:

> Every day spent in a psychiatric hospital can be a trial. At Acadia facilities around the country, health inspectors have found that some patients did not receive therapy, were unsupervised or were denied access to vital medications. Many inspection reports described rapes, assaults and filthy conditions.

* * *

Health inspectors nationwide have faulted Acadia for similar problems, including failing to provide adequate medical care and neglecting patients. Acadia closed its Highland Ridge Hospital in Utah this year after state regulators investigated reports of dozens of rapes and assaults. In 2022, Tennessee inspectors faulted Acadia for falsely claiming in medical charts that a patient in Memphis had been checked on every 15 minutes. He was found in rigor mortis hours after he died.

35. While unlawful and countertherapeutic, unnecessarily holding patients against their will was very profitable for Acadia. As a January 29, 2018 Wells Fargo Securities analyst report described:

> [T]he last few days of a patient's stay in a mental health facility are often when the patient is most stable and perhaps requires less costly care. . . . Reimbursement for most behavioral health stays are based on fixed rates per day versus episodes of care. Therefore, rates stay at a fairly consistent level each day of a stay, but those payments may not match costs on a day-to-day basis. If the intensity of care is higher when a patient first arrives (since it likely was an event that triggered the stay) and then the patient stabilizes before returning to the community (so care levels could be more normalized), we believe the latter days of a stay are more profitable for a behavioral healthcare facility.

36. Investors reacted promptly to *The New York Times* exposé. Defendants, however, managed to attenuate certain of the consequences, at least in the short term. Defendants denied the exposé's findings, with Acadia spokesman Tim Blair falsely contending that "'[q]uality care and medical necessity drives every patient-related decision at Acadia,'" when in fact it did not. Moreover, Acadia was given advance notice of the exposé's publication and, according to Deutsche Bank analyst Pito Chickering, "had prepared its referral network and hence there was no impact on referrals during September."

37. On September 26, 2024, the U.S. Department of Justice ("DOJ") issued a release entitled "Acadia Healthcare Company Inc. to Pay $19.85M to Settle Allegations Relating to Medically Unnecessary Inpatient Behavioral Health Services." The settlement related to claims involving Acadia facilities in six different states, including claims that Acadia "failed to properly

discharge beneficiaries when they no longer needed inpatient treatment and had improper and excessive lengths of stay":

> The United States contended that, between 2014 and 2017, Acadia knowingly submitted false claims for payment to Medicare, Medicaid and TRICARE for inpatient behavioral health services that were not reasonable or medically necessary. In particular, the United States contended that Acadia admitted beneficiaries who were not eligible for inpatient treatment and failed to properly discharge beneficiaries when they no longer needed inpatient treatment and had improper and excessive lengths of stay. The United States further alleged that Acadia knowingly failed to provide adequate staffing, training and/or supervision of staff, which resulted in assaults, elopements, suicides and other harm resulting from these staffing failures. In addition, Acadia allegedly failed to provide inpatient acute care in accord with federal and state regulations, including, but not limited to, by failing to provide active treatment, to develop and/or update individualized assessments and treatment plans, to provide adequate discharge planning and to provide required individual and group therapy.

38. Just one day after the settlement announcement, Acadia disclosed new investigations, including that it had received grand jury subpoenas and requests for information from additional government entities and expected to receive additional "document requests from the U.S. Securities and Exchange Commission and may receive additional document requests from other governmental agencies." *The New York Times* also reported on Acadia's investigations, publishing an article on September 27, 2024 entitled "Acadia Healthcare Says It Faces New Federal Investigations":

> The company, which operates more than 50 psychiatric hospitals nationwide and gets much of its revenue from government insurance programs, said that federal prosecutors in Manhattan this week requested information from the company and that it also received subpoenas from a federal grand jury in Missouri. Acadia said it expected to receive similar inquiries from the Securities and Exchange Commission.

39. Analysts promptly connected these subpoenas and document requests to *The New York Times* exposé. "The developments are clearly negative and prolong an unfavorable cycle of legal, regulatory, and media attention for ACHC, which may weigh on the stock's multiple," wrote Barclays analyst Andrew Mok. Moreover, the disclosures were "not a welcome sign for investors

who might still be digesting the $400m [patient abuse] settlement ACHC paid this year," wrote BofA Securities analyst Joanna Gajuk.

40. Underscoring the seriousness of these developments, on October 11, 2024, J.P. Morgan downgraded its Acadia recommendation from Neutral to Underweight:

> Despite the strong stats, favorable regulatory environment, and attractive sub-sector, we believe there is limited upside and no positive credit-specific catalysts at these levels. At these levels and given past litigation outcomes, we cannot dismiss the risks associated with recent negative headlines. The company has access to the capital markets and should not have any challenges funding litigation payments. That said, any continued negative outcomes may impact its JV pipeline and could materially weaken our LTV positioning.

41. Additional revelations soon followed. On October 18, 2024, *The New York Times* published an article entitled "Veterans Dept. Investigating Acadia Healthcare for Insurance Fraud," which revealed that the Department of Veterans Affairs was investigating whether Acadia "is defrauding government health insurance programs by holding patients longer than is medically necessary":

> The fresh round of investigations are focused on recent events. The veterans agency is looking into whether Acadia billed insurance programs for patients who were stable enough to be released and did not need intensive inpatient care, according to two of the people with knowledge of the investigation, who requested anonymity because it has not been made public.
>
> Several former Acadia employees in Georgia and Missouri have also recently been interviewed by agents from the F.B.I. and the inspector general's office of the Health and Human Services Department.

42. On October 20, 2024, Leerink Partners analyst Whit Mayo stated: "From our view, we've been anticipating more investigations and inquiries to surface, and this is unlikely the last."

43. The impact of Defendants' scheme continued when Acadia announced 3Q24 financial results on October 30, 2024, and reduced FY24 guidance. According to Dixon, the Company's reduced FY24 guidance was due to lower patient referrals following the disclosures of Acadia's misconduct: "We have experienced lower volume growth than expected in October,

with same facility patient day growth of approximately 3% for the month, which we believe is a result of the recent headlines and reporting in the media . . . .”

44. Analysts echoed the Company’s statements. “Reputation headwinds from NY Times articles lower referral patterns impacting outlook for 4Q24 volumes and EBITDA,” wrote Cantor Fitzgerald analyst Sarah James. “We believe the change in pattern to be widespread, not specific to any geography, physician, or health system.” “Management attributed the Q4 miss to lower volume growth in October supposedly tied to the negative press (October is typically the strongest volume month in the quarter),” wrote J.P. Morgan analyst Rishi S. Parekh. “Management views the decline as transitory but could not provide a valid reason why these issues will not continue on a same-facility basis in 1H25.”

45. On December 7, 2024, *The New York Times* published another exposé entitled “Fraud and Fakery at the Country’s Largest Chain of Methadone Clinics.” Based on interviews with “five dozen current and former employees in 22 of the 33 states where the company has clinics,” the article revealed that the $1.3 billion in revenue generated by Acadia’s methadone clinics since 2022 “has been built in part on deception.” As the article explained:

> Methadone is a narcotic, and the clinics are heavily regulated by federal and state governments. In addition to handing out methadone, the clinics are required to provide counseling and other services, like drug testing.
>
> . . . Instead, employees at times falsify the medical records that Acadia uses to bill insurers, according to the employees and internal emails.

46. The article went on to describe how Acadia’s methadone business was “built on volume. Its counselors carry caseloads that are sometimes more than double the limit set by state regulators, according to employees and inspection records”:

> Dozens of counselors told The Times that they were overwhelmed by caseloads that were far higher than what their states allowed, with some responsible for as many as 120 patients. In September, Acadia cut the schedules of its full-time

> counselors and other clinic workers nationwide by up to four hours a week, further taxing their capacity, employees said.

47. Worse still, because of Acadia's bonus structures – "Clinic directors can get bonuses when their patient enrollment goes up" – Acadia clinics in multiple states administered methadone to people who did not even suffer from opioid addiction, which could lead to dependence.

48. Acadia also routinely failed to adequately staff its methadone clinics. "Reports filed by health inspectors in at least six states have criticized Acadia's methadone clinics for inadequate staffing." "'Acadia does not focus on client care,' said Ginger Phillips, who until quitting last year was a supervisor at an Acadia methadone clinic in Washington State. 'They focus on the bottom line.'"

49. Once again, Acadia falsely denied *The New York Times*' revelations, and falsely denied that Acadia put "profits over patients":

> Tim Blair, a spokesman for Acadia, said that the company did not falsify medical records, overbill insurers or pressure employees to treat patients who weren't addicted to opioids. He said that Acadia had rigorous internal controls and trained its employees on proper billing practices, and that regulators and auditors regularly reviewed its records.
>
> "We take our responsibility to our patients and the communities we serve extremely seriously and patently reject claims that Acadia places profits over patients[.]"

50. The impact of Defendants' scheme became further apparent when, on February 27, 2025, Acadia issued a release entitled "Acadia Healthcare Reports Fourth Quarter 2024 Results." In the 4Q24 release, Acadia: (i) announced that it had missed its 4Q24 Adjusted EBITDA guidance; (ii) provided 1Q25 and FY25 revenue and Adjusted EBITDA guidance, both well below analyst expectations; and (iii) reduced its long-term growth targets, projecting, for the 3-year

period beginning 2026, 7% to 9% average annual revenue growth, and 8% to 10% average annual Adjusted EBITDA growth, both well below its prior targets.

51. During a conference call with investors the next day, Hunter and Dixon confirmed that Acadia was still suffering from lower patient referrals following the disclosures of Acadia's misconduct, which would cause "a $20 million EBITDA headwind for the full year." Dixon also confirmed that "[f]acility closures are expected to be a headwind to year-over-year EBITDA growth of approximately $5 million in the first quarter." Additional analyst downgrades followed. For example, a February 28, 2025 Barclays report entitled "Multiple resets; downgrade to EW" noted: "With virtually every long-term target revised down, an unexpected step-down in revenue per patient day, lingering uncertainty over 5-10 media-impacted facilities, and potential signs of slowing demand for CTCs, we believe the fundamental outlook has deteriorated."

52. All told, as the truth regarding Defendants' misconduct became apparent to the market, and the artificial inflation caused by Defendants' scheme was removed, Acadia's stock price declined over 63%, from a close of $81.93 per share before *The New York Times* exposé, to just $29.98 per share following its 4Q24 earnings release.

### B. Acadia Intentionally Destroyed Evidence Relevant to Patient Lawsuits and Concealed It Had Been Subject to Terminating Sanctions, Ultimately Resulting in a $485 Million Jury Verdict

53. By no later than January 2021, Acadia was on notice that it was reasonably likely to suffer significant losses, including punitive damages, from a series of lawsuits in New Mexico arising from Acadia's involvement in the placement of children in a foster care home with a known sexual predator.

54. In early 2019, Acadia was named in multiple lawsuits in New Mexico state court in connection with the Company's Desert Hills facility in Albuquerque, New Mexico. New Mexico's Children, Youth and Families Department revoked the license for Desert Hills in late

2018 amid longstanding reports of sexual abuse and violence at the facility, and ultimately ordered the facility to shutter its operations in early 2019. By April 2019, seven lawsuits had been filed against Acadia alleging that the Company had failed to protect patients from physical and sexual abuse from its workers and other patients – citing internal fight clubs instigated by facility staff members, sex between staff and young patients, the unchecked spread of HIV among patients, and the excessive use of restraints on children. Three of these lawsuits specifically accused Acadia and related entities of failing to protect children in their care from Clarence Garcia, a former foster parent certified through Familyworks Inc. (a non-profit operated by Desert Hills) who was accused in the lawsuits of sexually assaulting children under his care, and who pled guilty to criminal child sexual abuse charges in August 2018.

55. The first of these cases to proceed to trial was *Inman v. Garcia, et al.*, No. D-117-CV-2019-00136. The complaint in *Inman v. Garcia* was filed on March 20, 2019 (the "*Inman* Complaint"), by a child identified as G.S. (through her guardian ad litem) against Acadia, former Acadia CEO Jacobs, Familyworks, Youth and Family Centered Services of New Mexico ("YFCS"), and Clarence Garcia and his wife, Debbie Garcia. YFCS was Acadia's wholly-owned subsidiary that operated the Desert Hills facility. Familyworks was a treatment foster care program run by YFCS out of the Desert Hills facility that placed patients in foster care homes. Clarence and Debbie Garcia were foster parents who participated in the Familyworks program.

56. The *Inman* Complaint alleged that Familyworks placed G.S. into a treatment foster care home with Clarence and Debbie Garcia in August 2015, when she was eight years old, despite Familyworks' prior knowledge that Clarence Garcia sexually abused and assaulted foster children in his home. The *Inman* Complaint alleged that Clarence Garcia repeatedly raped G.S. while she

resided with him, and that in August 2018 Clarence Garcia pled guilty to the criminal charge of Aggravated Indecent Exposure to a child less than 18 years of age.

57. The *Inman* Complaint pled the following claims against Acadia: Alter Ego/Instrumentality based on Acadia's control of Desert Hills and Familyworks; Civil RICO under the New Mexico Racketeering Act; Civil Conspiracy; Negligence; Professional Liability; Breach of Fiduciary Duty; Breach of Contract Third-Party Beneficiary; Breach of Covenant of Good Faith and Fair Dealing Third-Party Beneficiary; Unfair Practices Act; and Assault and Battery and Infliction of Extreme Emotional Distress. Under N.M.S.A. 1978, §30-42-6(A), the RICO claims entitled G.S. to recover three times the actual damages proved and the costs of the suit, including attorneys' fees. The New Mexico Unfair Practices Act claim also entitled G.S. to treble damages and fees. Furthermore, the *Inman* Complaint sought punitive damages against Acadia for the Civil Conspiracy, Negligence, Professional Liability, Breach of Fiduciary Duty, Breach of Contract, Breach of Covenant of Good Faith and Fair Dealing Third-Party Beneficiary, Unfair Practices Act (in lieu of treble damages), and Assault and Battery and Infliction of Extreme Emotional Distress claims.

58. As the *Inman* litigation proceeded, the plaintiff filed numerous motions to compel against Acadia – and 15 in total against all defendants – for various alleged discovery abuses, many of which resulted in sanctions. In fact, the plaintiff's first motion to compel against Acadia was filed on June 21, 2019, just three months after the *Inman* Complaint was filed. The court granted that motion on February 10, 2020, and awarded plaintiff attorneys' fees associated with the motion. The court wrote in its order:

> It is also noted that Acadia Healthcare Company, Inc.'s conduct has been obstructive in the discovery process. Should another motion to compel, or other discovery obstruction issues come again before the Court, it will consider

> imposition of *United Nuclear Corporation versus General Atomic Company*, 1980-NMSC-094, 96 N.M. 155, 629 P.2d 231 sanctions.

*United Nuclear* is a landmark New Mexico Supreme Court case upholding a default judgment sanction for a defendant's willful and bad-faith failure to comply with discovery orders.

59. The plaintiff filed her second motion to compel against Acadia on November 6, 2019, which was granted on January 14, 2020. The plaintiff filed her third motion to compel against Acadia on May 1, 2020, which was granted with sanctions on October 16, 2020. The plaintiff filed her fourth motion to compel against Acadia on May 11, 2020, which was granted with sanctions on July 27, 2020. The plaintiff filed yet another motion to compel – her fifth – against Acadia on July 21, 2020, which was granted – again with sanctions – on October 14, 2020. Further, the court repeatedly warned Acadia (and its co-defendants) that its discovery conduct was sanctionable. As early as October 1, 2019, the court stated at a hearing: "If this would occur again I would consider, strongly consider sanctions apart from attorney's fees including attorney's sanctions and/or the ***possible default judgment*** . . . ."

60. Finally, on October 22, 2020 – just days before trial was scheduled to begin on October 26, 2020 – Acadia's counsel informed plaintiff's counsel:

> We have learned that back-up data/information from a Desert Hills server has been located by Acadia. The amount of back-up data/information initially appears to be significant. It is unclear if any of the back-up data/information is responsive to the requests in this case, or if it contains duplicates of the materials already produced. We are in the process of trying to sort through the back-up data/information in order to make these determinations. However, we realize where we are in relation to the trial setting and we are certainly willing to address this new development with you all and the court tomorrow.

61. The court held a hearing on October 23, 2020, the day after this disclosure. It continued the trial set for October 26, 2020, ***granted default judgment*** against Acadia, Desert Hills, Jacobs, and Familyworks as a sanction for their discovery misconduct, and ordered defendants to turn "all of the Desert Hills' server data and information" over to the plaintiff by

November 23, 2020, "because there may be certain information contained in the at-issue server[,] information that may go to damages, ***including punitive damages***." In a written order dated January 6, 2021, the court formalized its default judgment order "as to all issues of liability." The court further noted: "The conduct in this case illustrates and proves there have been bad-faith discovery abuses by Acadia, Desert Hills, Jacobs, and Familyworks and that there has been a cavalier approach, if not an intentional hiding of evidence, in this matter." In addition, the court determined to set a new jury trial on damages when it could obtain another trial date.

62. Acadia was well aware of the immense liability it faced in the *Inman* litigation and the other cases involving Desert Hills and/or Clarence Garcia, particularly given G.S. and the other plaintiffs' claims for punitive damages. Under New Mexico law, punitive damages may be awarded if the conduct of the party against whom direct liability for punitive damages is asserted was malicious, willful, reckless, wanton, fraudulent or in bad faith. Civ. UJI 13-1827, N.M.R.A. New Mexico does not have a general cap on punitive damages in tort cases.

63. Demonstrating its concern with the scope of liability it faced, Acadia moved for summary judgment on G.S.'s claim for punitive damages in July 2020. Acadia argued that despite Clarence Garcia's horrific acts against G.S., its own mental state was not sufficiently culpable to warrant punitive damages. As G.S pointed out, however, her claim against Acadia and its related entities was based on them placing her with Clarence and Debbie Garcia despite knowing about Clarence Garcia's history of sexually abusing foster children in his home – not on a theory of vicarious liability for Clarence Garcia's conduct. The court summarily denied Acadia's motion on October 21, 2020, finding it "not well-taken."

64. Thus, on October 23, 2020, and no later than January 6, 2021, Acadia knew that: (i) the only issue left to resolve in G.S.'s (*Inman*) case was the amount of damages; and (ii) it faced

the possibility of a jury awarding hundreds of millions of dollars in punitive damages, not only in G.S.'s case, but the related cases involving Desert Hills and/or Clarence Garcia as well.

65. On September 23, 2021, G.S. filed yet another motion for sanctions, styled "Plaintiff's Motion for Sanctions Due to a Pattern and Practice of Discovery Abuses and Misconduct Throughout this Litigation and Intentional Destruction of Evidence Even After this Court Entered *United Nuclear* Default Judgment." The court granted the motion in part on July 1, 2022 in an order detailing more of Acadia's egregious discovery misconduct and finding:

> On November 5, 2020, only 13 days after this Court entered default judgment against Joey Jacobs, Acadia, Desert Hills, and Familyworks as a sanction for discovery abuses under *United Nuclear*, the Nube Group [*i.e.*, Acadia's discovery vendor] caused twenty-three 95-gallon containers of paper to be destroyed. The Nube Group destroyed the documents with Acadia's approval.

66. As an additional sanction, the court made the probability of a massive verdict against Acadia even more certain:

> Regardless of whether the lost files include this Plaintiff's files, if a party is destroying or modifying evidence after the commencement of litigation, that conduct is evidence of that party's state of mind, ***which is relevant to claims for punitive damages***.
>
> IT IS ORDERED that, in support of Plaintiff's punitive damages claim, Plaintiff is entitled to receive an inference instruction under UJI 13-1651 against Acadia Healthcare Company, Inc. and will be allowed to present evidence about destruction of evidence by Acadia Healthcare Company, Inc. . . . .

67. The damages trial in the *Inman v. Garcia* matter began in June 2023. Following a two-week trial, on July 7, 2023, the jury returned a verdict against Acadia awarding the plaintiff compensatory damages of ***$80 million*** and punitive damages of ***$405 million***.

68. At no point prior to the jury verdict did Acadia make any public disclosure about any developments in the *Inman* case or the Company's likely liability. On the contrary, in a *Santa Fe New Mexican* article published January 18, 2020, Acadia's director of investor relations falsely characterized the suit as "unsubstantiated allegations," "denied Acadia had any connection with

Familyworks[,] and said [Acadia] was wrongfully named in the suits" – even though, as the article itself noted, "IRS tax forms for Familyworks say it provided management services on a more than $1.6 million contract."

69. Only after the jury verdict, on July 11, 2023, did the Company file a Form 8-K disclosing the verdict and damages awards, yet even then provided no disclosures about its rampant discovery abuses, default judgment, and sanctions that precipitated the award.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

70. During the Class Period, Defendants made materially false and misleading statements and omitted material facts necessary to make the statements made not false or misleading, including statements regarding: (i) Acadia's financial results and the drivers of its growth and success; (ii) Acadia's commitments and contingencies; and (iii) Acadia's risk factors.

### A. False and Misleading Statements and Omissions Regarding Acadia's Financial Results and the Drivers of Its Growth and Success

71. Throughout the Class Period, Defendants reported Acadia's financial results on a quarterly basis, primarily through press releases, conference calls, as well as quarterly and annual reports filed with the SEC and disseminated to investors and the public. The financial results reported each quarter included revenue and Adjusted EBITDA metrics for Acadia, as well as operating statistics for Acadia's facilities – which as the Company was subsequently forced to admit following SEC criticism of its disclosures at the end of the Class Period, were unreliable because they "may not be indicative of the overall performance of our business," "reflect adjustments that may be irregular in timing," and "may omit certain results that investors may view as important."

72. In addition to reporting Acadia's financial results, Defendants also provided explanations for the purported drivers of Acadia's growth and success. Defendants repeatedly

claimed that Acadia's "high-quality services" were a key factor in driving improvements to its operating results. Indeed, Defendants consistently emphasized that Acadia was "committed to achieving the highest levels of quality" and that quality care was "key to driving outcomes and operational effectiveness." In reality, however, Acadia's operational results were inflated by the systematic, countertherapeutic, and unlawful detention of patients beyond their medically necessary lengths of stay, as well as fraud in their CTCs. As a result, as set forth herein, Defendants' explanations for the purported drivers of Acadia's growth and success were materially false and misleading.

73. On February 27, 2020, Acadia issued a release announcing its 4Q19 and FY19 financial results, including:

| | 4Q19 | FY19 |
|---|---|---|
| **Revenue** (millions) | $ 780.2 | $ 3,107.5 |
| y/y growth | 4.9% | 3.2% |
| **Adjusted EBITDA** (millions) | $ 144.4 | $ 585.9 |
| y/y growth | 7.8% | -1.3% |
| **U.S. Same Facility Admissions** | 40,712 | 166,774 |
| y/y growth | 1.5% | 4.0% |
| **U.S. Same Facility Patient Days** | 635,929 | 2,546,768 |
| y/y growth | 2.4% | 3.2% |
| **U.S. Same Facility Average Length of Stay** | 15.6 | 15.3 |
| y/y growth | 0.9% | -0.8% |
| **U.S. Same Facility Revenue per Patient Day** | $ 768 | $ 768 |
| y/y growth | 3.0% | 2.5% |

74. On February 28, 2020, Acadia filed with the SEC its annual financial report on Form 10-K for FY19.[3] The FY19 Form 10-K repeated the annual revenue and U.S. same facility

[3] The materially misleading statements and omissions regarding Acadia's financial performance and operating statistics described in ¶¶74-121 were issued in Acadia's: (i) February 28, 2020 FY19

operating metrics reported in the 4Q19 release. The "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A") section of the FY19 Form 10-K contained the following discussion of Acadia's FY19 U.S. revenue growth:

> U.S. same facility revenue increased by $106.7 million, or 5.8%, for the year ended December 31, 2019 compared to the year ended December 31, 2018, resulting from same facility growth in patient days of 3.2% and an increase in same facility revenue per day of 2.5%. Consistent with the same facility patient day growth in 2018, the growth in same facility patient days for the year ended December 31, 2019 compared to the year ended December 31, 2018 resulted from the addition of beds to our existing facilities and ongoing demand for our services.

75. In addition, beginning on February 28, 2020, and continuing through the end of the Class Period, Acadia consistently touted its "high-quality services" as a key factor in improving its operating results in its Forms 10-K and Forms 10-Q filed with the SEC:

> ***We strive to improve the operating results of our facilities by providing high-quality services***, expanding referral networks and marketing initiatives while meeting the increased demand for behavioral healthcare services through expansion of our current locations as well as developing new services within existing locations.[4]

---

Form 10-K (signed by Osteen and Duckworth); (ii) May 5, 2020 1Q20 Form 10-Q (signed by Duckworth); (iii) August 5, 2020 2Q20 Form 10-Q (signed by Duckworth); (iv) October 30, 2020 3Q20 Form 10-Q (signed by Duckworth); (v) February 26, 2021 FY20 Form 10-K (signed by Osteen and Duckworth); (vi) April 30, 2021 1Q21 Form 10-Q (signed by Duckworth); (vii) August 3, 2021 2Q21 Form 10-Q (signed by Duckworth); (vii) October 29, 2021 3Q21 Form 10-Q (signed by Duckworth); (viii) March 1, 2022 FY21 Form 10-K (signed by Osteen and Duckworth); (ix) May 4, 2022 1Q22 Form 10-Q (signed by Duckworth); (x) July 28, 2022 2Q22 Form 10-Q (signed by Duckworth); (xi) November 2, 2022 3Q22 Form 10-Q (signed by Duckworth); (xii) February 28, 2023 FY22 Form 10-K (signed by Hunter and Duckworth); (xiii) April 27, 2023 1Q23 Form 10-Q (signed by Duckworth); (xiv) July 28, 2023 2Q23 Form 10-Q (signed by Dixon); (xv) November 3, 2023 3Q23 Form 10-Q (signed by Dixon); (xvi) February 28, 2024 FY23 Form 10-K (signed by Hunter and Dixon); (xvii) May 2, 2024 1Q24 Form 10-Q (signed by Dixon); and (xviii) August 1, 2024 2Q24 Form 10-Q (signed by Dixon).

[4] This statement was issued in Acadia's: (i) February 28, 2020 FY19 Form 10-K (signed by Osteen and Duckworth); (ii) May 5, 2020 1Q20 Form 10-Q (signed by Duckworth); (iii) August 5, 2020 2Q20 Form 10-Q (signed by Duckworth); (iv) October 30, 2020 3Q20 Form 10-Q (signed by Duckworth); (v) February 26, 2021 FY20 Form 10-K (signed by Osteen and Duckworth); (vi) April 30, 2021 1Q21 Form 10-Q (signed by Duckworth); (vii) August 3, 2021 2Q21 Form 10-Q (signed by Duckworth); (vii) October 29, 2021 3Q21 Form 10-Q (signed by Duckworth); (viii)

*　　*　　*

> We are committed to providing the communities we serve with high-quality, cost-effective behavioral healthcare services, while growing our business, increasing profitability and creating long-term value for our stockholders.[5]

76. On March 3, 2020, Acadia presented at the Raymond James Institutional Investors Conference. During the conference, Osteen stated: "We have had a very stable length of stay in our acute business, about 9 days, and that really has not changed over the last 4 years." Osteen also stated:

> I think we've talked about our strategies, and I think one of the most important things is really the impact on our success that quality of care has. And I think Acadia, again, is very well positioned. We are committed to achieving the highest levels of quality throughout really all of our levels of care.

77. On May 4, 2020, Acadia issued a release announcing its 1Q20 financial results, including:

---

March 1, 2022 FY21 Form 10-K (signed by Osteen and Duckworth); (ix) May 4, 2022 1Q22 Form 10-Q (signed by Duckworth); (x) July 28, 2022 2Q22 Form 10-Q (signed by Duckworth); (xi) November 2, 2022 3Q22 Form 10-Q (signed by Duckworth); (xii) February 28, 2023 FY22 Form 10-K (signed by Hunter and Duckworth); (xiii) April 27, 2023 1Q23 Form 10-Q (signed by Duckworth); (xiv) July 28, 2023 2Q23 Form 10-Q (signed by Dixon); and (xv) November 3, 2023 3Q23 Form 10-Q (signed by Dixon).

[5] This statement was issued in Acadia's: (i) February 28, 2020 FY19 Form 10-K (signed by Osteen and Duckworth); (ii) May 5, 2020 1Q20 Form 10-Q (signed by Duckworth); (iii) August 5, 2020 2Q20 Form 10-Q (signed by Duckworth); (iv) October 30, 2020 3Q20 Form 10-Q (signed by Duckworth); (v) February 26, 2021 FY20 Form 10-K (signed by Osteen and Duckworth); (vi) April 30, 2021 1Q21 Form 10-Q (signed by Duckworth); (vii) August 3, 2021 2Q21 Form 10-Q (signed by Duckworth); (vii) October 29, 2021 3Q21 Form 10-Q (signed by Duckworth); (viii) March 1, 2022 FY21 Form 10-K (signed by Osteen and Duckworth); (ix) May 4, 2022 1Q22 Form 10-Q (signed by Duckworth); (x) July 28, 2022 2Q22 Form 10-Q (signed by Duckworth); (xi) November 2, 2022 3Q22 Form 10-Q (signed by Duckworth); (xii) February 28, 2023 FY22 Form 10-K (signed by Hunter and Duckworth); (xiii) April 27, 2023 1Q23 Form 10-Q (signed by Duckworth); (xiv) July 28, 2023 2Q23 Form 10-Q (signed by Dixon); (xv) November 3, 2023 3Q23 Form 10-Q (signed by Dixon); (xvi) February 28, 2024 FY23 Form 10-K (signed by Hunter and Dixon); (xvii) May 2, 2024 1Q24 Form 10-Q (signed by Dixon); and (xviii) August 1, 2024 2Q24 Form 10-Q (signed by Dixon).

| | 1Q20 |
|---|---|
| **Revenue** (millions) | $ 782.8 |
| y/y growth | 2.9% |
| **Adjusted EBITDA** (millions) | $ 132.8 |
| y/y growth | -2.3% |
| **U.S. Same Facility Admissions** | 42,470 |
| y/y growth | 0.9% |
| **U.S. Same Facility Patient Days** | 646,314 |
| y/y growth | 2.9% |
| **U.S. Same Facility Average Length of Stay** | 15.2 |
| y/y growth | 1.9% |
| **U.S. Same Facility Revenue per Patient Day** | $ 775 |
| y/y growth | 1.2% |

78. In the release, the Company noted its growth rates were impacted by the COVID-19 pandemic, which "starting in late March . . . caused same facility patient day volumes to decline 3% in the last two weeks of the month relative to the same period last year."

79. On May 5, 2020, Acadia filed with the SEC its 1Q20 Form 10-Q, which repeated the revenue and U.S. same facility operating metrics reported in the May 4, 2020 release. The MD&A section of the 1Q20 Form 10-Q contained the following discussion of Acadia's 1Q20 U.S. revenue growth:

> U.S. same facility revenue increased by $19.7 million, or 4.1%, for the three months ended March 31, 2020 compared to the three months ended March 31, 2019, resulting from same facility growth in patient days of 2.9% and an increase in same facility revenue per day of 1.2%. Consistent with the same facility patient day growth in 2019, the growth in same facility patient days for the three months ended March 31, 2020 compared to the three months ended March 31, 2019, resulted from the addition of beds to our existing facilities and ongoing demand for our services.

80. On August 4, 2020, Acadia issued a release announcing its 2Q20 financial results, including:

| | 2Q20 |
|---|---|
| **Revenue** (millions) | $ 750.3 |
| y/y growth | -4.9% |
| **Adjusted EBITDA** (millions) | $ 144.4 |
| y/y growth | -9.1% |
| **U.S. Same Facility Admissions** | 41,158 |
| y/y growth | -4.6% |
| **U.S. Same Facility Patient Days** | 648,518 |
| y/y growth | -1.2% |
| **U.S. Same Facility Average Length of Stay** | 15.8 |
| y/y growth | 4.1% |
| **U.S. Same Facility Revenue per Patient Day** | $ 757 |
| y/y growth | -2.7% |

81. In the release, the Company attributed the lack of revenue and Adjusted EBITDA growth to "declines in inpatient volumes as a result of a number of temporary factors related to the COVID-19 pandemic."

82. On August 5, 2020, Acadia filed with the SEC its 2Q20 Form 10-Q, which repeated the revenue and U.S. same facility operating metrics reported in the August 4, 2020 release.

83. Also on August 5, 2020, Acadia hosted a conference call to discuss its 2Q20 results. During the call, Osteen stated that the Company's "top priority remains supporting our patients with quality care provided in a safe manner. . . . We will continue to deliver the highest quality of patient care, extend our market reach and advance our market leadership as a behavioral health care facilities operator."

84. On October 29, 2020, Acadia issued a release announcing its 3Q20 financial results, including:

| | 3Q20 |
|---|---|
| **Revenue** (millions) | $ 833.3 |
| y/y growth | 7.2% |
| **Adjusted EBITDA** (millions) | $ 159.4 |
| y/y growth | 8.7% |
| **U.S. Same Facility Admissions** | 44,724 |
| y/y growth | 0.5% |
| **U.S. Same Facility Patient Days** | 685,472 |
| y/y growth | 4.2% |
| **U.S. Same Facility Average Length of Stay** | 15.3 |
| y/y growth | 3.8% |
| **U.S. Same Facility Revenue per Patient Day** | $ 797 |
| y/y growth | 3.1% |

85. On October 30, 2020, Acadia filed with the SEC its 3Q20 Form 10-Q, which repeated the revenue and U.S. same facility operating metrics reported in the October 29, 2020 release. The MD&A section of the 3Q20 Form 10-Q contained the following discussion of Acadia's 3Q20 U.S. revenue growth: "U.S. same facility revenue increased by $38.2 million, or 7.5%, for the three months ended September 30, 2020 compared to the three months ended September 30, 2019, resulting from same facility growth in patient days of 4.2% and an increase in same facility revenue per day of 3.1%."

86. On February 26, 2021, Acadia issued a release announcing its 4Q20 and FY20 financial results, including:

| | 4Q20 | FY20 |
|---|---|---|
| **Revenue** (millions) | $ 541.3 | $ 2,089.9 |
| y/y growth | 8.0% | 4.1% |
| **Adjusted EBITDA** (millions) | $ 157.9 | $ 483.4 |
| y/y growth | 51.3% | 15.3% |
| **U.S. Same Facility Admissions** | 42,352 | 170,704 |
| y/y growth | 0.7% | -0.6% |
| **U.S. Same Facility Patient Days** | 669,126 | 2,649,430 |
| y/y growth | 3.6% | 2.5% |
| **U.S. Same Facility Average Length of Stay** | 15.8 | 15.5 |
| y/y growth | 2.9% | 3.2% |
| **U.S. Same Facility Revenue per Patient Day** | $ 804 | $ 784 |
| y/y growth | 3.8% | 1.4% |

87. Also on February 26, 2021, Acadia filed with the SEC its annual financial report on Form 10-K for FY20. The FY20 Form 10-K repeated the annual revenue and U.S. same facility operating metrics reported in the 4Q20 release. The MD&A section of the FY20 Form 10-K contained the following discussion of Acadia's FY20 U.S. revenue growth:

> Revenue increased $81.5 million, or 4.1%, to $2,089.9 million for the year ended December 31, 2020 from $2,008.4 million for the year ended December 31, 2019. Same facility revenue increased by $78.5 million, or 3.9%, for the year ended December 31, 2020 compared to the year ended December 31, 2019, resulting from same facility growth in patient days of 2.5% and an increase in same facility revenue per day of 1.4%. Consistent with the same facility patient day growth in 2019, the growth in same facility patient days for the year ended December 31, 2020 compared to the year ended December 31, 2019 resulted from the addition of beds to our existing facilities and ongoing demand for our services.

88. Also on February 26, 2021, Acadia hosted a conference call to discuss its 4Q20 results. During the call, Osteen stated: "Acadia is setting the standard for excellence in the treatment of behavioral health, and substance use concerns. We are intently focused on fostering high levels of quality and safety for all of our patients every day."

89. On April 29, 2021, Acadia issued a release announcing its 1Q21 financial results, including:

| | 1Q21 |
|---|---|
| **Revenue** (millions) | $ 551.2 |
| y/y growth | 8.2% |
| **Adjusted EBITDA** (millions) | $ 119.5 |
| y/y growth | 23.6% |
| **U.S. Same Facility Admissions** | 43,813 |
| y/y growth | 0.8% |
| **U.S. Same Facility Patient Days** | 669,725 |
| y/y growth | 2.7% |
| **U.S. Same Facility Average Length of Stay** | 15.3 |
| y/y growth | 1.9% |
| **U.S. Same Facility Revenue per Patient Day** | $ 815 |
| y/y growth | 4.5% |

90. On April 30, 2021, Acadia filed with the SEC its 1Q21 Form 10-Q, which repeated the revenue and U.S. same facility operating metrics reported in the April 29, 2021 release. The MD&A section of the 1Q21 Form 10-Q contained the following discussion of Acadia's 1Q21 U.S. revenue growth:

> Revenue increased $42.0 million, or 8.2%, to $551.2 million for the three months ended March 31, 2021 from $509.2 million for the three months ended March 31, 2020. Same facility revenue increased $37.5 million, or 7.4%, for the three months ended March 31, 2021 compared to the three months ended March 31, 2020, resulting from same facility growth in patient days of 2.7% and an increase in same facility revenue per day of 4.5%. Consistent with same facility patient growth in 2020, the growth in same facility patient days for the three months ended March 31, 2021 compared to the three months ended March 31, 2020 resulted from the addition of beds to our existing facilities and ongoing demand for our services.

91. Also on April 30, 2021, Acadia held a conference call to discuss the Company's 1Q21 financial results. During the conference call, Osteen stated:

> For the first quarter of 2021, our U.S. operations produced very favorable results, driven by solid volumes and strong cost management. Our same-facility

revenue increased 7.4% compared with the first quarter of 2020, including a 2.7% increase in patient days and a 4.5% increase in revenue per patient day.

> Acadia is well positioned to meet the needs of those seeking behavioral treatment with our diversified service lines, all of which provide high levels of exceptional patient care.

92. On August 2, 2021, Acadia issued a release announcing its 2Q21 financial results, including:

| | 2Q21 |
|---|---|
| **Revenue** (millions) | $ 582.2 |
| y/y growth | 18.5% |
| **Adjusted EBITDA** (millions) | $ 141.3 |
| y/y growth | 25.2% |
| **U.S. Same Facility Admissions** | 46,494 |
| y/y growth | 13.4% |
| **U.S. Same Facility Patient Days** | 706,128 |
| y/y growth | 9.8% |
| **U.S. Same Facility Average Length of Stay** | 15.2 |
| y/y growth | -3.1% |
| **U.S. Same Facility Revenue per Patient Day** | $ 816 |
| y/y growth | 7.5% |

93. On August 3, 2021, Acadia filed with the SEC its 2Q21 Form 10-Q, which repeated the revenue and U.S. same facility operating metrics reported in the August 2, 2021 release. The MD&A section of the 2Q21 Form 10-Q contained the following discussion of Acadia's 2Q21 U.S. revenue growth:

> Revenue increased $90.7 million, or 18.5%, to $582.2 million for the three months ended June 30, 2021 from $491.5 million for the three months ended June 30, 2020. Same facility revenue increased $87.9 million, or 18.0%, for the three months ended June 30, 2021 compared to the three months ended June 30, 2020, resulting from same facility growth in patient days of 9.8% and an increase in same facility revenue per day of 7.5%. Consistent with same facility growth in 2020, the growth in same facility patient days for the three months ended June 30, 2021 compared to the three months ended June 30, 2020 resulted from the addition of beds to our existing facilities and ongoing demand for our services.

94. On October 28, 2021, Acadia issued a release announcing its 3Q21 financial results, including:

| | 3Q21 |
|---|---|
| **Revenue** (millions) | $ 587.6 |
| y/y growth | 7.2% |
| **Adjusted EBITDA** (millions) | $ 141.9 |
| y/y growth | 22.3% |
| **U.S. Same Facility Admissions** | 45,070 |
| y/y growth | 0.6% |
| **U.S. Same Facility Patient Days** | 699,344 |
| y/y growth | 2.2% |
| **U.S. Same Facility Average Length of Stay** | 15.5 |
| y/y growth | 1.5% |
| **U.S. Same Facility Revenue per Patient Day** | $ 839 |
| y/y growth | 5.6% |

95. On October 29, 2021, Acadia filed with the SEC its 3Q21 Form 10-Q, which repeated the revenue and U.S. same facility operating metrics reported in the October 28, 2021 release. The MD&A section of the 3Q21 Form 10-Q contained the following discussion of Acadia's 3Q21 U.S. revenue growth:

> Revenue increased $39.6 million, or 7.2%, to $587.6 million for the three months ended September 30, 2021 from $548.0 million for the three months ended September 30, 2020. Same facility revenue increased $43.0 million, or 7.9%, for the three months ended September 30, 2021 compared to the three months ended September 30, 2020, resulting from same facility growth in patient days of 2.2% and an increase in same facility revenue per day of 5.6%. Consistent with same facility growth in 2020, the growth in same facility patient days for the three months ended September 30, 2021 compared to the three months ended September 30, 2020 resulted from the addition of beds to our existing facilities and ongoing demand for our services.

96. On February 28, 2022, Acadia issued a release announcing its 4Q21 and FY21 financial results, including:

| | 4Q21 | FY21 |
|---|---|---|
| **Revenue** (millions) | $ 593.5 | $ 2,314.4 |
| y/y growth | 9.6% | 10.7% |
| **Adjusted EBITDA** (millions) | $ 156.1 | $ 558.7 |
| y/y growth | -1.1% | 15.6% |
| **U.S. Same Facility Admissions** | 42,414 | 177,791 |
| y/y growth | -0.4% | 3.5% |
| **U.S. Same Facility Patient Days** | 684,984 | 2,760,181 |
| y/y growth | 2.7% | 4.3% |
| **U.S. Same Facility Average Length of Stay** | 16.1 | 15.5 |
| y/y growth | 3.1% | 0.8% |
| **U.S. Same Facility Revenue per Patient Day** | $ 864 | $ 833 |
| y/y growth | 7.8% | 6.3% |

97. On March 1, 2022, Acadia filed with the SEC its annual financial report on Form 10-K for FY21. The FY21 Form 10-K repeated the annual revenue and U.S. same facility operating metrics reported in the 4Q21 release. The MD&A section of the FY21 Form 10-K contained the following discussion of Acadia's FY21 U.S. revenue growth:

> Revenue increased $224.5 million, or 10.7%, to $2,314.4 million for the year ended December 31, 2021 from $2,089.9 million for the year ended December 31, 2020. Same facility revenue increased by $225.6 million, or 10.9%, for the year ended December 31, 2021 compared to the year ended December 31, 2020, resulting from same facility growth in patient days of 4.3% and an increase in same facility revenue per day of 6.3%. Consistent with the same facility patient day growth in 2020, the growth in same facility patient days for the year ended December 31, 2021 compared to the year ended December 31, 2020 resulted from the addition of beds to our existing facilities and ongoing demand for our services.

98. On May 3, 2022, Acadia issued a release announcing its 1Q22 financial results, including:

| | 1Q22 |
|---|---|
| **Revenue** (millions) | $ 616.7 |
| y/y growth | 11.9% |
| **Adjusted EBITDA** (millions) | $ 135.5 |
| y/y growth | 13.4% |
| **U.S. Same Facility Admissions** | 42,968 |
| y/y growth | -2.6% |
| **U.S. Same Facility Patient Days** | 684,429 |
| y/y growth | 2.2% |
| **U.S. Same Facility Average Length of Stay** | 15.9 |
| y/y growth | 4.9% |
| **U.S. Same Facility Revenue per Patient Day** | $ 865 |
| y/y growth | 6.2% |

99. On May 4, 2022, Acadia filed with the SEC its 1Q22 Form 10-Q, which repeated the revenue and U.S. same facility operating metrics reported in the May 3, 2022 release. The MD&A section of the 1Q22 Form 10-Q contained the following discussion of Acadia's 1Q22 U.S. revenue growth:

> Revenue increased $65.5 million, or 11.9%, to $616.7 million for the three months ended March 31, 2022 from $551.2 million for the three months ended March 31, 2021. Same facility revenue increased $46.8 million, or 8.6%, for the three months ended March 31, 2022 compared to the three months ended March 31, 2021, resulting from same facility growth in patient days of 2.2% and an increase in same facility revenue per day of 6.2%. Consistent with same facility growth in 2021, the growth in same facility patient days for the three months ended March 31, 2022 compared to the three months ended March 31, 2021 resulted from the addition of beds to our existing facilities and ongoing demand for our services.

100. On July 27, 2022, Acadia issued a release announcing its 2Q22 financial results, including:

| | 2Q22 |
|---|---|
| **Revenue** (millions) | $ 651.7 |
| y/y growth | 11.9% |
| **Adjusted EBITDA** (millions) | $ 165.9 |
| y/y growth | 17.4% |
| **U.S. Same Facility Admissions** | 44,791 |
| y/y growth | -4.5% |
| **U.S. Same Facility Patient Days** | 712,169 |
| y/y growth | 0.7% |
| **U.S. Same Facility Average Length of Stay** | 15.9 |
| y/y growth | 5.4% |
| **U.S. Same Facility Revenue per Patient Day** | $ 880 |
| y/y growth | 7.8% |

101. On July 28, 2022, Acadia filed with the SEC its 2Q22 Form 10-Q, which repeated the revenue and U.S. same facility operating metrics reported in the July 27, 2022 release. The MD&A section of the 2Q22 Form 10-Q contained the following discussion of Acadia's 2Q22 U.S. revenue growth:

> Revenue increased $69.6 million, or 11.9%, to $651.7 million for the three months ended June 30, 2022 from $582.2 million for the three months ended June 30, 2021. The increase includes revenue generated from our acquisition of CenterPointe on December 31, 2021 and one-time payments of approximately $5.4 million from one of the states in which we operate during the three months ended June 30, 2022. Same facility revenue increased $49.1 million, or 8.5%, for the three months ended June 30, 2022 compared to the three months ended June 30, 2021, resulting from an increase in same facility revenue per day of 7.8% and same facility growth in patient days of 0.7%. Consistent with same facility growth in 2021, the growth in same facility patient days for the three months ended June 30, 2022 compared to the three months ended June 30, 2021 resulted from the addition of beds to our existing facilities and ongoing demand for our services.

102. On October 31, 2022, Acadia issued a release announcing its 3Q22 financial results, including:

| | 3Q22 |
|---|---|
| **Revenue** (millions) | $ 666.7 |
| y/y growth | 13.5% |
| **Adjusted EBITDA** (millions) | $ 162.8 |
| y/y growth | 14.7% |
| **U.S. Same Facility Admissions** | 45,445 |
| y/y growth | 0.6% |
| **U.S. Same Facility Patient Days** | 713,531 |
| y/y growth | 3.1% |
| **U.S. Same Facility Average Length of Stay** | 15.7 |
| y/y growth | 2.5% |
| **U.S. Same Facility Revenue per Patient Day** | $ 897 |
| y/y growth | 6.9% |

103. On November 2, 2022, Acadia filed with the SEC its 3Q22 Form 10-Q, which repeated the revenue and U.S. same facility operating metrics reported in the October 21, 2022 release. The MD&A section of the 3Q22 Form 10-Q contained the following discussion of Acadia's 3Q22 U.S. revenue growth:

> Revenue increased $79.2 million, or 13.5%, to $666.7 million for the three months ended September 30, 2022 from $587.6 million for the three months ended September 30, 2021. The increase includes revenue generated from our acquisition of CenterPointe on December 31, 2021. Same facility revenue increased $59.4 million, or 10.2%, for the three months ended September 30, 2022 compared to the three months ended September 30, 2021, resulting from an increase in same facility revenue per day of 6.9% and same facility growth in patient days of 3.1%. Consistent with same facility revenue growth in 2021, the growth in same facility patient days for the three months ended September 30, 2022 compared to the three months ended September 30, 2021 resulted from the addition of beds to our existing facilities and ongoing demand for our services.

104. On December 7, 2022, Acadia hosted an Investor Day in New York. During his prepared remarks, Acadia EVP of Operations John S. Hollingsworth stated that growth in Acadia's acute facilities was driven in part by its uniquely high quality care:

> Time to recap our Acute service line. We are very excited about the opportunities for future growth in this service line, again, because of growing

demand, unmet need and increased acceptance of mental health and mental health treatment. To reiterate Acadia, because of its scale, experience, operational excellence and high quality of service, is uniquely positioned to capitalize on this growth opportunity to treat the patients that need our services.

105. During the December 7, 2022 Investor Day, Duckworth also stated: "We have seen strong performance throughout the year. The trends that we've seen in our business have continued throughout the year. That includes our quality being a strong driver of our volume."

106. Concluding the Investor Day presentation, Hunter stated: "I think the last thing I would say is it all comes down to the quality of our care."

107. On February 27, 2023, Acadia issued a release announcing its 4Q22 and FY22 financial results, including:

| | **4Q22** | **FY22** |
|---|---|---|
| **Revenue** (millions) | $ 675.3 | $ 2,610.4 |
| y/y growth | 13.8% | 12.8% |
| **Adjusted EBITDA** (millions) | $ 150.9 | $ 615.1 |
| y/y growth | -3.3% | 10.1% |
| **U.S. Same Facility Admissions** | 43,777 | 176,981 |
| y/y growth | 2.6% | -1.0% |
| **U.S. Same Facility Patient Days** | 704,485 | 2,818,614 |
| y/y growth | 4.0% | 2.5% |
| **U.S. Same Facility Average Length of Stay** | 16.2 | 15.9 |
| y/y growth | 1.4% | 3.6% |
| **U.S. Same Facility Revenue per Patient Day** | $ 911 | $ 888 |
| y/y growth | 5.2% | 6.5% |

108. On February 28, 2023, Acadia filed with the SEC its annual financial report on Form 10-K for FY22. The FY22 Form 10-K repeated the annual revenue and U.S. same facility operating metrics reported in the 4Q22 release. The MD&A section of the FY22 Form 10-K contained the following discussion of Acadia's FY22 U.S. revenue growth:

> Revenue increased $296.0 million, or 12.8%, to $2,610.4 million for the year ended December 31, 2022 from $2,314.4 million for the year ended December 31, 2021. Same facility revenue increased by $210.9 million, or 9.2%, for the year ended December 31, 2022 compared to the year ended December 31, 2021, resulting from same facility growth in patient days of 2.5%, an increase in same facility revenue per day of 6.5% and an increase in the average length of stay of 3.6%. Consistent with the same facility patient day growth in 2021, the growth in same facility patient days for the year ended December 31, 2022 compared to the year ended December 31, 2021 resulted from the addition of beds to our existing facilities and ongoing demand for our services.

109. On April 26, 2023, Acadia issued a release announcing its 1Q23 financial results, including:

| | 1Q23 |
|---|---|
| **Revenue** (millions) | $ 704.3 |
| y/y growth | 14.2% |
| **Adjusted EBITDA** (millions) | $ 151.3 |
| y/y growth | 11.6% |
| **U.S. Same Facility Admissions** | 49,059 |
| y/y growth | 8.6% |
| **U.S. Same Facility Patient Days** | 746,658 |
| y/y growth | 6.5% |
| **U.S. Same Facility Average Length of Stay** | 15.2 |
| y/y growth | -1.9% |
| **U.S. Same Facility Revenue per Patient Day** | $ 931 |
| y/y growth | 6.4% |

110. On April 27, 2023, Acadia filed with the SEC its 1Q23 Form 10-Q, which repeated the revenue and U.S. same facility operating metrics reported in the April 26, 2023 release. The MD&A section of the 1Q23 Form 10-Q contained the following discussion of Acadia's 1Q23 U.S. revenue growth:

> Revenue increased $87.6 million, or 14.2%, to $704.3 million for the three months ended March 31, 2023 from $616.7 million for the three months ended March 31, 2022. Same facility revenue increased $81.7 million, or 13.3%, for the three months ended March 31, 2023 compared to the three months ended March 31, 2022, resulting from an increase in same facility revenue per day of 6.4%, same

facility growth in admissions of 8.6% and same facility growth in patient days of 6.5%. Consistent with same facility revenue growth in 2022, the growth in same facility patient days for the three months ended March 31, 2023 compared to the three months ended March 31, 2022 resulted from the addition of beds to our existing facilities and ongoing demand for our services.

111. On July 27, 2023, Acadia issued a release announcing its 2Q23 financial results, including:

| | 2Q23 |
|---|---|
| **Revenue** (millions) | $ 731.3 |
| y/y growth | 12.2% |
| **Adjusted EBITDA** (millions) | $ 174.5 |
| y/y growth | 10.9% |
| **Same Facility Admissions** | 49,017 |
| y/y growth | 4.3% |
| **Same Facility Patient Days** | 763,813 |
| y/y growth | 4.9% |
| **Same Facility Average Length of Stay** | 15.6 |
| y/y growth | 0.6% |
| **Same Facility Revenue per Patient Day** | $ 944 |
| y/y growth | 6.1% |

112. On July 28, 2023, Acadia filed with the SEC its 2Q23 Form 10-Q, which repeated the revenue and same facility operating metrics reported in the July 27, 2023 release. The MD&A section of the 2Q23 Form 10-Q contained the following discussion of Acadia's 2Q23 U.S. revenue growth:

> Revenue increased $79.6 million, or 12.2%, to $731.3 million for the three months ended June 30, 2023 from $651.7 million for the three months ended June 30, 2022. Same facility revenue increased $73.7 million, or 11.4%, for the three months ended June 30, 2023 compared to the three months ended June 30, 2022, resulting from an increase in same facility revenue per day of 6.1%, same facility growth in admissions of 4.3% and same facility growth in patient days of 4.9%. Consistent with same facility revenue growth in 2022, the growth in same facility patient days for the three months ended June 30, 2023 compared to the three months ended June 30, 2022 resulted from the addition of beds to our existing facilities and ongoing demand for our services.

113. On November 2, 2023, Acadia issued a release announcing its 3Q23 financial results, including:

| | 3Q23 |
|---|---|
| **Revenue** (millions) | $ 750.3 |
| y/y growth | 12.5% |
| **Adjusted EBITDA** (millions) | $ 175.9 |
| y/y growth | 13.4% |
| **Same Facility Admissions** | 49,658 |
| y/y growth | 5.1% |
| **Same Facility Patient Days** | 774,996 |
| y/y growth | 6.0% |
| **Same Facility Average Length of Stay** | 15.6 |
| y/y growth | 0.9% |
| **Same Facility Revenue per Patient Day** | $ 961 |
| y/y growth | 6.6% |

114. On November 3, 2023, Acadia filed with the SEC its 3Q23 Form 10-Q, which repeated the revenue and same facility operating metrics reported in the November 2, 2023 release.[6] The MD&A section of the 3Q23 Form 10-Q contained the following discussion of Acadia's 3Q23 U.S. revenue growth:

> Revenue increased $83.6 million, or 12.5%, to $750.3 million for the three months ended September 30, 2023 from $666.7 million for the three months ended September 30, 2022. Same facility revenue increased $85.5 million, or 13.0%, for the three months ended September 30, 2023 compared to the three months ended September 30, 2022, resulting from an increase in same facility revenue per day of 6.6%, same facility growth in patient days of 6.0% and same facility growth in admissions of 5.1%. Consistent with same facility revenue growth in 2022, the growth in same facility patient days for the three months ended September 30, 2023 compared to the three months ended September 30, 2022 resulted from the addition of beds to our existing facilities and ongoing demand for our services.

6 Acadia's Adjusted EBITDA would have been far lower (in fact negative) had it not backed out the impact of the $394.2 million paid to resolve the *Inman* litigation.

115. Also on November 3 2023, Acadia held a conference call to discuss its 3Q23 results. During the call, Hunter stated: "As we continue to extend our market reach, safety and quality care remain our top priorities in every aspect of patient care."

116. On February 27, 2024, Acadia issued a release announcing its 4Q23 and FY23 financial results, including:

| | 4Q23 | FY23 |
|---|---|---|
| **Revenue** (millions) | $ 742.8 | $ 2,928.7 |
| y/y growth | 10.0% | 12.2% |
| **Adjusted EBITDA** (millions) | $ 169.6 | $ 671.2 |
| y/y growth | 11.9% | 13.1% |
| **Same Facility Admissions** | 46,481 | 194,215 |
| y/y growth | 1.5% | 4.9% |
| **Same Facility Patient Days** | 750,660 | 3,036,127 |
| y/y growth | 2.9% | 5.1% |
| **Same Facility Average Length of Stay** | 16.1 | 15.6 |
| y/y growth | 1.4% | 0.2% |
| **Same Facility Revenue per Patient Day** | $ 981 | $ 954 |
| y/y growth | 7.1% | 6.5% |

117. On February 28, 2024, Acadia filed with the SEC its annual financial report on Form 10-K for FY23. The FY23 Form 10-K repeated the annual revenue and same facility operating metrics reported in the 4Q23 release. The MD&A section of the FY23 Form 10-K contained the following discussion of Acadia's FY23 U.S. revenue growth:

> Revenue increased $318.3 million, or 12.2%, to $2,928.7 million for the year ended December 31, 2023 from $2,610.4 million for the year ended December 31, 2022. Same facility revenue increased by $309.3 million, or 12.0%, for the year ended December 31, 2023 compared to the year ended December 31, 2022, resulting from same facility growth in patient days of 5.1%, an increase in same facility revenue per patient day of 6.5% and an increase in same facility admissions of 4.9%. Consistent with the same facility patient day growth in 2022, the growth in same facility patient days for the year ended December 31, 2023 compared to the year

ended December 31, 2022 resulted from the addition of beds to our existing facilities and ongoing demand for our services.

118. On May 1, 2024, Acadia issued a release announcing its 1Q24 financial results, including:

| | 1Q24 |
|---|---|
| **Revenue** (millions) | $ 768.1 |
| y/y growth | 9.1% |
| **Adjusted EBITDA** (millions) | $ 173.9 |
| y/y growth | 14.9% |
| **Same Facility Admissions** | 48,158 |
| y/y growth | -1.7% |
| **Same Facility Patient Days** | 757,990 |
| y/y growth | 2.2% |
| **Same Facility Average Length of Stay** | 15.7 |
| y/y growth | 4.0% |
| **Same Facility Revenue per Patient Day** | $ 998 |
| y/y growth | 6.9% |

119. On May 2, 2024, Acadia filed with the SEC its 1Q24 Form 10-Q, which repeated the revenue and same facility operating metrics reported in the May 1, 2024 release. The MD&A section of the 1Q24 Form 10-Q contained the following discussion of Acadia's 1Q24 U.S. revenue growth:

> Revenue increased $63.8 million, or 9.1%, to $768.1 million for the three months ended March 31, 2024 from $704.3 million for the three months ended March 31, 2023. Same facility revenue increased $63.8 million, or 9.2%, for the three months ended March 31, 2024 compared to the three months ended March 31, 2023, resulting from an increase in same facility revenue per day of 6.9% and same facility growth in patient days of 2.2%. Consistent with same facility revenue growth in 2023, the growth in same facility patient days for the three months ended March 31, 2024 compared to the three months ended March 31, 2023 resulted from the addition of beds to our existing facilities and ongoing demand for our services.

120. On July 31, 2024, Acadia issued a release announcing its 2Q24 financial results, including:

| | 2Q24 |
|---|---|
| **Revenue** (millions) | $ 796.0 |
| y/y growth | 8.8% |
| **Adjusted EBITDA** (millions) | $ 187.6 |
| y/y growth | 7.6% |
| **Same Facility Admissions** | 49,091 |
| y/y growth | 0.7% |
| **Same Facility Patient Days** | 773,499 |
| y/y growth | 2.6% |
| **Same Facility Average Length of Stay** | 15.8 |
| y/y growth | 1.8% |
| **Same Facility Revenue per Patient Day** | $ 1,003 |
| y/y growth | 5.6% |

121. On August 1, 2024, Acadia filed with the SEC its 2Q24 Form 10-Q, which repeated the revenue and same facility operating metrics reported in the July 31, 2024 release. The MD&A section of the 2Q24 Form 10-Q contained the following discussion of Acadia's 2Q24 U.S. revenue growth:

> Revenue increased $64.7 million, or 8.8%, to $796.0 million for the three months ended June 30, 2024 from $731.3 million for the three months ended June 30, 2023. Same facility revenue increased $59.5 million, or 8.3%, for the three months ended June 30, 2024 compared to the three months ended June 30, 2023, resulting from an increase in same facility revenue per day of 5.6% and same facility growth in patient days of 2.6%. Consistent with same facility revenue growth in 2023, the growth in same facility patient days for the three months ended June 30, 2024 compared to the three months ended June 30, 2023 resulted from the addition of beds to our existing facilities and ongoing demand for our services.

122. Also on August 1, 2024, Acadia hosted a conference call to discuss its 2Q24 results. During the call, Hunter stated: "Quality remains foundational to every aspect of the work we do at Acadia and is key to driving outcomes and operational effectiveness."

123. In the September 1, 2024 article published by *The New York Times*, Acadia spokesman Tim Blair falsely contended that "'[q]uality care and medical necessity drives every patient-related decision at Acadia.'"

124. Similarly, in the December 7, 2024 article published by *The New York Times*, Defendants falsely denied that Acadia put "profits over patients":

> Tim Blair, a spokesman for Acadia, said that the company did not falsify medical records, overbill insurers or pressure employees to treat patients who weren't addicted to opioids. He said that Acadia had rigorous internal controls and trained its employees on proper billing practices, and that regulators and auditors regularly reviewed its records.
>
> "We take our responsibility to our patients and the communities we serve extremely seriously and patently reject claims that Acadia places profits over patients[.]"

125. The statements in ¶¶73-124 above regarding the drivers of Acadia's growth and success were misleading as they misstated Acadia's quality of care and failed to disclose that Acadia's financial growth and results were the result of Acadia's illicit practices. The true facts, which were then known to, or recklessly disregarded by, Defendants were:

(a) Throughout the Class Period, Acadia was systematically and unlawfully detaining patients against their will and without medical necessity in order to inflate its profits. As detailed by *The New York Times* in its September 2024 exposé entitled "How a Leading Chain of Psychiatric Hospitals Traps Patients," more than 50 current and former Acadia executives and employees outlined an "elaborate system at Acadia to get as many patients in the door and then keep those patients, especially the ones with insurance, in Acadia facilities for as long as possible" – regardless of medical necessity (*see* ¶¶29-34, *supra*). Indeed, at least 12 of the 19 states where Acadia operates psychiatric hospitals, dozens of patients, employees, and police officers had alerted the authorities that the Company was detaining people in ways that violated the law by, *e.g.*, exaggerating patients' symptoms, tweaking medication dosages, and filing baseless petitions

(that in at least one hospital, were rejected 99% of the time) to extend patients' involuntary stays (*see id.*, *supra*);

(b) Such misconduct was countertherapeutic and antithetical to providing quality patient care, including because it discouraged patients from seeking mental health care in the future, negatively impacted patients' mental health, and because many of Acadia's facilities provided substandard care, including "failing to provide adequate medical care and neglecting patients" (*see* ¶34, *supra*);

(c) As detailed by *The New York Times* in its December 7, 2024 exposé entitled "Fraud and Fakery at the Country's Largest Chain of Methadone Clinics," throughout the Class Period, Acadia's methadone business prioritized volume over patient care by, *e.g.*, falsifying medical records regarding counseling services, having counselors carry excessive caseloads beyond limits set by state regulators, and inadequately staffing its methadone clinics (*see* ¶¶45-49, *supra*). As one former supervisor at an Acadia methadone clinic succinctly put it: "Acadia does not focus on client care . . . . They focus on the bottom line" (*see* ¶48, *supra*);

(d) Acadia's reliance on these improper and undisclosed practices inflated its financial metrics and operating statistics while concealing that its reported results were not sustainable if these improper business practice came to light;

(e) Acadia's growth was the product of unsustainable and systemic misconduct rather than the quality of the care provided to patients;

(f) Acadia's past performance was not indicative of its future performance because once Defendants' misconduct was revealed, Acadia's performance would materially decline;

(g) Defendants' Forms 10-Q and Forms 10-K violated SEC disclosures rules (*see* §VI.A., *infra*); and

(h) As a result, Defendants' statements regarding the drivers of Acadia's growth and success were materially misleading.

### B. False and Misleading Statements and Omissions Regarding Commitments and Contingencies

126. By October 23, 2020, and no later than January 6, 2021, Acadia was aware that default judgment had been entered against it in the *Inman v. Garcia* litigation "as to all issues involving liability" due to its "bad-faith discovery abuses," and that the Company would be facing a trial on damages, including punitive damages.[7] Despite this, Acadia misleadingly omitted any mention of the *Inman* litigation or any of the lawsuits involving Desert Hills and/or Clarence Garcia – and the Company's potential exposure in these cases – from its SEC filings and public disclosures until July 11, 2023.

127. The "Commitments and Contingencies" section of Acadia's Forms 10-K and Forms 10-Q purported to identify significant lawsuits that had been filed against the Company and discussed the extent to which actual and potential liability could be quantified. Each section began with the paragraph below, followed by a discussion of updates in significant legal proceedings:

> The Company is, from time to time, subject to various claims, lawsuits, governmental investigations and regulatory actions, including claims for damages for personal injuries, medical malpractice, overpayments, breach of contract, securities law violations, tort and employment related claims. In these actions, plaintiffs request a variety of damages, including, in some instances, punitive and other types of damages that may not be covered by insurance. In addition, healthcare companies are subject to numerous investigations by various governmental agencies. Certain of the Company's individual facilities have received, and from time to time, other facilities may receive, subpoenas, civil investigative demands, audit requests and other inquiries from, and may be subject

---

[7] Defendants also failed to disclose that Acadia's insurance policies would not cover the Desert Hills litigation.

to investigation by, federal and state agencies. These investigations can result in repayment obligations, and violations of the False Claims Act can result in substantial monetary penalties and fines, the imposition of a corporate integrity agreement and exclusion from participation in governmental health programs. In addition, the federal False Claims Act permits private parties to bring qui tam, or "whistleblower," suits against companies that submit false claims for payments to, or improperly retain overpayments from, the government. Some states have adopted similar state whistleblower and false claims provisions.[8]

128. The statements detailed in ¶127 omitted to state material facts necessary to make them not misleading by omitting any mention of the *Inman* litigation or any of the lawsuits involving Desert Hills and/or Clarence Garcia. The true facts, which were known to, or recklessly disregarded by, Defendants were that:

(a) GAAP rule ASC 450-20 requires companies to disclose a loss contingency (such as potential or actual litigation) if "there is at least a reasonable possibility" that a loss may be incurred, even if the amount cannot be reasonably estimated (*see* §VI.B., *infra*);

(b) on October 21, 2020, the court in the *Inman* litigation denied Acadia's motion for summary judgment on punitive damages (*see* ¶63, *supra*);

(c) by October 23, 2020, and no later than January 6, 2021, the court in the *Inman* litigation had entered default judgment against Acadia "as to all issues involving liability"

---

8 This statement was included in the "Commitments and Contingencies" section of all the Forms 10-K and Forms 10-Q that Acadia issued in the February 26, 2021 to July 11, 2023 time period (identified in n.9, *infra*). During that time, Acadia followed this paragraph with discussion of the following legal proceedings: (i) the securities class action captioned styled *St. Clair County Employees' Retirement System v. Acadia Healthcare Company, Inc., et al.* pending in the United States District Court for the Middle District of Tennessee; (ii) related derivative stockholder actions – captioned *Davydov v. Joey A. Jacobs, et al.*, *Beard v. Jacobs, et al.*, *Pfenning v. Jacobs, et al.*, *Solak v. Jacobs, et al.* – pending in the United States District Court for the Middle District of Tennessee and the Court of Chancery for the State of Delaware; (iii) a consolidated wage and hour class action captioned *Pence v. Sober Living by the Sea, Inc.* pending in the Superior Court of California, County of Orange; and (iv) a number of subpoenas issued by the Office of Inspector General and a civil investigative demand from the U.S. Attorney's Office for the Middle District of Florida. The *Inman v. Garcia* case was never identified or discussed during this time period, nor were any of the other pending cases involving Desert Hills and/or Clarence Garcia.

due to Acadia's "bad-faith discovery abuses," which, combined with the court's denial of Acadia's motion for summary judgment on punitive damages, made it explicitly clear that Acadia had been found liable and the only remaining question was the amount of damages, including punitive damages, it would be required to pay (*see* ¶61, *supra*);

(d) on July 1, 2022, the court in the *Inman* litigation had ordered an adverse inference jury instruction in support of the plaintiff's punitive damages claim as a sanction for Acadia's continued spoliation even after the court entered default judgment against Acadia, and further ordered that the plaintiff would be allowed to present evidence about destruction of evidence by Acadia to the jury in the damages trial to support her punitive damages claim (*see* ¶¶65-66, *supra*); and

(e) as a result of the foregoing, Acadia knew by February 26, 2021, when it issued its FY20 Form 10-K, that it was liable in the *Inman* litigation and that it was reasonably likely to suffer significant losses and punitive damages in the *Inman* litigation and other related lawsuits concerning Desert Hills and/or Clarence Garcia.

### C. False and Misleading Statements and Omissions Regarding Acadia's Risk Factors

129. Throughout the Class Period, Acadia's Forms 10-K contained recitations of "risk factors" it stated could "materially and adversely affect our business, financial condition or results of operations."

130. Acadia's FY19 Form 10-K included the following risk factors regarding investigations, negative publicity, and quality deficiencies:

> ***An incident involving one or more of our patients or the failure by one or more of our facilities to provide appropriate care could result in increased regulatory burdens, governmental investigations, negative publicity and adversely affect the trading price of our common stock.***

Because many of the patients we treat suffer from severe mental health and chemical dependency disorders, patient incidents, including deaths, sexual abuse, assaults and elopements, occur from time to time. If one or more of our facilities experiences an adverse patient incident or is found to have failed to provide appropriate patient care, an admissions hold, loss of accreditation, license revocation or other adverse regulatory action could be taken against us. Any such patient incident or adverse regulatory action could result in governmental investigations, judgments or fines and have a material adverse effect on our business, financial condition and results of operations. In addition, we have been and could become the subject of negative publicity or unfavorable media attention, whether warranted or unwarranted, that could have a significant, adverse effect on the trading price of our common stock or adversely impact our reputation and how our referral sources and payors view us.

***We have been and could become the subject of governmental investigations, regulatory actions and whistleblower lawsuits***.

Healthcare companies in both the U.S. and the U.K. may be subject to investigations by various governmental agencies. Certain of our individual facilities have received, and from time to time, other facilities may receive, subpoenas, civil investigative demands, audit reports and other inquiries from, and may be subject to investigation by, federal and state agencies and regulatory agencies in the U.K. See "Item 3. Legal Proceedings" for additional information about pending investigations. These investigations can result in repayment obligations, and violations of the False Claims Act can result in substantial monetary penalties and fines, the imposition of a corporate integrity agreement and exclusion from participation in governmental health programs. If we incur significant costs responding to or resolving these or future inquiries or investigations, our business, financial condition and results of operations could be materially adversely affected.

*　　*　　*

***We care for a large number of vulnerable individuals with complex needs and any care quality deficiencies could adversely impact our brand, reputation and ability to market our services effectively***.

Our future growth will partly depend on our ability to maintain our reputation for providing quality patient care and, through new programs and marketing activities, increased demand for our services. Factors such as increased acuity of our patients, health and safety incidents at our facilities, regulatory enforcement actions, negative press or general customer dissatisfaction could lead to deterioration in the level of our quality ratings or the public perception of the quality of our services (including as a result of negative publicity about our industry generally), which in turn could lead to a loss of patient placements, referrals and self-pay patients or service users. Any impairment of our reputation, loss of

> goodwill or damage to the value of our brand name could have a material adverse effect on our business, results of operations and financial condition.
>
> Many of our service users have complex medical conditions or special needs, are vulnerable and often require a substantial level of care and supervision. There is a risk that one or more service users could be harmed by one or more of our employees, either intentionally, through negligence or by accident. Further, individuals cared for by us have in the past engaged, and may in the future engage, in behavior that results in harm to themselves, our employees or to one or more other individuals, including members of the public. A serious incident involving harm to one or more service users or other individuals could result in negative publicity. Such negative publicity could have a material adverse effect on our brand, reputation and ADC, which would have a corresponding negative impact on our business, results of operations and financial condition. Furthermore, the damage to our reputation or to the reputation of the relevant facility from any such incident could be exacerbated by any failure on our part to respond effectively to such incident.

131. Substantially identical risk factors were set forth in the Company's FY20 Form 10-K, FY21 Form 10-K, FY22 Form 10-K, and FY23 Form 10-K. These risk factors were expressly incorporated into all of Acadia's Forms 10-Q issued throughout the Class Period. These risk factors did not include any cautionary language related to its operating statistics, or the artificial inflation of reported revenue that resulted from Acadia's misconduct.

132. The statements detailed in ¶¶130-131 above omitted to state material facts necessary in order to make them not misleading. The true facts, which were then known to, or recklessly disregarded by, Defendants were that:

(a) Acadia was systematically and unlawfully detaining patients against their will and without medical necessity in order to inflate its profits at the expense of patient care (*see* ¶¶29-34, *supra*);

(b) similar misconduct in the behavioral healthcare industry had previously led to criminal and civil investigations, negative publicity, and material negative financial and reputational consequences, including at UHS where Osteen previously served as an executive for approximately 19 years (*see* §VII.A.4., *infra*); and

(c) as a result, Defendants' warnings of hypothetical consequences that could result from quality care deficiencies, investigations, or negative publicity, were materially misleading.

133. In addition, the risk factors identified in Acadia's Forms 10-K generically warned that the Company faced risks from "legal proceedings based on negligence or breach of a contractual or statutory duty from service users or their family members or from employees or former employees." These warnings were written as hypothetical risks, *i.e.*, that there could be material adverse impacts to the business from substantial damage awards in such cases:

> From time to time, we are subject to complaints and claims from service users and their family members alleging professional negligence, medical malpractice or mistreatment. We are also subject to claims for unlawful detention from time to time when patients allege they should not have been detained under applicable laws and regulations or where the appropriate procedures were not correctly followed.
>
> Similarly, there may be substantial claims from employees in respect of personal injuries sustained in the performance of their duties. Current or former employees may also make claims against us in relation to breaches of employment laws. There may also be safeguarding incidents at our facilities which, depending on the circumstances, may result in custodial sentences or other criminal sanctions for the member of staff involved.
>
> The incurrence of substantial legal fees, damage awards or other fines as well as the potential impact on our brand or reputation as a result of being involved in any legal proceedings could have a material adverse impact on our business, results of operations and financial condition.

134. The risk factors included in Acadia's Forms 10-K also generically warned that the Company faced risks from its "large self-insured retention and may be responsible for significant amounts not covered by insurance." These warnings were similarly written as hypothetical risks, *i.e.*, that there could be claims that exceed or are not covered by insurance coverage that could have a material adverse impact on the business:

> We are subject to medical malpractice lawsuits and other legal actions in the ordinary course of business. Some of these actions may involve large claims,

> as well as significant defense costs. We cannot predict the outcome of these lawsuits or the effect that findings in such lawsuits may have on us. We maintain liability insurance intended to cover service user, third-party and employee personal injury claims. Due to the structure of our insurance program under which we carry a large self-insured retention, there may be substantial claims in respect of which the liability for damages and costs falls to us before being met by any insurance underwriter. There may also be claims in excess of our insurance coverage or claims which are not covered by our insurance due to other policy limitations or exclusions or where we have failed to comply with the terms of the policy. Furthermore, there can be no assurance that we will be able to obtain liability insurance coverage in the future on acceptable terms, or without substantial premium increases or at all, particularly if there is a deterioration in our claim experience history. A successful claim against us not covered by or in excess of our insurance coverage could have a material adverse effect on our business, results of operations and financial condition.[9]

135. The statements detailed in ¶¶133-134 above omitted to state material facts necessary in order to make them not misleading, in that Defendants' risk factor statements presented substantial litigation damage awards and awards in excess of, or not covered by, insurance coverage as merely hypothetical risks that could materially impact its business, while omitting that those risks had already materialized with the *Inman* litigation and other lawsuits involving Desert Hills and/or Clarence Garcia. The true facts, which were known to or recklessly disregarded by Defendants, were that:

(a) GAAP rule ASC 450-20 requires companies to disclose a loss contingency (such as potential or actual litigation) if "there is at least a reasonable possibility" that a loss may be incurred, even if the amount cannot be reasonably estimated (*see* §VI.B., *infra*);

---

[9] The risk factor statements described in ¶¶133-134 were issued in Acadia's: (i) February 26, 2021 FY20 Form 10-K (signed by Osteen and Duckworth); (ii) March 1, 2022 FY21 Form 10-K (signed by Osteen and Duckworth); and (iii) February 28, 2023 FY22 Form 10-K (signed by CEO Hunter and Duckworth). They were also explicitly incorporated by inference into Acadia's: (i) April 30, 2021 1Q21 Form 10-Q (signed by Duckworth); (ii) August 3, 2021 2Q21 Form 10-Q (signed by Duckworth); (iii) October 29, 2021 3Q21 Form 10-Q (signed by Duckworth); (iv) May 4, 2022 1Q22 Form 10-Q (signed by Duckworth); (v) July 28, 2022 2Q22 Form 10-Q (signed by Duckworth); (vi) November 2, 2022 3Q22 Form 10-Q (signed by Duckworth); and (vii) April 27, 2023 1Q23 Form 10-Q (signed by Duckworth).

(b) by no later than January 2021, default judgment had been entered against Acadia in the *Inman* litigation "as to all issues involving liability" due to Acadia's "bad-faith discovery abuses," leaving Acadia subject to a jury trial solely on the issues of compensatory and punitive damages (*see* ¶61, *supra*);

(c) by no later than January 2021, Acadia's motion for summary judgment on punitive damages had been denied and the court's default judgment against Acadia made it explicitly clear that it was subject to punitive damages claims at trial (*see* ¶63, *supra*); and

(d) as a result of the foregoing, Acadia was on notice by no later than January 2021 that it was reasonably likely to suffer significant losses and punitive damages from the *Inman* litigation and other related lawsuits concerning Desert Hills and/or Clarence Garcia in excess of, or not covered by, Acadia's insurance coverage.

## VI. DEFENDANTS' SEC DISCLOSURE VIOLATIONS

### A. The Impact of Defendants' Scheme and Wrongful Course of Conduct on Acadia's Reported Performance

136. Defendants employed the scheme complained of herein in order to artificially inflate Acadia's revenue, profits, financial metrics, and operating statistics. The scheme entailed Acadia unlawfully detaining patients against their will without medical necessity in order to inflate Acadia's reported profits. This scheme carried material financial risk, and as it unraveled, Acadia's financial performance plummeted.

137. In accordance with the explicit SEC disclosure rules described below, Defendants were required to disclose Acadia's misconduct to investors in Acadia's quarterly and annual financial statements filed with the SEC during the Class Period. In particular, SEC disclosure rules require that every Form 10-K and Form 10-Q contain an MD&A section, and Item 303 of Regulation S-K and subsequent SEC guidance set the framework for required MD&A disclosures.

For example, SEC Release No. 33-8350, *Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations*, states:

> The MD&A requirements are intended to satisfy three principal objectives:
>
> - to provide a narrative explanation of a company's financial statements that ***enables investors to see the company through the eyes of management***;
> - to enhance the overall financial disclosure and provide the context within which financial information should be analyzed; and
> - to provide information about the quality of, and potential variability of, a company's earnings and cash flow, ***so that investors can ascertain the likelihood that past performance is indicative of future performance***.

138. As detailed below, in accordance with the SEC's MD&A rules, Defendants were required to disclose the impact of Defendants' misconduct on Acadia's performance. Defendants failed to make these required disclosures, rendering Acadia's Class Period statements materially misleading and in violation of SEC disclosure rules.

139. The material impact of Defendants' misconduct on Acadia's financial results is precisely the type of information required to be disclosed under the SEC's MD&A rules. For example, within SEC Staff Accounting Bulletin No. 104 ("SAB 104"), the SEC Staff provided specific guidance on required MD&A disclosures pertaining to a Company's reported revenue and changes in reported revenue:

> Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also ***include an analysis of the reasons and factors contributing to the increase or decrease***.

140. Defendants knew the scheme was unsustainable and could only temporarily continue to inflate Acadia's financial results.

## B. Acadia's Class Period Financial Statements Violated Generally Accepted Accounting Principles

141. As alleged herein, Defendants' failure to properly account for and disclose the *Inman v. Garcia* litigation (and other lawsuits involving Desert Hills and/or Clarence Garcia) rendered Acadia's Class Period financial statements materially misleading and in violation of GAAP.[10] Financial Accounting Standards Board ("FASB") Accounting Standard Codification 450, *Contingencies* ("ASC 450") codifies GAAP regarding "loss contingencies." A loss contingency is "[a]n existing condition, situation, or set of circumstances involving uncertainty as to a possible loss . . . that will ultimately be resolved when one or more future events occur or fail to occur." *See* ASC 450-20-20. Loss contingencies include: (i) "[a]ctual or possible claims"; and (ii) "[p]ending or threatened litigation." *See* ASC 450-20-05-10. The SEC has explicitly stated: "A public company facing a material loss contingency, such as one arising from a lawsuit or government investigation, is required under accounting principles and the securities laws to (1) disclose the loss contingency if a loss is at least reasonably possible, and (2) record an accrual for the estimated loss if a loss is probable and reasonably estimable."[11]

142. ASC 450 includes requirements for both disclosure of a loss contingency and the accrual of a loss contingency. An issuer must record an accrual for a material loss contingency as a charge against income in its financial statements if a loss is probable and reasonably estimable.

---

[10] GAAP constitutes those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time, and are the common set of accounting principles, standards, and procedures that companies in the United States use to prepare their financial statements. According to SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)), financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.

[11] Complaint, ¶4, *SEC v. Mylan N.V.*, No. 1:19-cv-02904 (D.D.C. Sept. 27, 2019), ECF 1, https://www.sec.gov/files/litigation/complaints/2019/comp-pr2019-194.pdf.

"Probable" means the future event or events is likely to occur. If a loss contingency "cannot be reasonably estimated," an issuer must still disclose a material loss contingency – such as the liability resulting from the claims asserted in the *Inman* litigation – if a loss is at least reasonably possible. A loss is considered "reasonably possible" when the "chance of the future event or events occurring is more than remote but less than likely." *See* ASC 450-20-20. A loss is considered "remote" when the "chance of the future event or events occurring is slight." *See id.* ASC 450 requires comprehensive disclosure of the potential loss, including the "nature of the contingency" and "[a]n estimate of the possible loss or range of loss or a statement that such an estimate cannot be made." *See* ASC 450-20-50-4.

143. As detailed herein, by no later than February 26, 2021, the date Acadia filed its FY20 Form 10-K, Defendants knew of, or recklessly disregarded, the likelihood that a material loss relating to the *Inman* litigation was reasonably possible. Thus, the requirements for accrual and/or disclosure under ASC 450 had been met and Acadia was required under GAAP to accurately account for and fully disclose the nature and scope of the *Inman* litigation in its subsequent Class Period SEC filings. Defendants' failure to make the required disclosures rendered Acadia's quarterly reports on Form 10-Q and annual reports on Form 10-K from at least February 26, 2021 through April 27, 2023 materially misleading and in violation of GAAP.

## VII. ADDITIONAL SCIENTER ALLEGATIONS

### A. Defendants' Pervasive Destruction of Evidence and Unbridled Violations of Law Support a Strong Inference of Scienter

#### 1. Acadia's Systematic and Pervasive Document Destruction

144. The default judgment and adverse inference sanctions levied against Acadia in the *Inman v. Garcia* litigation for "bad-faith discovery abuses" are not anomalous. Rather, the systematic and pervasive destruction of documents and other evidence has been a hallmark of

Acadia's business operations. This concerted effort to deprive litigation opponents, investigators, and the public – including investors – of information about its business further supports a strong inference of Defendants' scienter.

145. Notably, Acadia has maintained a draconian, 30-day email deletion policy since 2012 – even after the court in the *Inman* litigation found in its July 1, 2022 order: "Acadia is responsible for the destruction of evidence through . . . the creation of an email retention policy that resulted in the destruction of emails after only 30 days." The deletion policy was authored by former Acadia general counsel Chris Howard. Howard testified in the *Inman* litigation that the email deletion policy resulted in regularized permanent destruction of emails as evidence, and that he knew the policy would cause problems for parties adverse to it in litigation. Additionally, although Howard claimed that the deletion policy was intended to alleviate purported server burdens and I.T. storage concerns, he testified that he never discussed the issue with Acadia's I.T. department to determine whether or not having a longer archive period would overburden Acadia's servers. The email deletion policy could be suspended by the institution of a litigation hold, but no litigation holds were ever instituted for the *Inman* litigation or any of the other cases involving Desert Hills and/or Clarence Garcia.[12]

146. In addition to the discovery abuses and sanctions in the *Inman* litigation, other courts around the country have similarly sanctioned Acadia for discovery abuses and destruction. In *Blunk v. Acadia Healthcare Co., Inc., et al.*, a Nevada judge issued an order in August 2021 sanctioning Acadia by striking its answer as to all liability issues – effectively granting default judgment. The court specifically found that, *inter alia*: Acadia "willfully engaged in discovery

[12] Former Chief Risk Officer Dulce Mooney testified that Chris Howard was also the person responsible for determining whether legal holds should be instituted.

abuse," "***[t]here is a pattern of Acadia destroying evidence***," "***Acadia engages in the practice of destruction of evidence nationwide***," Acadia "attempted to hide [its] destruction [of evidence]," Acadia engaged in an "***extensive scheme to destroy, deceive, and mislead***," and Acadia "must be deterred from continuing to destroy relevant evidence on cases." In *Dean v. PHC Meadowood, LLC, et al.*, a Delaware judge issued an order in March 2024 sanctioning Acadia with an adverse jury instruction on spoliated evidence, finding that Acadia, "in violation of Delaware law, altered, deleted and destroyed portions of . . . medical records" and withheld "video evidence and misrepresented to Plaintiff and the Court that it did not exist."

147. Acadia's blatant and remarkably consistent destruction of evidence supports a strong inference of Defendants' scienter because it was designed to prevent the truth about its operations from coming to light. Indeed, as the court in the *Inman* litigation held in its order imposing an adverse inference sanction for Acadia's continued discovery abuses even after the court's default judgment order, "if a party is destroying or modifying evidence after the commencement of litigation, that conduct is evidence of that party's state of mind."

### 2. Acadia's Violation of SEC Whistleblower Protection Rule 21F-17(a)

148. On September 9, 2024, the SEC issued a release announcing it had settled charges against seven public companies, including Acadia, for "using employment, separation, and other agreements that violated rules prohibiting actions to impede whistleblowers from reporting potential misconduct to the SEC." Of the approximately $3 million combined in civil penalties between the seven companies, Acadia was responsible for $1.3 million. One of the SEC investigators noted that Acadia was fined because it "'required employees to waive their right to possible whistleblower monetary awards. This severely impedes the would-be whistleblowers from reporting potential securities law violations to the SEC.'" Acadia's unlawful attempt to

silence its employees and discourage them from reporting misconduct to the SEC – particularly misconduct related to potential securities law violations – further supports a strong inference of scienter.

**3. Defendants' History of Misconduct**

149. Defendants Osteen and Duckworth were CEO and CFO when, in 2019, the Company entered into a corporate integrity agreement ("CIA") with the United States Department of Health and Human Services ("HHS"). *See United States ex rel. Wheeler v. Acadia Healthcare Co., Inc.*, 127 F.4th 472, 483 (4th Cir. 2025) (settlement with the DOJ related to claims that Acadia's facilities seeking Medicaid reimbursement for moderate and high complexity laboratory drug testing "'were not certified to perform, and did not, in fact, perform'" such drug testing).

150. The CIA required Acadia to provide training to certain "covered persons," including staff, contractors, and agents who provide patient care or perform a billing or coding function. *Id.* "These covered persons were required to receive at least annual trainings on the requirements of federal healthcare programs and the requirements of the CIA itself." *Id.* "The CIA also required Acadia to develop a 'disclosure program' that would enable individuals to internally report any potential concerns about Acadia's policies, conduct, practices, or procedures with respect to a federal health care program believed by the individual to be a potential violation of criminal, civil, or administrative law." *Id.*

151. In February 2025, the Fourth Circuit Court of Appeals held that the plaintiff had adequately alleged that Acadia had violated the CIA by failing to: (i) provide the requisite training related to the CIA's disclosure program; and (ii) publicize the existence of the disclosure program. *Id.* at 495-97. Specifically, the underlying complaint in *Wheeler* alleged that Acadia's Asheville clinic was falsifying group therapy records, that these concerns were raised with supervisors on many occasions, and that Acadia failed to investigate, take remedial action, or report these

allegations to the HHS Office of the Inspector General. *Id.* at 484. Further, the plaintiff claimed that Acadia "never provided her or other staff the annual trainings required by the CIA." *Id.* That Defendants knew of an agreement to report any misconduct occurring at Acadia facilities, and that Acadia violated the CIA, further supports a strong inference of scienter.

### 4. Defendant Osteen's History and Receipt of Warnings Concerning Similar Misconduct

152. Defendant Osteen was the Executive Vice President of UHS and President of UHS' behavioral health division when lawsuits regarding identical conduct as alleged above were filed and/or settled.

153. In 2020, UHS reached an agreement with the DOJ's Civil Division, and various states' attorneys general offices, to resolve alleged violations of the False Claims Act. The government alleged that, between January 2006 and December 2018, UHS facilities admitted patients who were not eligible for inpatient or residential treatment, and also failed to properly discharge patients when they no longer required inpatient care. The government further alleged that UHS billed for services not rendered and for improper and excessive lengths of stay. Ultimately, UHS agreed to pay $122 million to settle the False Claims Act allegations.

154. On May 12, 2017, a complaint with nearly identical allegations was filed in the Eastern District of Pennsylvania against UHS and Osteen, among others. The complaint alleged that UHS admitted patients regardless of medical necessity, held patients against their will until the patients' insurance policy payments ran out in order to increase revenues, and sought to increase patients' average length of stay.[13] On October 21, 2020, while the appeal of the district

---

[13] The complaint also alleged that Osteen reaped over $6 million in insider trading proceeds and received over $8 million in total compensation, including cash incentive awards.

court's decision granting defendants' motion to dismiss was still pending, the parties reached an agreement to settle the claims for $17,500,000.

### B. Defendants Closely Monitored and Reported Key Revenue Metrics

155. Throughout the Class Period, Defendants closely monitored key metrics tracking admissions, patient days, average length of stay, and revenue per patient day. As set forth above, these metrics were consistently reported in Acadia's quarterly press releases and SEC filings. In fact, Defendants made numerous public statements, including prepared statements – or were asked and answered detailed questions – on admissions, patient days, average length of stay, and revenue per patient day and held themselves out as knowledgeable on each of these key metrics.

156. Throughout the Class Period, Defendants monitored admissions – a metric critical to Acadia's revenues. In fact, when asked about underperforming facilities, the Company looked directly at increasing admissions to improve performance. For instance, at the Bank of America Merrill Lynch Healthcare Conference on May 12, 2020, Osteen stated: "And then the other thing I'll just say is we tried to problem solve. We met twice a day. We looked at any obstacles around admissions." Similarly, during Acadia's 4Q24 conference call, Hunter stated: "We're going to look really closely at admissions, and [what] that can include . . . ."

157. Defendants also monitored patient days – another metric critical to Acadia's revenues. As Duckworth stated at the May 9, 2023 Bank of America Global Healthcare Conference: "As a company, we tend to talk a lot about bed additions and patient days, which is a metric for our inpatient business."

158. Defendants also represented throughout the Class Period that they had a constant eye on average length of stay across all of Acadia's service lines. As Osteen stated on an October 30, 2020 earnings call: "And I think that our length of stay increased. As we looked at it, there wasn't any one factor there. It's been pretty stable across all of our service lines."

159. On April 30, 2021, Duckworth reiterated that:

> We do not view any of our metrics as relating to a change in what managed care is doing. It's been a pretty consistent process, pre-pandemic and through the last year. We attribute our stats more to just the service mix that we see. We do see a pretty consistent length of stay, but we have to look at it by service line and by facility, and it can vary, but it tends to be within a range, and we've seen it trend consistently within a range.

160. Lastly, Defendants closely monitored revenue per patient day. In doing so, Defendants repeatedly reported to investors and analysts on what was driving this key metric's alleged growth. As Duckworth stated on an August 3, 2021 earnings call:

> There is a component of our revenue per day growth this quarter that is a challenging comp to last year. We did see a different service mix in the second quarter of 2020, with acute and specialty being temporarily lower on patient volumes. And therefore, RTC mix was a little bit higher. So that's part of our 7.5% revenue per day growth this quarter.
>
> But as we look ahead, we think where we are right now, the $816 is a very strong metric. We do expect to continue into this year, and that will continue to provide revenue per day growth, probably more in the 2% to 3% range given that a component of this quarter is the comparison to last year. But we do think a lot of the trends that we see and the revenue per day that we see will continue moving forward.

161. Defendants also represented throughout the Class Period that they had teams at the corporate and facility levels to manage payer relationships that would support revenue per patient day growth. As Duckworth stated on an April 30, 2021 earnings call:

> Yes. And Frank, picking up on the revenue per day. We did see a strong revenue per day, a 4.5% year-over-year growth here in the first quarter. That is a continuation of a strong trend that we have seen. We were above 3% in the second half of 2020. Our team at the facility and the corporate and those that manage our payer relationships here at the corporate office are doing a great job on rate increases across our service lines.
>
> And in the – in Q1, we're also seeing a strong payer mix. Our commercial payer mix did increase slightly, just under 30% for the quarter. That is a contributing factor to our revenue per day growth being at 4.5%. And part of that does relate to the specialty facilities and the volumes we saw there at some of the higher revenue per day specialty facilities, where we're now seeing strong volumes as we exit the quarter. That is a contributing factor to the strong revenue per day

> number for the quarter, and that's a trend that we see continuing into April and continuing into the year.

162. Duckworth similarly stated on a December 7, 2022 earnings call:

> We believe that revenue per day will continue to grow for the company. Our payer relationships are very much a local – a facility to a local payer plan supported by, at the corporate level, relationships that we have at the corporate office with that payer. And the team has done a great job, as you can see in our results throughout the year, driving those increases. And we expect that opportunity to continue. We have a lot of our payer contracting already done for next year as of today, as you think about recent rate increases. We have visibility on Medicare because a rate increase that was effective October 1, 3.8% increase for Medicare will continue into next year. And we have many other recent rate increases that give us visibility and confidence that we'll continue to see success in our revenue per day.

163. On May 4, 2022, Duckworth confirmed again that:

> We have seen a strong revenue per day performance, which we say throughout 2021 and continued into the first quarter. And we would say that the most significant component of that is rate increases that we are seeing broadly across many of our payors and many of our service lines. We have a team that maintains close and collaborative relationship with our commercial and our other managed care payors. And have worked with them very well at a local level and at a corporate level on those rate increases.

164. Defendants' professed personal knowledge and close oversight of the key metrics impacted by their fraudulent scheme further supports a strong inference of their scienter.

### C. Acadia Had Actual Knowledge of the *Inman* Default Judgment

165. Acadia had actual knowledge of at least the reasonable possibility that the Desert Hills lawsuits, and particularly G.S.'s case in the *Inman v. Garcia* litigation, would result in massive liability. For example, Acadia's failed attempt to obtain summary judgment on the issue of punitive damages demonstrates its knowledge of the scope of liability it faced. Moreover, key Acadia corporate executives were deposed in the *Inman* litigation, including its general counsel, Chris Howard (taken June 29, 2021), then-Chief Risk Officer Cary Matos (taken March 4, 2021), and previous Chief Risk Officer Dulce Mooney (taken March 3, 2021). Acadia itself also supplied

testimony through corporate representatives (including depositions taken on January 20, 2021 and March 2, 2021).

166. Yet, in violation of GAAP standards, Acadia failed to make ***any*** disclosure concerning the *Inman* litigation in its SEC filings for over ***two years*** after the court entered ***default judgment*** against it, leaving the amount of damages as the only issue even remotely in play. Even when the court granted an adverse inference and explicitly suggested that Acadia's "bad-faith discovery abuses" were relevant to the issue of punitive damages and admissible in the damages trial, Acadia failed to disclose any potential liability related to the case. Moreover, in January 2020 Acadia absurdly claimed it was "wrongfully named in the suits" and "denied [it] had any connection with Familyworks" – a nonprofit run by its wholly-owned subsidiary and headed by its employee, Michael Girlamo – and downplayed the allegations as "unsubstantiated," even though Clarence Garcia had already pled guilty to criminal charges related to the same conduct underlying the *Inman* litigation as far back as August 2018.

**D. Defendants' Fraud Allowed Them to Reap $21 Million in Salary and Performance-Based Compensation**

167. Defendants were motivated to conceal the truth about Acadia's practices from the market by their self-interested desire to keep their executive positions at Acadia and to continue to collect lucrative salaries and performance-based compensation. During the Class Period, compensation for Acadia's executives was based on a "pay-for-performance philosophy" where a substantial amount, if not the majority, of their pay was performance based and not guaranteed.

168. In 2020 and 2021, this performance-based compensation was entirely centered on Acadia's reported financial results: annual non-equity incentive compensation payable to Defendants "was based 100% on the Company-wide measures Adjusted EBITDA, Adjusted EPS and revenue, with Adjusted EBITDA determining 50% of the total incentive award, Adjusted EPS

determining 30% of the total incentive award and revenue determining 20% of the total incentive award."

169. In 2022-2024, Defendants' performance-based compensation was altered to include certain non-financial goals such as leadership development, initiatives to help enhance Acadia's technology capabilities, and patient safety and outcomes. However, performance-based compensation was still overwhelmingly focused on Acadia's reported financial results: "Annual non-equity incentive compensation payable to [Defendants] was based 80% on Company-wide Adjusted EBITDA and Adjusted EPS" (each determining 40% of the total incentive award) and 20% based on non-financial goals.

170. The Proxy Statements reported the compensation for Osteen, Hunter, Duckworth, and Dixon as follows:

| **Defendant** | **2020 Comp.** | **2021 Comp.** | **2022 Comp.** | **2023 Comp.** | **2024 Comp.** |
|---|---|---|---|---|---|
| Debra K. Osteen | $918,000 base $1,417,168 perf. based | $1,000,000 base $1,856,590 perf. based | $1,000,000 base $900,000 bonus | | |
| Christopher H. Hunter | | | $1,000,000 base $915,202 perf. based | $1,000,000 base $1,653,667 perf. based | $1,020,000 base $967,319 perf. based |
| David M. Duckworth | $635,558 base $833,974 perf. based | $654,625 base $1,033,065 perf. based | $674,264 base $722,458 perf. based | $694,492 base | |
| Heather Dixon | | | | $690,000 base $372,007 perf. based | $710,700 base $457,500 perf. based |

171. In total, Osteen, Hunter, Duckworth, and Dixon collected over $21 million in compensation in the four years before their fraudulent scheme was fully disclosed. Over 50% of that compensation was in the form of performance-based bonuses that were completely or largely predicated on Acadia's reported financial performance.

172. Not only did Acadia's incentive compensation structures encourage Defendants to prioritize profits over patients, defendants Hunter and Dixon were awarded additional bonuses to deal with the fallout caused by their own misconduct. On April 24, 2025, *The New York Times* published an article entitled "Leaders of Mental Health Giant Promised Big Bonuses to Deal With Federal Investigations" that described how "Acadia Healthcare's chief executive was awarded a $1.8 million bonus to respond to 'unprecedented governmental inquiries' into allegations of holding psychiatric patients against their will." Specifically:

> Acadia's troubles have been a boon to the company's chief executive, Christopher Hunter. Its board of directors awarded him a $1.8 million bonus to help respond to "unprecedented governmental inquiries," according to a financial filing this month. The bonus comes on top of his regular compensation, which totaled more than $7 million in 2024.
>
> Acadia's chief financial officer and general counsel were also granted bonuses of about $1 million, and the chief operating officer was promised $600,000. Acadia said the bonuses, which will be paid in March of next year, were awarded to ensure that the leaders did not leave before the investigations were completed.

## VIII. LOSS CAUSATION/ECONOMIC LOSS

173. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and/or omitted material information concerning Acadia's business practices and financial prospects and engaged in a scheme to deceive the market. By artificially inflating and manipulating Acadia's stock price, Defendants deceived Plaintiff and the Class and caused them losses when the relevant truth was partially revealed. When Defendants' prior misrepresentations and fraudulent conduct was disclosed to the market, it caused Acadia's stock price to fall precipitously as artificial inflation came out of the stock price. As a result of their purchases of Acadia stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws. The following are examples of dates when Defendants' misconduct was partially revealed.

174. On July 11, 2023, after the market closed, Acadia announced that a jury in New Mexico had awarded $485 million in damages to the plaintiff in the *Inman v. Garcia* litigation in New Mexico related to Acadia's Desert Hills facility. On July 12, 2023, a release was issued announcing the verdict. In the release, the attorneys for the plaintiff stated:

> The case involved a minor female who was sexually abused in foster care by a foster parent licensed under [Acadia's] umbrella of subsidiaries doing business in New Mexico. . . . The lawyers argued that the company was reckless in protecting and keeping the child safe in light of historical and recurring reports of sexual assault, physical assault, and emotional abuse in the foster home.
>
> * * *
>
> "This verdict sends a clear message that children are valued and for-profit companies can't turn a blind eye to their safety while hoarding profits," stated Josh Conaway, co-counsel and partner for Fadduol, Cluff, Hardy & Conaway. "We are thankful for the courage shown by the twelve jurors in holding Acadia Healthcare responsible for its actions."

175. Analyst reaction was immediate, labeling the disclosure a considerable downside surprise. For example, a TD Cowen report stated on July 11, 2023: "ACHC faces a staggering $485m (~$4/share) jury verdict from a New Mexico lawsuit related to a foster parent's abuse of a young child."

176. On this news, Acadia's share price fell over 5% from a closing price of $79.05 per share on July 11, 2023, to close at $75 per share on July 12, 2023, on unusually high trading volume of more than 2.5 million shares. Acadia's stock price, however, continued to trade at artificially inflated levels.

177. On Sunday, September 1, 2024, *The New York Times* published an article entitled "How a Leading Chain of Psychiatric Hospitals Traps Patients." As described in more detail above, *The New York Times* revealed that while Acadia's stock price had "more than doubled" since the COVID-19 pandemic:

> [S]ome of that success was built on a disturbing practice: Acadia has lured patients into its facilities and held them against their will, even when detaining them was not medically necessary . . . patients were often held for financial reasons rather than medical ones, according to more than 50 current and former executives and staff members.

178. On this news, Acadia's share price fell over 4.5% from a closing price of $81.93 per share on August 30, 2024, to close at $78.21 per share on September 3, 2024, on unusually high trading volume of more than 1.8 million shares. Acadia's stock price remained inflated, however, because Defendants falsely denied *The New York Times*' revelations and continued to conceal the full impact of their fraudulent misconduct and scheme from investors. For example, in the September 1 article, an Acadia spokesperson falsely stated that "[q]uality care and medical necessity drives every patient-related decision at Acadia." In a September 10, 2024 *Omaha World-Herald* article entitled "Jennie Edmundson committed to Acadia partnership, despite recent critique of the company," Acadia officials falsely stated that the assertions made by *The New York Times* were inaccurate. "'Decisions about patient care, including how long treatment may be necessary, are never business decisions made by the company,' the officials said. 'They are medical decisions made by licensed physicians and care clinicians in accredited, regulated healthcare facilities based on medical necessity and associated legal requirements.'"

179. On September 27, 2024, before the market opened, Acadia announced that it had received subpoenas and requests for information from several government entities, and expected to receive additional requests in the future:

> On September 24, 2024, [Acadia] received a voluntary request for information from the United States Attorney's Office for the Southern District of New York as well as a grand jury subpoena from the United States District Court for the Western District of Missouri (W.D.Mo.) related to its admissions, length of stay and billing practices. In addition, Lakeland Hospital Acquisition, LLC, a subsidiary of Acadia, also received a grand jury subpoena from W.D.Mo. on the same day regarding similar subject matter. Acadia anticipates receiving similar document requests from the U.S. Securities and Exchange Commission and may receive additional document requests from other governmental agencies.

180. Notably, this announcement came just one day after the DOJ announced that Acadia would be paying $19.85 million to settle allegations related to medically unnecessary inpatient behavioral health services.

181. On this news, Acadia's share price fell over 16% from a closing price of $75.66 per share on September 26, 2024, to close at $63.28 per share on September 27, 2024, on unusually high trading volume of more than 10 million shares. Acadia's stock price, however, remained artificially inflated.

182. On October 18, 2024, *The New York Times* published an article entitled "Veterans Dept. Investigating Acadia Healthcare for Insurance Fraud." As described in more detail above, *The New York Times* revealed that the Department of Veterans Affairs inspector general was investigating whether Acadia was "defrauding government health insurance programs by holding patients longer than is medically necessary."

183. On this news, Acadia's share price fell over 12% from a closing price of $59.32 per share on October 17, 2024, to close at $52.03 per share on October 18, 2024, on unusually high trading volume of more than 6 million shares. Acadia's stock price, however, remained artificially inflated.

184. On October 30, 2024, after the market closed, Acadia issued a release entitled "Acadia Healthcare Reports Strong Third Quarter 2024 Results." In the 3Q24 release, Acadia announced that it was reducing its FY24 finance guidance, reducing its FY24 revenue guidance range to $3.150-$3.165 billion from $3.180-$3.225 billion, and reducing its FY24 Adjusted EBITDA guidance to a range of $725-$735 million, from $735-$765 million. In addition, the Company disclosed that its revenue per patient day had declined on a quarterly basis for only the second time since 4Q19.

185. On October 31, 2024, before the market opened, Acadia held a conference call to discuss its 3Q24 financial results and reduced FY24 guidance with investors. During the conference call, Dixon stated that the Company's reduced FY24 guidance was due to lower patient referrals following the disclosures of Acadia's misconduct:

> We have experienced lower volume growth than expected in October, with same facility patient day growth of approximately 3% for the month, which we believe is a result of the recent headlines and reporting in the media that [Hunter] addressed at the top of the call as such. Our revised guidance reflects expected fourth quarter year over year, same facility volume growth of approximately 3% to 4% which is 200 basis points to 300 basis points below our previous expectations for the quarter.
>
> . . . This change in our volume growth outlook for the fourth quarter resulted in a $20 million to $30 million impact to our revenue guidance and a $10 million to $15 million impact to our EBITDA outlook.

186. On this news, Acadia's share price fell 18% from a closing price of $52.08 per share on October 30, 2024, to close at $42.69 per share on October 31, 2024, on unusually high trading volume of more than 5 million shares. Acadia's stock price remained inflated, however, because Defendants continued to conceal the full impact of their fraudulent misconduct and scheme from investors. For example, in the October 31, 2024 conference call, Hunter continued to falsely claim that "medical necessity drives patient care decisions at Acadia. These decisions are made by licensed providers and adhere to all associated legal requirements . . . . The allegation that Acadia systematically holds patients longer than medically necessary is false and goes directly against everything we do and stand for when it comes to patient care . . . ."

187. On February 27, 2025, after the market closed, Acadia issued a release entitled "Acadia Healthcare Reports Fourth Quarter 2024 Results." In the 4Q24 release, Acadia: (i) announced that it had missed its 4Q24 Adjusted EBITDA guidance; (ii) provided 1Q25 and FY25 revenue and Adjusted EBITDA guidance both well below analyst expectations; (iii) reduced its long-term growth targets, projecting, for the three-year period beginning 2026, 7% to 9% average

annual revenue growth and 8% to 10% average annual Adjusted EBITDA growth; and (iv) disclosed that its revenue per patient day had again declined. For the first time, the Company also disclaimed the reliability of its total facility and same facility results, stating:

> Total facility results reflect adjustments that are intended to provide the specific presentation described above, and same facility results reflect adjustments that may be irregular in timing from period to period related to newly opened or acquired facilities or facilities that we no longer operate, and may omit certain results that investors may view as important. Total facility and same facility results may therefore not be indicative of the overall performance of our business and should not be considered as an alternative for net income or any other performance measures derived in accordance with GAAP.

188. On February 28, 2025, before the market opened, Acadia held a conference call to discuss its 4Q24 financial results and reduced FY25 guidance and long-term growth targets with investors. During the conference call, Hunter and Dixon confirmed that Acadia was still suffering from lower patient referrals following the disclosures of Acadia's misconduct, which would cause "a $20 million EBITDA headwind for the full year." Dixon also confirmed that "[f]acility closures are expected to be a headwind to year-over-year EBITDA growth of approximately $5 million in the first quarter" – a thinly-veiled reference to Acadia's closure of its Timberline Knolls facility, which, according to an April 22, 2025 *The New York Times* article entitled "Suicides and Rape at a Prized Mental Health Center," was rife with understaffing and allegations of sexual assault and rape by staff members.

189. Analysts were shocked by Acadia's announcements. A February 28, 2025 Barclays report entitled "Multiple resets; downgrade to EW" noted that "[w]ith virtually every long-term target revised down, an unexpected step-down in revenue per patient day, lingering uncertainty over 5-10 media-impacted facilities, and potential signs of slowing demand for CTCs, we believe the fundamental outlook has deteriorated." Other analysts called the disclosures disappointing or

materially below investor expectations, and several analysts reduced their valuation assumptions, multiples, and price targets in response.

190. On this news, Acadia's share price fell over 25% from a closing price of $40.26 per share on February 27, 2025, to close at $29.98 per share on February 28, 2025, on unusually high trading volume of more than 7 million shares.

191. The declines in the price of Acadia securities were a direct result of the nature and extent of Defendants' fraudulent misrepresentations, omissions, and scheme being revealed to investors and the market and were a substantial cause of the declines. The timing and magnitude of the price declines in Acadia securities compared to the market and its peers negate any inference that the losses suffered by Plaintiff and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and the other members of the Class was a direct result of Defendants' fraud, which artificially inflated and maintained the price of Acadia securities and caused the subsequent significant declines in the value of Acadia securities when Defendants' prior misrepresentations and fraudulent scheme began to be revealed.

## IX. APPLICABILITY OF PRESUMPTION OF RELIANCE

192. Because of Defendants' scheme and pervasive Class Period omissions, a class-wide presumption of reliance is appropriate pursuant to *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972).

193. Plaintiff's claims for securities fraud are also asserted, in part, under the fraud-on-the market theory of reliance. The market price of Acadia securities, including common stock regularly traded on the NASDAQ, was artificially inflated by the scheme and the materially false and misleading statements and omissions complained of herein. Defendants' materially false and

misleading statements and omissions inflated the price of Acadia securities both before and during the Class Period.

194. The Class Period inflation in the price of Acadia securities was eliminated when the financial conditions, business risks, and other information concealed by Defendants' fraud was revealed to the market. The information did not reach the market all at once but leaked out through several partial disclosures, each of which partially corrected the market price of Acadia securities.

195. At all relevant times, the market for Acadia securities was an efficient market for the following reasons, among others:

(a) Acadia securities met the requirements for listing, and were listed and actively traded, on the NASDAQ, a highly efficient and automated market;

(b) During the Class Period, a high volume of Acadia securities traded on the NASDAQ;

(c) As a regulated issuer, Acadia filed periodic public reports with the SEC and NASDAQ;

(d) Acadia regularly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, publications on its website and other Internet sites, and other wide-ranging public disclosures, such as conference calls, communications with the financial press, and other similar reporting services;

(e) During the Class Period, Acadia was followed by securities analysts employed by major brokerage firms. Analysts employed by these and other firms regularly wrote reports based on the publicly available information disseminated by Defendants about Acadia.

These reports were distributed to the sales force and certain customers of their respective brokerage firms; and

(f) Acadia had substantial institutional ownership during the Class Period. Each of these institutions regularly analyzed and reported on the publicly available information about Acadia and its operations.

196. Through the foregoing mechanisms, the information publicly disseminated by Defendants about Acadia and its operations, and the import thereof, became widely available to and was acted upon by investors in the marketplace, such that, as a result of their transactions in Acadia stock, the information disseminated by Defendants, including the scheme and materially false and misleading statements and omissions described above, became incorporated into and were reflected by the market price of Acadia publicly traded securities.

197. Under these circumstances, all purchasers of Acadia securities during the Class Period suffered similar injury through their purchase of Acadia securities at artificially inflated prices and their subsequent decline in value, and a presumption of reliance applies.

## X. CLASS ACTION ALLEGATIONS

198. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons who purchased Acadia securities during the Class Period and were harmed thereby (the "Class"). Excluded from the Class are Defendants and their immediate families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

199. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Acadia shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff believes

that there are thousands of members in the proposed Class, if not more. Record owners and other members of the Class may be identified from records maintained by Acadia, its transfer agent, or securities' brokers, and may be notified of the pendency of this action electronically or by mail, using the form of notice similar to that customarily used in securities class actions.

200. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

201. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

202. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the business and operations of Acadia;

(c) whether the price of Acadia securities was artificially inflated during the Class Period; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

203. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

**For Violation of §10(b) of the Exchange Act and Rule 10b-5**
**(Against All Defendants)**

204. Plaintiff incorporates ¶¶1-203 by reference.

205. During the Class Period, Defendants disseminated or approved the statements as specified above in §V., which they knew or recklessly disregarded contained material misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

206. Defendants violated §10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Acadia securities during the Class Period.

207. Defendants, individually and together, directly and indirectly, by the use of the means and instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about Acadia's business, operations, and financial condition as specified herein.

208. Defendants had knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.

209. As a result of the scheme and dissemination of the materially false or misleading information and/or failure to disclose material facts, as set forth above, the market price of Acadia securities was artificially inflated during the Class Period. In ignorance of the fact that the market price of Acadia securities was artificially inflated, and relying directly or indirectly on the materially false and misleading statements, or upon the integrity of the market in which Acadia securities traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants (but not disclosed in Defendants' public statements during the Class Period), Plaintiff and the other Class members purchased or otherwise acquired Acadia securities during the Class Period at artificially high prices and were damaged thereby.

210. Plaintiff and the Class, in reliance on the integrity of the market, paid artificially inflated prices for Acadia securities, and suffered losses when the relevant truth was revealed. Plaintiff and the Class would not have purchased Acadia securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' scheme and materially misleading statements and omissions.

211. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other Class members suffered damages in connection with their Class Period transactions in Acadia securities.

212. By reason of the foregoing, Defendants violated §10(b) of the Exchange Act and SEC Rule 10b-5.

## COUNT II

**For Violation of §20(a) of the Exchange Act**
**(Against the Individual Defendants)**

213. Plaintiff incorporates ¶¶1-212 by reference.

214. The Individual Defendants were controlling persons of Acadia within the meaning of §20(a) of the Exchange Act. By virtue of their high-level positions as officers and/or directors of Acadia, their ownership and contractual rights, participation in and awareness of the Company's operations, and intimate knowledge of the statements filed by the Company with the SEC and/or disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the allegedly materially false and misleading statements.

215. In particular, each of the Individual Defendants had direct or supervisory responsibility over the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions and business practices giving rise to the securities violations as alleged in Count I, and exercised that power.

216. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases and acquisitions of Acadia securities during the Class Period when the relevant truth was revealed.

217. By reason of the foregoing, the Individual Defendants violated §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A. Determining that this action is a proper class action and certifying Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

DATED: July 10, 2025

ROBBINS GELLER RUDMAN
& DOWD LLP
CHRISTOPHER M. WOOD (BPR #032977)
JERRY E. MARTIN (BPR #20193)

s/ Christopher M. Wood
CHRISTOPHER M. WOOD

200 31st Avenue North
Nashville, TN 37203
Telephone: 615/244-2203
cwood@rgrdlaw.com
jmartin@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
DARREN J. ROBBINS
SAM S. SHELDON
DARRYL J. ALVARADO
J. MARCO JANOSKI GRAY
TING H. LIU
T. ALEX B. FOLKERTH
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
darrenr@rgrdlaw.com
ssheldon@rgrdlaw.com
dalvarado@rgrdlaw.com
mjanoski@rgrdlaw.com
tliu@rgrdlaw.com
afolkerth@rgrdlaw.com

Lead Counsel for Lead Plaintiff

BISHOP PARTNOY LLP
FRANK PARTNOY
1717 K Street, NW Suite 900
Washington, DC 20006
Telephone: 202/787-5769
Frank@bishoppartnoy.com

Counsel for Lead Plaintiff