UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION

| | |
|---|---|
| ANURAG KACHRODIA, Individually and on Behalf of All Others Similarly Situated,<br><br>              Plaintiff,<br><br>    vs.<br><br>ACADIA HEALTHCARE COMPANY, INC., et al.,<br><br>              Defendants. | Civil Action No. 3:24-cv-01238 (Consolidated)<br><br><u>CLASS ACTION</u><br><br>Chief Judge William L. Campbell, Jr.<br>Magistrate Judge Jeffery S. Frensley<br><br>PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS |

- 1 -

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ...................................................................................................1

II. FACTUAL BACKGROUND ....................................................................................2

    A. Defendants Focus on "Quality Care" as Key to Acadia's Success ..........................2

    B. Acadia Traps Patients and Understaffs Clinics in a Scheme to Inflate Reported Results .................................................................................................3

    C. Defendants Conceal Exposure to Patient Lawsuits Involving Massive, Uncapped Damages ...........................................................................................5

    D. The Truth Is Slowly Revealed ...........................................................................6

III. LEGAL STANDARDS ............................................................................................7

IV. ARGUMENT ...........................................................................................................8

    A. Plaintiff Adequately Alleges an Undisclosed Scheme........................................8

    B. Plaintiff's Other Scheme Liability Claims Are Unchallenged .............................14

    C. Plaintiff Adequately Alleges Material Misstatements and Omissions ..................14

        1. Misleading Statements Regarding Acadia's Success ...............................15

            a. Misleading "Quality Care" Statements .........................................15

            b. Misleading Statements Regarding Metrics .....................................17

        2. Misleading Statements Concerning Legal Contingencies ........................18

        3. Misleading Risk Disclosures...................................................................22

    D. The Totality of the Allegations Support a Strong Inference of Scienter ...............23

        1. Defendants' Involvement in the Fraud Establishes Their Contemporaneous Knowledge of the Scheme .........................................24

        2. The Fraud Concerned Acadia's Core Operation......................................26

        3. Divergence Between Defendants' Statements and Internal Reports ........28

        4. Defendants' Attempts to Cover Up Wrongdoing ....................................28

        5. Related Litigation Is Probative of Defendants' Scienter .........................29

4906-7970-2645.v7

Case 3:24-cv-01238   Document 69   Filed 11/07/25   Page 2 of 47 PageID #: 1577

6.     Defendants Had Motive to Commit Fraud.................................................29

7.     Defendants Knowingly or Recklessly Misled Investors by Concealing *Inman* ...................................................................................31

E.     Plaintiff Adequately Alleges Loss Causation ........................................................33

F.     Plaintiff Adequately Alleges Control Person Claims ...........................................35

V.     CONCLUSION.................................................................................................................35

4906-7970-2645.v7

**TABLE OF DEFINED TERMS**

| Defined Term | Meaning |
|---|---|
| Acadia | Acadia Healthcare Company, Inc. |
| ASC 450 | Financial Accounting Standards Board Accounting Standard Codification 450, *Contingencies* |
| CEO | Chief Executive Officer |
| Class Period | February 8, 2020 to February 27, 2025 |
| Company | Acadia Healthcare Company, Inc. |
| Complaint | Consolidated Complaint for Violations of the Federal Securities Laws (ECF 55) |
| Defendants | Acadia Healthcare Company, Inc., Christopher H. Hunter, Heather Dixon, Debra K. Osteen, and David M. Duckworth |
| DOJ | U.S. Department of Justice |
| Exchange Act | Securities Exchange Act of 1934 |
| GAAP | Generally Accepted Accounting Principles |
| *Inman* | *Inman v. Garcia*, No. D-117-CV-2019-00136 (N.M. 1st Jud. Dist. Ct., Rio Arriba Cnty.) |
| Mot. | Memorandum of Law in Support of Defendants' Motion to Dismiss (ECF 63) |
| *NYT* | *The New York Times* |
| Plaintiff | Lead Plaintiff California Public Employees' Retirement System |
| PSLRA | Private Securities Litigation Reform Act of 1995 |
| SEC | U.S. Securities and Exchange Commission |
| UHS | United Health Services, Inc. |
| | Emphasis is added and citations are omitted unless otherwise noted. |
| | Paragraph references ("¶_" and "¶¶_") are to the Consolidated Complaint for Violations of the Federal Securities Laws (ECF 55). Section references ("§_" and "§§_") are internal citations to this Memorandum of Law, unless citing to a statute. |

4906-7970-2645.v7

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)............................................................................................................7

*Bisel v. Acasti Pharma, Inc.*,
    2022 WL 4538173 (S.D.N.Y. Sep. 28, 2022)...................................................................19

*Boca Raton Firefighters' & Police Pension Fund
    v. DeVry Inc.*,
    2012 WL 1030474 (N.D. Ill. Mar. 27, 2012)...................................................................13

*Bond v. Clover Health Invs., Corp.*,
    587 F. Supp. 3d 641 (M.D. Tenn. 2022).............................................................18, 25, 27, 31

*Bondali v. Yum! Brands, Inc.*,
    620 F. App'x 483 (6th Cir. 2015) .....................................................................................23

*Chamberlain v. Reddy Ice Holdings, Inc.*,
    757 F. Supp. 2d 683 (E.D. Mich. 2010)...............................................................12, 25, 30, 34

*City of Fort Lauderdale Police & Firefighters'
    Ret. Sys. v. Pegasystems Inc.*,
    683 F. Supp. 3d 120 (D. Mass. 2023) ...............................................................................32

*City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*,
    637 F.3d 169 (2d Cir. 2011).............................................................................................21

*Cosby v. KPMG, LLP*,
    2018 WL 3723712 (E.D. Tenn. Aug. 2, 2018) .............................................................21, 35

*Doshi v. Gen. Cable Corp.*,
    823 F.3d 1032 (6th Cir. 2016) ..........................................................................................27

*Dougherty v. Esperion Therapeutics, Inc.*,
    905 F.3d 971 (6th Cir. 2018) ............................................................................................17

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)..........................................................................................................14

*Fidel v. Farley*,
    392 F.3d 220 (6th Cir. 2004) ............................................................................................33

*Franchi v. SmileDirectClub, Inc.*,
    633 F. Supp. 3d 1046 (M.D. Tenn. 2022).....................................................................18, 35

4906-7970-2645.v7

*Frank v. Dana Corp.*,
547 F.3d 564 (6th Cir. 2008) ....................................................................................24

*Frank v. Dana Corp.*,
646 F.3d 954 (6th Cir. 2011) ....................................................................................23

*Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*,
2011 WL 1335803 (M.D. Tenn. Mar. 31, 2011) ............................................ *passim*

*Gaynor v. Miller*,
273 F. Supp. 3d 848 (E.D. Tenn. 2017) ....................................................................21

*Gimpel v. Hain Celestial Grp., Inc.*,
2025 WL 2749562 (2d Cir. Sep. 29, 2025)...............................................................12

*Grae v. Corr. Corp. of Am.*,
2017 WL 6442145 (M.D. Tenn. Dec. 18, 2017)............................................. *passim*

*Hassan v. Boston Beer Co., Inc.*,
2023 WL 8110940 (2d Cir. Nov. 22, 2023)...............................................................14

*Helwig v. Vencor, Inc.*,
251 F.3d 540 (6th Cir. 2001) ................................................................... *passim*

*In re 2007 Novastar Fin. Inc. Sec. Litig.*,
579 F.3d 878 (8th Cir. 2009) ....................................................................................19

*In re Almost Fam., Inc. Sec. Litig.*,
2012 WL 443461 (W.D. Ky. Feb. 10, 2012) .......................................................10, 34

*In re Am. Serv. Grp., Inc.*,
2009 WL 1348163 (M.D. Tenn. Mar. 31, 2009) ............................................ *passim*

*In re AT&T/DirecTV Now Sec. Litig.*,
480 F. Supp. 3d 507 (S.D.N.Y. 2020).......................................................................13

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
980 F. Supp. 2d 564 (S.D.N.Y. 2013).................................................................20, 32

*In re Boeing Sec. Litig.*,
40 F. Supp. 2d 1160 (W.D. Wash. 1998)...................................................................33

*In re Cardinal Health Inc. Sec. Litig.*,
426 F. Supp. 2d 688 (S.D. Ohio 2006) .....................................................................30

4906-7970-2645.v7

*In re CBL & Assocs. Props., Inc. Sec. Litig.*,
2022 WL 1405415 (E.D. Tenn. May 3, 2022),
*clarified*, 2022 WL 1714484 (E.D. Tenn. May 25, 2022) ....................................12, 19, 21, 32

*In re Citigroup Sec. Litig.*,
2023 WL 2632258 (S.D.N.Y. Mar. 24, 2023) .........................................................................32

*In re Comshare Inc. Sec. Litig.*,
183 F.3d 542 (6th Cir. 1999) .................................................................................................23

*In re Dentsply Sirona, Inc. Sec. Litig.*,
665 F. Supp. 3d 255 (E.D.N.Y. 2023) ...................................................................................21

*In re Direct Gen. Corp. Sec. Litig.*,
398 F. Supp. 2d 888 (M.D. Tenn. 2005).......................................................................9, 13, 14

*In re Envision Healthcare Corp. Sec. Litig.*,
2019 WL 6168254 (M.D. Tenn. Nov. 19, 2019) ............................................................ *passim*

*In re Envision Healthcare Corp. Sec. Litig.*,
2022 WL 4551876 (M.D. Tenn. Sep. 29, 2022).....................................................................34

*In re Estée Lauder Co., Inc. Sec. Litig.*,
2025 WL 965686 (S.D.N.Y. Mar. 31, 2025) ...................................................................12, 18

*In re FirstEnergy Corp. Sec. Litig.*,
2022 WL 681320 (S.D. Ohio Mar. 7, 2022)...............................................................22, 30, 31

*In re FirstEnergy Corp. Sec. Litig.*,
316 F. Supp. 2d 581 (N.D. Ohio 2004)..................................................................................21

*In re Genius Brands Int'l, Inc. Sec. Litig.*,
97 F.4th 1171 (9th Cir. 2024) ................................................................................................21

*In re JP Morgan Chase Sec. Litig.*,
363 F. Supp. 2d 595 (S.D.N.Y. 2005)....................................................................................22

*In re Lumen Techs., Inc. Sec. Litig. II*,
2025 WL 978229 (W.D. La. Mar. 14, 2025) .........................................................................32

*In re Nature's Sunshine Prods. Sec. Litig.*,
486 F. Supp. 2d 1301 (D. Utah 2007).....................................................................................28

4906-7970-2645.v7

*In re Phycor Corp. Sec. Litig.*,
No. 3:98-0834, slip op. (M.D. Tenn. Feb. 17, 2000) ...............................................................17

*In re Shoals Techs. Grp., Inc. Sec. Litig.*,
2025 WL 2795062 (M.D. Tenn. Sep. 30, 2025) ............................................................ *passim*

*In re Silver Wheaton Corp. Sec. Litig.*,
2016 WL 3226004 (C.D. Cal. June 6, 2016) ........................................................................31

*In re Snap Inc. Sec. Litig.*,
2018 WL 2972528 (C.D. Cal. June 7, 2018) ...................................................................19, 31

*In re Sunbeam Sec. Litig.*,
89 F. Supp. 2d 1326 (S.D. Fla. 1999) ..................................................................................25

*In re Tenet Healthcare Corp. Sec. Litig.*,
2017 WL 11638941 (N.D. Tex. Dec. 20, 2017) ..................................................................32

*In re Virtu Fin., Inc. Sec. Litig.*,
770 F. Supp. 3d 482 (E.D.N.Y. 2025) .................................................................................22

*In re Zumiez Inc. Sec. Litig.*,
2009 WL 901934 (W.D. Wash. Mar. 30, 2009) ..................................................................10

*Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*,
2021 WL 1316705 (M.D. Tenn. Apr. 8, 2021)....................................................................29

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
818 F.3d 85 (2d Cir. 2016)..............................................................................20, 31, 32, 33

*Jackson Cnty. Emps.' Ret. Sys. v. Ghosn*,
510 F. Supp. 3d 583 (M.D. Tenn. 2020)........................................................16, 26, 27, 31

*Karp v. SI Fin. Grp., Inc.*,
2020 WL 1891629 (D. Conn. Apr. 16, 2020)......................................................................19

*Kolominsky v. Root, Inc.*,
100 F.4th 675 (6th Cir. 2024) .............................................................................................23

*Kuhn v. Washtenaw Cnty.*,
709 F.3d 612 (6th Cir. 2013) ..............................................................................................14

*Kyrstek v. Ruby Tuesday, Inc.*,
2016 WL 1274447 (M.D. Tenn. Mar. 31, 2016) .................................................................24

*La. Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc.*,
2021 WL 4397946 (S.D. Ohio Sep. 27, 2021)..................................................................11, 16

*Levine v. NL Indus., Inc.*,
926 F.2d 199 (2d Cir. 1991)...........................................................................................22

*Lorenzo v. SEC*,
587 U.S. 71 (2019).........................................................................................................8

*Lubbers v. Flagstar Bancorp. Inc.*,
162 F. Supp. 3d 571 (E.D. Mich. 2016)........................................................................20

*Macquarie Infrastructure Corp. v.*
*Moab Partners, L. P.*,
601 U.S. 257 (2024).......................................................................................................19

*Meyer v. Greene*,
710 F.3d 1189 (11th Cir. 2013) .....................................................................................34

*Miller v. Champion Enters. Inc.*,
346 F.3d 660 (6th Cir. 2003) .........................................................................................11

*Morse v. McWhorter*,
290 F.3d 795 (6th Cir. 2002) .........................................................................................35

*Nemo Tile Co. v. Shawmut Nat'l Corp.*,
1995 WL 1682315 (E.D.N.Y. Nov. 1, 1995).................................................................10

*Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*,
877 F.3d 687 (6th Cir. 2017) ...................................................................................10, 34

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
830 F.3d 376 (6th Cir. 2016) .....................................................................................7, 33

*Omnicare, Inc. v. Laborers Dist. Council Constr.*
*Indus. Pension Fund*,
575 U.S. 175 (2015).......................................................................................................18

*Padilla v. Cmty. Health Sys., Inc.*,
2022 WL 3452318 (M.D. Tenn. Aug. 17, 2022) ......................................................11, 20

*Pension Fund Grp. v. Tempur-Pedic Int'l, Inc.*,
614 F. App'x 237 (6th Cir. 2015) ..................................................................................18

4906-7970-2645.v7

*Perez v. Target Corp.*,
2024 WL 4804656 (D. Minn. Nov. 15, 2024) ........................................................................14

*Pittman v. Unum Grp.*,
861 F. App'x 51 (6th Cir. 2021) ...............................................................................26, 29, 30

*Plumbers Loc. No. 200 Pension Fund v. Wash. Post Co.*,
831 F. Supp. 2d 291 (D.D.C. 2011) ......................................................................................27

*Podraza v. Whiting*,
790 F.3d 828 (8th Cir. 2015) ................................................................................................33

*Police & Fire Ret. Sys. of the City of Detroit
v. La Quinta Holdings Inc.*,
2017 WL 4082482 (S.D.N.Y. Aug. 24, 2017) .......................................................................11

*PR Diamonds, Inc. v. Chandler*,
364 F.3d 671 (6th Cir. 2004) ..........................................................................................24, 31

*Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*,
769 F.3d 313 (5th Cir. 2014) ................................................................................................34

*Robeco Cap. Growth Funds v. Peloton Interactive, Inc.*,
665 F. Supp. 3d 522 (S.D.N.Y. 2023).....................................................................................14

*St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co., Inc.*,
2021 WL 195370 (M.D. Tenn. Jan. 20, 2021)................................................................. *passim*

*St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co., Inc.*,
2022 WL 4598044 (M.D. Tenn. Sep. 30, 2022).....................................................................34

*St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co., Inc.*,
2025 WL 2940714 (M.D. Tenn. Oct. 16, 2025) ..............................................................22, 23

*Sherman v. Abengoa, S.A.*,
2025 WL 2825369 (2d Cir. Oct. 6, 2025)...............................................................................11

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
547 F.3d 406 (2d Cir. 2008)...................................................................................................21

*Strougo v. Tivity Health, Inc.*,
551 F. Supp. 3d 839 (M.D. Tenn. 2021).........................................................................30, 35

*Teamsters Loc. 237 Welfare Fund v.*
    *ServiceMaster Glob. Holdings, Inc.*,
    2022 WL 989240 (W.D. Tenn. Mar. 31, 2022) ...............................................................27, 33

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007).........................................................................................23, 24, 27

*Think Village-Kiwi, LLC v. Adobe Sys., Inc.*,
    2009 WL 3837270 (N.D. Cal. Nov. 16, 2009) ............................................................8

*Weiner v. Tivity Health, Inc.*,
    365 F. Supp. 3d 900 (M.D. Tenn. 2019)..............................................................23, 24

*White v. H&R Block, Inc.*,
    2004 WL 1698628 (S.D.N.Y. July 28, 2004) ...........................................................32

*Winslow v. BancorpSouth, Inc.*,
    2011 WL 7090820 (M.D. Tenn. Apr. 26, 2011),
    *R&R approved by*, 2012 WL 214635 (M.D. Tenn. Jan. 24, 2012)...................................11, 25

*Zwick Partners, LP v. Quorum Health Corp.*,
    2018 WL 2933406 (M.D. Tenn. Apr. 19, 2018).................................................20, 23

**STATUTES, RULES, AND REGULATIONS**

Private Securities Litigation Reform Act of 1995
    15 U.S.C. §78u-4 et seq. ...............................................................................................7, 33

15 U.S.C.
    §78t(a) ...........................................................................................................................35

Federal Rules of Civil Procedure
    Rule 8 .............................................................................................................................33
    Rule 9 .............................................................................................................................33
    Rule 9(b) ......................................................................................................................7, 8
    Rule 15(a)(2) ..................................................................................................................35

17 C.F.R.8, 14
    240.10b-5(a).....................................................................................................................8
    240.10b-5(c).....................................................................................................................8

## I.    INTRODUCTION

Helmed by a new management team following the abrupt ouster of its former CEO, Acadia appeared to be a company turning a new leaf. ¶27.  That, however, was not the case.  This securities fraud class action arises out of a widespread scheme by Acadia and its senior-most executives to inflate reported revenue and earnings through the systematic: (i) understaffing of methadone clinics below acceptable levels, resulting in counselor caseloads twice the size permitted by state regulators; and (ii) trapping patients in the Company's psychiatric hospitals without medical justification in order to capture insurance payments from patients who should have been discharged.  Defendants misled investors by: (i) falsely representing Acadia's purported core tenet, the high "quality" of its services, as well as the sustainability of increases in Acadia's key revenue and EBITDA metrics; and (ii) causing the Company to issue misleading warnings that "sometimes" detentions are "challenged," when its improper practices were widespread and systematic.  As investors learned the truth, Acadia's share price tumbled.

In their attempt to avoid liability, Defendants mischaracterize Acadia's appalling conduct as isolated and Plaintiff's allegations as unparticularized.  But the Complaint details a scheme across dozens of states: (i) corroborated by Acadia employees, internal documents, and inspection reports; (ii) confirmed by a DOJ investigation; and (iii) supported by numerous specific examples of the wrongful conduct at multiple Acadia facilities.  Further, Plaintiff's allegations set forth the "who" (defendants Acadia, Hunter, Dixon, Osteen, and Duckworth), the "what" (concealing improper detentions and understaffing at Acadia's psychiatric hospitals and methadone clinics), the "where" (in Defendants' public misstatements), the "when" (during the Class Period), and even the "why" (to unlock substantial compensation by inflating reported results through unsustainable and illegitimate practices).  Defendants' misdirection aside, nothing more is required.

- 1 -

Defendants' contention that they were unaware of the scheme defies common sense. The scheme concerns Acadia's core operations, which Defendants are presumed to know. Indeed, Defendants' own (mis)statements, including explicit denials of the allegations, betray their knowledge of the scheme, or at least their recklessness in not knowing, given the divergence between what Defendants told investors and what the Company's employees and regulators reported. Defendants' cover-up, profit motive, and the widespread evidence of misconduct at so many independent facilities all support a strong inference of scienter.

And given that negative publicity regarding its "quality" care (or lack thereof) is anathema to Acadia, it makes perfect sense why Defendants instituted policies and practices designed to conceal the true conditions at Acadia facilities. As alleged in the Complaint, this included intentionally destroying evidence in litigation regarding the repeated sexual assault of an eight-year-old girl – litigation that Defendants concealed from investors, despite an obvious duty to disclose following a default judgment on all liability issues against Acadia.

Defendants' Motion to Dismiss should be denied.

## II. FACTUAL BACKGROUND

### A. Defendants Focus on "Quality Care" as Key to Acadia's Success

Throughout the Class Period, Defendants repeatedly emphasized to investors that Acadia's present and continued success depended on the "quality care" it provided. *See, e.g.*, ¶76 ("I think one of the ***most important*** things is really the impact on our success that quality of care has."); ¶105 ("quality" "a ***strong driver*** of our volume"); ¶106 ("***it all comes down to the quality of our care***"); ¶¶72, 122 ("Quality remains ***foundational to every aspect of the work*** we do . . . and is ***key*** to driving outcomes and operational effectiveness."). Indeed, "quality care" was Acadia's "top priority," which Defendants contended the Company would "continue to deliver." ¶83. In truth, however, Acadia's revenue and EBITDA growth were fueled in material part by Defendants'

- 2 -

scheme and wrongful course of conduct whereby Acadia detained vulnerable psychiatric patients against their will and systematically understaffed its methadone clinics.  ¶¶4, 28, 72, 125.

**B.** **Acadia Traps Patients and Understaffs Clinics in a Scheme to Inflate Reported Results**

Defendants' far-reaching scheme put profit over patient care.  As reported on September 1, 2024 in *The New York Times* exposé entitled "How a Leading Chain of Psychiatric Hospitals Traps Patients," Acadia systematically held patients against their will in order to continue to bill their insurance.  ¶29.  "In *at least 12 of the 19 states* where Acadia operates psychiatric hospitals," the Company "detain[ed] people in ways that violated the law" (*id*.), and *over 50* of Acadia's own current and former executives and staff from "hospitals *all across the country*" outlined an "*elaborate system*" created "to get as many patients in the door and then keep those patients, especially the ones with insurance, in Acadia facilities for as long as possible."  ¶¶4, 30.  Acadia derived a majority of its revenue from these acute inpatient psychiatric facilities.  ¶23.

To carry out their scheme, Defendants caused Acadia to deploy an array of strategies to keep patients locked up, including "exaggerat[ing] patients' symptoms," making "false statements" in medical records, "tweak[ing]" medication dosages, and "coach[ing]" employees "to use certain buzzwords, like 'combative'" in patients' charts, to improperly lengthen patient  stays. ¶32.  At one hospital alone, Acadia filed *thousands* of meritless court petitions "to extend patients' involuntary stays" to allow Acadia to continue improperly billing patient insurance.  ¶33.

On September 26, 2024, just weeks after the *NYT* story, the DOJ announced in a press release that Acadia had *knowingly* "failed to properly discharge beneficiaries when they no longer needed inpatient treatment and had improper and excessive lengths of stay" at Acadia facilities *in six different states* between 2014 and 2017; and *knowingly* "failed to provide adequate staffing, training and/or supervision of staff, which resulted in assaults . . . and other harm."  ¶37.

- 3 -

This undisclosed conduct was antithetical to providing quality patient care. As one former Acadia hospital executive explained, the Company's practice of improperly institutionalizing people "limits them from ever coming back for treatment" (¶34); this is particularly true given that, as the *NYT* reported, "[a]t Acadia facilities ***around the country***, health inspectors have found that some patients did not receive therapy, were unsupervised or were denied access to vital medications" and "[m]any inspection reports described rapes, assaults and filthy conditions." *Id*.

Further, as the *NYT* published in a December 7, 2024 follow-on piece entitled "Fraud and Fakery at the Country's Largest Chain of Methadone Clinics," based on interviews with "***five dozen*** current and former employees ***in 22 of the 33 states*** where the company has clinics," ***$1.3 billion*** in revenue generated by Acadia's methadone clinics since 2022 "has been built in part on deception." ¶45. The *NYT* report explained how Acadia's methadone business was "built on volume," yet inadequately staffed. ¶¶46, 48. The Company's "counselors carry caseloads that are sometimes ***more than double the limit set by state regulators***, according to employees and inspection records" (¶46), and "[r]eports filed by health inspectors in at least ***six states*** have criticized Acadia's methadone clinics for inadequate staffing." ¶48.

Compounding the issue, Acadia "cut the schedules of its full-time counselors and other clinic workers ***nationwide*** by up to four hours a week, further taxing their capacity" (¶46), and awarded bonuses to clinic directors "when their patient enrollment goes up." ¶47. As a result, clinics in multiple states administered methadone to people who did not even suffer from opioid addiction. *Id*. The article further detailed how Acadia employees "***falsify*** the medical records that Acadia uses to bill insurers, according to the ***employees and internal emails***." ¶45. As one former supervisor at an Acadia clinic stated: "'Acadia does not focus on client care . . . . They focus on the bottom line.'" ¶48. This was all concealed from investors.

- 4 -

## C. Defendants Conceal Exposure to Patient Lawsuits Involving Massive, Uncapped Damages

On October 23, 2020, a New Mexico court granted default judgment against Acadia, its former CEO, and their co-defendants on all liability issues in *Inman*. ¶61. The conduct there was beyond the pale. An entity operated by Acadia's Desert Hills facility placed an eight-year-old girl, G.S., into treatment foster care with Clarence Garcia, despite prior knowledge that he sexually abused children at his home. ¶56. *Inman* alleged that Garcia repeatedly raped G.S. while she resided with him, and that, in August 2018, Garcia had pled guilty to Aggravated Indecent Exposure to a child. *Id*. *Inman* sought treble and punitive damages for Conspiracy, Negligence, and Assault and Battery and Infliction of Extreme Emotional Distress. ¶57. New Mexico does not cap punitive damages, which may be awarded for bad faith actions, among other reasons. ¶62.

Days before trial, the court issued two orders. First, on October 21, 2020, the court *denied* Acadia's motion for summary judgment on punitive damages. ¶63. Second, on October 23, 2020, the court granted default judgment on all issues of liability against Acadia, and its co-defendants, for discovery misconduct. ¶61. The court formalized the default judgment in a January 6, 2021 written order noting that "[t]he conduct in this case illustrates and *proves* there have been *bad-faith discovery abuses* by Acadia." *Id*.; ¶¶58-59.

Acadia's discovery abuses continued. On July 1, 2022, the court granted another motion for sanctions, finding that, "only 13 days after this Court entered default judgment . . . as a sanction for discovery abuses . . . , [Acadia's discovery vendor] caused twenty-three 95-gallon containers of paper to be destroyed . . . *with Acadia's approval*." ¶65. As a result, the court ordered that Inman was "entitled to receive an inference instruction" against Acadia and "will be allowed to present evidence about destruction of evidence" because "that conduct is evidence of that party's state of mind, which is relevant to" punitive damages. ¶66.

- 5 -

Following a trial, on July 7, 2023, the jury returned a verdict against Acadia awarding the plaintiff compensatory damages of *$80 million* and punitive damages of *$405 million*. ¶67.

**D.    The Truth Is Slowly Revealed**

Acadia filed a Form 8-K on Tuesday July 11, 2023 disclosing the $485 million award, causing Acadia's share price to fall. ¶¶67, 69, 174-175. Following the September 1, 2024 *NYT* article, Acadia's share price again fell. ¶¶177-178. Acadia, however, denied the *NYT*'s reporting and continued to conceal the full impact of its fraudulent scheme. ¶¶36, 49, 123-124, 178, 186.

Government investigations quickly followed. On September 27, 2024, Acadia announced that it had received subpoenas from prosecutors and a grand jury, and that the Company expected additional investigations, causing Acadia's share price to fall further. ¶¶38, 179, 181. An October 18, 2024 *NYT* article then revealed that the Department of Veterans Affairs was also investigating Acadia, causing Acadia's share price to fall yet again. ¶183.

Unable to continue to rely on their scheme to prop up Acadia's earnings, Defendants announced on October 30, 2024 that the Company had reduced its 2024 full-year guidance and disclosed that its revenue per patient day had declined for only the second time since 4Q19. ¶¶43, 184. During the Company's October 31, 2024 conference call, Dixon told investors the guidance reduction related to the misconduct: "[W]e believe [lower volume growth] is a result of the recent headlines and reporting in the media." ¶¶184-185. As a result, Acadia's share price fell 18%. ¶186. Yet Defendants continued to conceal the full impact of their scheme. During the call, Hunter falsely stated that at Acadia "medical necessity drives patient care" and that "[t]he allegation that Acadia systematically holds patients longer than medically necessary is false." ¶186.

Acadia then announced in a February 27, 2025 release that it had missed its 4Q24 guidance and was reducing long-term growth targets. ¶¶50, 187. The Company further disclaimed the reliability of its total facility and same facility results, and disclosed that its revenue per patient

- 6 -

day had again declined.  ¶187.  Before the market opened the next day, Hunter and Dixon confirmed during a conference call that Acadia was still suffering from lower patient referrals following the disclosures of Acadia's misconduct.  ¶¶51, 188.  As a result, Acadia's share price fell over 25%.  ¶¶189-190.  All told, Acadia's stock price declined over 63%, from almost $82 per share before the September 1, 2024 *NYT* exposé to just under $30 per share following its February 27, 2025 earnings release, inflicting substantial damage on Plaintiff and the Class.

## III.     LEGAL STANDARDS

A court evaluating a motion to dismiss "construes the complaint in the light most favorable to the plaintiff, accepts its allegations as true, and draws all reasonable inferences in favor of the plaintiff."  *In re Envision Healthcare Corp. Sec. Litig.*, 2019 WL 6168254, at *6 (M.D. Tenn. Nov. 19, 2019) (Campbell, J.).  A complaint need only allege "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007), and "dismissal is appropriate only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  *St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co., Inc.*, 2021 WL 195370, at *2 (M.D. Tenn. Jan. 20, 2021) (Campbell, J.).

A securities fraud complaint must also satisfy the additional pleading requirements of Fed. R. Civ. P. 9(b) and the PSLRA.  *See Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 383 (6th Cir. 2016).  Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  But "'Rule 9(b) does not require omniscience; rather the Rule requires that the circumstances of the fraud be pled with enough specificity to put [the opposing party] on notice as to the nature of the claim.'"  *Grae v. Corr. Corp. of Am.*, 2017 WL 6442145, at *12 (M.D. Tenn. Dec. 18, 2017) ("*CCA*") (Trauger, J.).

- 7 -

## IV.    ARGUMENT

### A.    Plaintiff Adequately Alleges an Undisclosed Scheme

The Complaint alleges "scheme liability" claims under Rule 10b-5(a) and (c) of the Exchange Act that Defendants' deceptive conduct – in addition to their misstatements – operated as a fraud on investors.  ¶¶26-52; *see Lorenzo v. SEC*, 587 U.S. 71 (2019); *Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*, 2011 WL 1335803, at *45 (M.D. Tenn. Mar. 31, 2011) (Haynes, J.) ("The securities laws reach misleading conduct as well as misleading statements . . . ."). Because the Complaint alleges the "'time, place, . . . content,'" and the "'nature'" of the scheme and the resulting injury, Rule 9(b)'s requirements are met.  *See CCA*, 2017 WL 6442145, at *12.

Here, Defendants knew, but did not disclose, that throughout the Class Period, Acadia was systematically holding patients against their will and without medical justification at its psychiatric hospitals in order to continue billing patients' insurance, and further intentionally understaffed its methadone clinics to inflate profits.  ¶¶26-52; §II.B.  Defendants then relied, in significant part, on revenue derived from these improper and unsustainable practices to generate its reported growth rates during 2020 through 2024.  ¶¶28, 136.[1]  This scheme created the illusion that Acadia was growing sustainably and allowed Defendants to obtain millions in compensation.  ¶¶167-172. Plaintiff has thus specified the fraud's who, what, where, when, and how.

As detailed in the Complaint, the scheme stretched across Acadia facilities in ***dozens*** of states and was corroborated by ***over*** 100 Acadia employees ***and*** DOJ investigative findings.  §II.B. Such allegations sufficiently allege a scheme.  *See Psychiatric Sols.*, 2011 WL 1335803, at *45 ("allegations concerning the actual state of patient care in PSI facilities ***in several states***" supported

---

[1]    Defendants attached a 32-page collection of "annexes" that should be disregarded as improper argument in excess of the Court's 30-page limit.  *See Think Village-Kiwi, LLC v. Adobe Sys., Inc.*, 2009 WL 3837270, at *7 (N.D. Cal. Nov. 16, 2009).

- 8 -

scheme allegations); *id*. at *7-*11 (reports from nine facilities supported scheme allegations); *In re Am. Serv. Grp., Inc.*, 2009 WL 1348163, at *46-*47 (M.D. Tenn. Mar. 31, 2009) (Haynes, J.) ("widespread and systemic" misconduct found based on comments from investigators in two states); *see also Acadia*, 2021 WL 195370, at *5 (crediting allegations that "violations did not just occur at some of Acadia's facilities" but were "pervasive" at Acadia's acute inpatient facilities).

Indeed, in a """complex and far-reaching fraudulent scheme"""" such as this, the Complaint need only """provide **examples** of specific" fraudulent conduct that are "**representative samples**" of the scheme.'" *CCA*, 2017 WL 6442145, at *12, *14; *Am. Serv. Grp.*, 2009 WL 1348163, at *44 (scheme allegations sufficient even with "small sample" size of wrongful practices).

In response, Defendants mischaracterize the Complaint as implicating "improper detention" at "just 5" Acadia facilities and claim "[n]one" of Plaintiff's allegations concern "'prevalent'" behavior. Mot. at 9-10. But Plaintiff's allegations of widespread violations belie Defendants' counternarrative. §II.B. Further, Defendants' contentions rely on a factual dispute, which does not properly support dismissal at this juncture. *See In re Direct Gen. Corp. Sec. Litig.*, 398 F. Supp. 2d 888, 894, 897-98 (M.D. Tenn. 2005) (T. Campbell, J.) (this "stage of the litigation is not the time to compare the parties' respective collections of supporting facts and inferences").[2]

In any case, the (*at least*) 12 hospitals implicated by the *NYT*'s reporting constitute nearly *a quarter* of Acadia's approximately 50 acute inpatient facilities (¶38), which made up the Company's *most important* business unit. *See* ¶23. Defendants' reference to the total number of

---

[2] Defendants' complaint that certain actions took place prior to the Class Period (Mot. at 9) misses the point, as such allegations "'confirm what a defendant should have known **during** the class period.'" *Psychiatric Sols.*, 2011 WL 1335803, at *52 n.6.

4906-7970-2645.v7

Acadia facilities (~250, *see* Mot. at 13), most of which are not acute inpatient facilities, is therefore inapt, and they ***do not dispute*** Acadia widely understaffed its methadone clinics.[3]

Defendants' additional argument that the Complaint relies on "speculation" (Mot. at 10-11) is misplaced. As noted above, the allegations are not "editorial commentary," but well-pled facts supported by interviews with hundreds of Acadia employees, internal Acadia email and documents, regulatory findings, and court records, all of which are further corroborated by the DOJ's investigative findings and settlement. §II.B. Indeed, "[n]ewspaper accounts are also sufficient bases on which to plead, if not prove, facts giving rise to a claim for securities fraud." *Psychiatric Sols.*, 2011 WL 1335803, at \*44 (citing cases); *id*. at \*8-\*11 (crediting allegations of understaffing and patient mistreatment based on *Chicago Tribune* reporting); *Am. Serv. Grp.*, 2009 WL 1348163, at \*16, \*47, \*62 (crediting allegations of fraud based on *NYT* reporting); *see also Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 877 F.3d 687, 695-96 (6th Cir. 2017) (noting that "revelations" of the truth come from "many sources," including "newspaper reports").[4]

***"Prior Disclosures."*** Defendants argue that there is no "fraud" because their SEC filings disclosed "the exact risk" that the *NYT* later reported by stating that, "'***from time to time***,'" (i) patients "'***allege*** they should not have been detained'"; and (ii) employees "'do not 'correctly follow[]'" "'appropriate procedures.'" Mot. at 11. But statements that Acadia had "alleged" incidents "from time to time" do not come close to disclosing an "***elaborate system***" institutionalizing patients without medical necessity or that it systematically understaffed its

---

[3]   Defendants' cases (Mot. at 10, 13), which discuss only isolated and anecdotal allegations of misconduct, are inapt. *See In re Zumiez Inc. Sec. Litig.*, 2009 WL 901934, at \*8-\*9 (W.D. Wash. Mar. 30, 2009); *In re Almost Fam., Inc. Sec. Litig.*, 2012 WL 443461, at \*9 (W.D. Ky. Feb. 10, 2012); *Envision*, 2019 WL 6168254, at \*8 (conduct at just 8 of 900 hospitals – ***0.88%***).

[4]   Defendants' cases (Mot. at 11) are inapposite; they concern whether statements in news articles can be attributed to a defendant, which is not at issue. *See, e.g.*, *Nemo Tile Co. v. Shawmut Nat'l Corp.*, 1995 WL 1682315, at \*2 (E.D.N.Y. Nov. 1, 1995).

- 10 -

methadone clinics. Nor do they warn Acadia's admissions and patient day metrics were fueled by its undisclosed scheme to misrepresent the "quality" of its care. As this Court has held, tepid disclosures that Acadia *occasionally* "had patient incidents" do not render the Company's "quality care" statements non-actionable where plaintiffs allege that quality care problems were the Company's *modus operandi*. *See Acadia*, 2021 WL 195370, at *5; *Sherman v. Abengoa, S.A.*, 2025 WL 2825369, at *10 (2d Cir. Oct. 6, 2025) ("it strains credulity to suggest that such a tepid warning about the use of estimates was enough to put investors on notice that [the company] was deliberately manipulating the percentage of completion to inflate its revenues").

Nor did Defendants' boilerplate warnings regarding "litigation, investigations, and negative publicity" disclose their scheme, as "'general cautionary language does not render omission of specific adverse historical facts immaterial.'" *Winslow v. BancorpSouth, Inc.*, 2011 WL 7090820, at *16 (M.D. Tenn. Apr. 26, 2011), *R&R approved by*, 2012 WL 214635 (M.D. Tenn. Jan. 24, 2012) (Sharp, J.). Indeed, "[t]he inadequacy of Defendants' cautionary language is demonstrated by the fact that, when investors learned the truth . . . they were surprised and disappointed." *La. Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc.*, 2021 WL 4397946, at *11 (S.D. Ohio Sep. 27, 2021); *see* ¶¶36, 178.[5] Moreover, whether a risk was adequately disclosed is a factual dispute "not fit for determination at this juncture." *See Padilla v. Cmty. Health Sys., Inc.*, 2022 WL 3452318, at *21 (M.D. Tenn. Aug. 17, 2022) (Richardson, J.); *Acadia*, 2021 WL 195370, at *4 (same). That is especially true here, where Plaintiff alleges that those risk

---

[5] By contrast, the companies in Defendants' cases (Mot. at 11) actually disclosed the "exact" risks and specific information alleged to have been concealed. *See Miller v. Champion Enters. Inc.*, 346 F.3d 660, 678 (6th Cir. 2003); *Police & Fire Ret. Sys. of the City of Detroit v. La Quinta Holdings Inc.*, 2017 WL 4082482, at *6 (S.D.N.Y. Aug. 24, 2017).

- 11 -

disclosures were themselves misleading.  §IV.C.3.; *see Psychiatric Sols.*, 2011 WL 1335803, at *47 ("false cautionary language cannot immunize defendants' misconduct").

*"Unlawful Conduct."*  Defendants incorrectly assert that Plaintiff's claims are premised "on the theory that Acadia was required to" confess that its actions were illegal.  Mot. at 11-12. Not so.  Instead, Plaintiff alleges that Defendants had a duty to disclose that "Acadia did not provide high quality care services and achieved growth by inadequately staffing facilities," which led to "counter-therapeutic policies and practices in its facilities."  *Acadia*, 2021 WL 195370, at *5.  The scheme is thus based on Defendants' concealment of Acadia's conduct, not their failure to take a position on whether that conduct was legal.  *See Psychiatric Sols.*, 2011 WL 1335803, at *44-*45 (scheme pled based on undisclosed practice of understaffing its psychiatric hospitals).[6]

"[T]he fact that a company ordinarily has no duty to opine about the legality of its business practices does not mean, when it does report information about matters relevant to its business practices, that it may knowingly make materially false statements." *In re CBL & Assocs. Props., Inc. Sec. Litig.*, 2022 WL 1405415, at *10 (E.D. Tenn. May 3, 2022), *clarified*, 2022 WL 1714484 (E.D. Tenn. May 25, 2022).  Moreover, Defendants' argument is incorrect as a matter of law because "knowledge of the illegality of the allegedly unlawful conduct *does*" "impose a duty to disclose." *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 708 (E.D. Mich. 2010). And, here, Plaintiff alleges that Defendants knew Acadia's conduct was unlawful.  *See* §IV.D.5.

---

[6]    Plaintiff's misstatement claims survive regardless of whether "unlawful" conduct occurred. *See Gimpel v. Hain Celestial Grp., Inc.*, 2025 WL 2749562, at *8 (2d Cir. Sep. 29, 2025) (10b-5(b) violations "'do[] not require that the defendant have used a fraudulent or otherwise illegal . . . act . . .' but rather turn on 'whether something said was materially misleading'"); *In re Estée Lauder Co., Inc. Sec. Litig.*, 2025 WL 965686, at *3 (S.D.N.Y. Mar. 31, 2025) ("omitted sources of revenue don't need to be 'fraudulent or otherwise illegal' for a statement to be misleading").

- 12 -

*"Financial Data."* Defendants first incorrectly claim that the Complaint "does not even attempt to quantify the scale of the alleged scheme." Mot. at 12. The scheme Plaintiff alleges, however, is pervasive, implicating ~25% or more of Acadia's psychiatric hospitals and methadone clinics in the majority of the states where the Company operates, and, following the revelation of the fraud, Acadia's company-wide growth was impacted. §§II.B., D. As noted above, the allegations concerning the scale of the scheme across several states are similar to those upheld against Acadia itself, Psychiatric Solutions – a behavioral health company started by Acadia executives – and other companies, for similar misconduct. *See* §II.B.; *Psychiatric Sols.*, 2011 WL 1335803, at *7-*11, *28, *45 ("allegations concerning the actual state of patient care in PSI facilities *in several states*" sufficient); *Acadia*, 2021 WL 195370, at *5 (crediting allegations that "violations did not just occur at some of Acadia's facilities" but were "pervasive" at Acadia's acute inpatient facilities); *Am. Serv. Grp.*, 2009 WL 1348163, at *46-*47 ("widespread and systemic" misconduct found based on comments from investigators in two states where, like here, company-wide growth was impacted following the revelation of the truth).[7]

Defendants then announce that data from Acadia's SEC filings "refutes" Plaintiff's alleged scheme. Mot. at 12. But it does not. Defendants improperly attempt to interject such data on a motion to dismiss to "prove the truth of the documents' contents." *Direct Gen.*, 398 F. Supp. 2d at 893-94 (refusing to consider SEC filing "as proof of the actual activities or transactions which it purports to disclose"). Moreover, the data hardly rebuts Plaintiff's allegations – it is not specific

---

[7] Defendants cite to cases (Mot. at 12) concerning mere "anecdotal incidents" and "isolated" misconduct, not a widespread scheme, like the one alleged here. *See, e.g.*, *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 527 (S.D.N.Y. 2020); *Boca Raton Firefighters' & Police Pension Fund v. DeVry Inc.*, 2012 WL 1030474, at *6 (N.D. Ill. Mar. 27, 2012).

- 13 -

to Acadia's psychiatric hospitals, but rather refers to all U.S. facilities, and conflicts with the allegations that revenue per patient day declined once the truth was revealed. ¶¶184, 187.[8]

### B. Plaintiff's Other Scheme Liability Claims Are Unchallenged

The Complaint also alleges Defendants' scheme incorporated the concealment of *Inman* from investors, including by hiding and destroying evidence. ¶¶53-69, 144-147. Because Defendants do not seek dismissal of these scheme claims, any challenge to them is waived. *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013) ("arguments not raised in a party's opening brief . . . are waived"); *see Acadia*, 2021 WL 195370, at *2 (declining to consider scheme liability argument made for the first time on reply).

### C. Plaintiff Adequately Alleges Material Misstatements and Omissions

The Exchange Act prohibits "the making of any 'untrue statement of a material fact' or the omission of any material fact 'necessary in order to make the statements made . . . not misleading.'" *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005). To survive a motion to dismiss, "'it is enough to identify the misrepresentations . . . and explain how they are false or misleading.'" *Acadia*, 2021 WL 195370, at *4. Courts have long recognized that "whether and when [d]efendants had a duty to disclose the adverse information . . . must be determined by the trier of fact." *Direct Gen.*, 398 F. Supp. 2d at 896.

Materiality "is a mixed question of law and fact [and] [c]ourts generally reserve such questions for the trier of fact." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 563 (6th Cir. 2001). "'[A] complaint may not properly be dismissed . . . on the ground that the alleged misstatements or

---

[8] Defendants' non-binding, out-of-circuit cases (Mot. at 12) concern instances, unlike here, where a plaintiff alleged a company failed to disclose a sales slowdown, but no sales decline was reflected in publicly available data, and the plaintiff alleged no other facts able to support falsity. *See Hassan v. Boston Beer Co., Inc.*, 2023 WL 8110940, at *3 (2d Cir. Nov. 22, 2023); *Robeco Cap. Growth Funds v. Peloton Interactive, Inc.*, 665 F. Supp. 3d 522, 541 (S.D.N.Y. 2023); *Perez v. Target Corp.*, 2024 WL 4804656, at *10 (D. Minn. Nov. 15, 2024).

- 14 -

omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance.'" *Id*.

### 1. Misleading Statements Regarding Acadia's Success

#### a. Misleading "Quality Care" Statements

Defendants admit that the Company's "growth depended on 'maintain[ing] [its] reputation for providing quality [patient] care.'" Mot. at 3; ¶¶130-131 (same). Indeed, they repeatedly claimed both that they ***actually*** provided "quality care," and that it was a ***crucial*** part of Acadia's current and future success. §II.A.; §IV.C.1.a., *infra*. Having chosen to speak about Acadia's "quality," Defendants had a "'duty to speak fully and truthfully on th[e] subject[].'" *See CCA*, 2017 WL 6442145, at *13; *Acadia*, 2021 WL 195370, at *4. Defendants, however, failed to do so, rendering their statements materially false and misleading. *See* ¶¶75-76, 83, 88, 91, 104-106, 115, 122-124, 130.

Acadia disregarded quality care at its psychiatric hospitals, creating an "elaborate system" to improperly detain patients without medical justification in order to continue billing patients' insurance and juice its short-term profits. ¶¶29-34. Further, Acadia inadequately staffed its methadone clinics while simultaneously cutting staff hours and incentivizing clinic directors to increase patient enrollment, resulting in counselors carrying caseloads more than ***double*** the limit set by state regulators and patients ***without*** opioid addiction receiving methadone. ¶¶45-48.

***"Puffery*** ***"*** ***and "Opinion***.***"*** In response to Plaintiff's allegations, Defendants wrongly contend that their statements are either puffery or inactionable opinion. Mot. at 21-23. "'The key'" to determining if such statements are puffery or opinion, however, "'is whether the proposition at issue can be proven or disproven using standard tools of evidence,'" *Acadia*, 2021 WL 195370, at *6, and, here, "Defendants' statements regarding . . . the quality of care at Acadia's facilities are both capable of objective measurement and verification" (*id*.), including by

- 15 -

comparison to concrete standards, such as state and federal laws and regulations and medical and industry guidelines governing patient care and staffing requirements.

Defendants inexplicably ignore this, and related authority, which confirms their "quality care" statements are not puffery or opinion. *See Psychiatric Sols.*, 2011 WL 1335803, at *47-*49, *51, *54 (holding that statements regarding the "'highest quality care'" were not puffery, but actionable and "subject to objective verification"); *id*. at *50 ("quality of its operations and the level of PSI's actual patient care" "involve[s] hard facts"); *CCA*, 2017 WL 6442145, at *8-*9 (falsity adequately alleged for statements that the company "'provid[ed] quality corrections services'").[9] Tellingly, Defendants consistently rely on non-binding, out-of-circuit cases throughout their Motion *in lieu* of authority from this District, including securities cases regarding Acadia itself and Psychiatric Solutions (founded by Acadia's former CEO), concerning similar types of misconduct as alleged here. Defendants, furthermore, do not contest that Acadia had a duty to disclose this information under Item 303 of SEC Regulation S-K. ¶¶136-140.

In passing, Defendants also incorrectly claim that certain of these alleged misstatements are "forward-looking." Mot. at 13 n.6; *id*. at 22 (referring to "[f]uture impact statements"). But the statements they identify relate to "'past or current, rather than future, performance.'" *Cardinal Health*, 2021 WL 4397946, at *11-*12. For example, Defendants state that Acadia was ***then*** "providing" and "committed to" "high-quality" services as a current "priorit[y]," and would

---

[9] Even if certain statements are viewed as opinions (they are not), they are still "actionable if [they were] subjectively false (i.e. not honestly held) or omit[ted] material facts about the basis or reliability of the opinion." *Envision*, 2019 WL 6168254, at *9; *Jackson Cnty. Emps.' Ret. Sys. v. Ghosn*, 510 F. Supp. 3d 583, 610 (M.D. Tenn. 2020) (Campbell, J.). Because Defendants' misstatements omitted material facts about the basis of their statements (§II.B.), they are actionable.

- 16 -

"continue" to provide quality. *See* ¶¶75-76, 83, 91, 104, 115. Defendants also assured investors that quality of care was ***at that time*** "foundational" to Acadia's success. *See* ¶¶76, 105, 106, 122.

And, under Sixth Circuit law, even "mixed statements" – those that contain both forward-looking and non-forward-looking parts – are actionable. *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 983-84 (6th Cir. 2018). Further, the warnings Defendants point to are not "meaningful," but are themselves misleading, *see* §IV.C.3., and whether their warnings were meaningful raises fact issues not determinable at this stage. §IV.A.; *see In re Phycor Corp. Sec. Litig.*, No. 3:98-0834, slip op. at 10 (M.D. Tenn. Feb. 17, 2000) (T. Campbell, J.).

### b.  Misleading Statements Regarding Metrics

"'[O]nce [Defendants] "put the topic of the cause of [their] financial success at issue," they were [also] "obligated to disclose information concerning the source of the success."'" *Envision*, 2019 WL 6168254, at *12. In discussing their financial results, Defendants repeatedly touted "factors that contributed to" Acadia's financial growth, including admissions and the number of days patients spent at Acadia facilities. *See* Mot. at 19; ¶¶74, 76, 79, 85, 87, 90, 91, 93, 95, 97, 99, 101, 103, 108, 110, 112, 114, 117, 119, 121.

In discussing admissions and patient days, however, Defendants failed to disclose that the revenue derived from those stays was inflated by their scheme. §II.A. These statements are therefore misleading. *See Envision*, 2019 WL 6168254, at *12 ("a reasonable person could view the statements regarding the drivers of success as misleading for omitting information regarding [improper billing practices] as a factor driving revenue"); *Psychiatric Sols.*, 2011 WL 1335803, at *30-*31 (failure to disclose that PSI's revenue growth was predicated upon an undisclosed practice of cutting expenses below the level necessary to prevent assaults was a material omission); *Am. Serv. Grp.*, 2009 WL 1348163, at *47 (undisclosed practice of denying medical services to inflate

- 17 -

profits "constituted material omissions about [defendant]'s actual practices, costs and gross margins").[10]

Defendants' argument that Plaintiff does not allege that the underlying numbers are false (Mot. at 18-20) misses the point. "[L]iteral accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 192 (2015); *Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 671 (M.D. Tenn. 2022) (Trauger, J.) ("'statements that are technically true can still be misleading'"). It is not that the financial results or the metrics underlying those results were false (though they may be), it is Defendants' failure to provide full and truthful disclosure regarding the practices driving Acadia's results that rendered those statements misleading. *See Envision*, 2019 WL 6168254, at *12 ("statements regarding the drivers of success" misleading "for omitting information regarding" improper billing practices as a factor driving revenue); *Estée Lauder*, 2025 WL 965686, at *3 ("Once [Acadia] chose to speak about the sources of its success, it had a duty 'to disclose the true (and improper) nature' of those sources.").

### 2. Misleading Statements Concerning Legal Contingencies

Acadia's failure to disclose *Inman* rendered its statements regarding its legal (i) contingencies (¶127); and (ii) risks (¶¶133-134) misleading. First, having chosen to speak on this topic, Defendants had a duty to offer complete disclosures, because "it would be 'untenable' to allow a company to 'offer a patchwork of honesty and omission' by 'choos[ing] which contingencies to expose and which to conceal.'" *Franchi v. SmileDirectClub, Inc.*, 633 F. Supp. 3d 1046, 1076 (M.D. Tenn. 2022) (Richardson, J.). *See* ¶¶125-128, 130-135. Second, "the

---

[10] Thus, this is not a situation, like in *Pension Fund Grp. v. Tempur-Pedic Int'l, Inc.*, 614 F. App'x 237, 245-46 (6th Cir. 2015), where a company "merely" spoke about "'recent positive results.'" Mot. at 20. Defendants here repeatedly spoke about a specific growth factor.

- 18 -

omission of [the *Inman*] claim in violation of [GAAP] ASC 450 rendered" Acadia's statements in its SEC filings on the lawsuits and litigation risks facing the Company "materially false and misleading." *In re Snap Inc. Sec. Litig.*, 2018 WL 2972528, at *6 & n.16 (C.D. Cal. June 7, 2018).

Defendants' contention that Plaintiff relies on a "'pure omissions'" theory (Mot. at 25-26) is incorrect. In fact, the Supreme Court recently held that the "failure to disclose information required" by SEC disclosure rules "can support a Rule 10b–5(b) claim" where, like here, the "omission renders affirmative statements made misleading." *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 265 (2024); *see* ¶¶126-128, 130-135.[11]

**"ASC 450."** Under ASC 450, Defendants "had a duty to disclose the [*Inman*] litigation" at the time of the default judgment (¶¶141-143) "because [Acadia's] **possibility** of incurring a loss from the litigation had become more than remote." *CBL*, 2022 WL 1405415, at *8. Defendants argue that they were under no obligation to disclose *Inman* because "[t]here are no facts showing that Acadia knew" the eventual loss. Mot. at 27. But under ASC 450 "'an issuer must disclose a loss contingency if there is "at least a reasonable possibility" that a loss may be incurred, **even** if the amount cannot be reasonably estimated.'" *Snap*, 2018 WL 2972528, at *6. Because "the risk of liability from the lawsuit was arguably probable if not likely" given the default judgment, Plaintiff's allegations "**easily** satisfy ASC 450's standard." *CBL*, 2022 WL 1405415, at *8.

Moreover, it is "sufficient at this stage" that *Inman* sought "significant damages," *see Snap*, 2018 WL 2972528, at *6, which is uncontroverted given the uncapped punitive damages at issue. Even Defendants acknowledge the damages in tort cases similar to *Inman* can reach the hundreds

---

[11] Defendants' cases (Mot. at 26), unlike here, all concern instances where a plaintiff either did not identify an affirmatively misleading statement or failed to explain why it was misleading. *See Macquarie*, 601 U.S. at 263; *In re 2007 Novastar Fin. Inc. Sec. Litig.*, 579 F.3d 878, 882-83 (8th Cir. 2009); *Bisel v. Acasti Pharma, Inc.*, 2022 WL 4538173, at *11 (S.D.N.Y. Sep. 28, 2022); *Karp v. SI Fin. Grp., Inc.*, 2020 WL 1891629, at *13 (D. Conn. Apr. 16, 2020).

4906-7970-2645.v7

of millions of dollars. *See* Mot. at 5. As in *SAIC*, ASC 450 required Defendants to disclose *Inman* based on their "awareness of a possible material claim," even though the amount was not yet quantified. *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 94 (2d Cir. 2016). And, in any event, "courts treat the issue of whether a defendant has complied with relevant accounting standards as inappropriate to resolve on a motion to dismiss." *Padilla*, 2022 WL 3452318, at *20.

Defendants' assertion that its legal risk warnings cannot be misleading as a matter of law (Mot. at 26) is incorrect. *See* §IV.C.3. It is also inapplicable to the alleged misstatements that are not risk warnings. *See* ¶127. As for the warnings themselves, they only state Acadia was "subject to" lawsuits "in the ordinary course of business" and that such actions "***may*** involve large claims" (¶134), and that "[f]rom time to time" the Company is "subject to complaints" that "***could*** have a material adverse impact" (¶133). But that boilerplate does not negate Defendants' independent disclosure obligations; neither disclosure warns that Acadia was ***then*** facing a significant lawsuit (*Inman*) where liability had already been decided. *See Zwick Partners, LP v. Quorum Health Corp.*, 2018 WL 2933406, at *7 (M.D. Tenn. Apr. 19, 2018) (Crenshaw, J.) ("'[T]o caution that it is only possible for the unfavorable events to happen when they have ***already occurred*** is deceit.'"). Such disclosures are themselves misleading. §IV.C.3.[12]

"***Statute of Limitations.***" Defendants claim that the *Inman* claim is barred by the two-year statute of limitations, because Plaintiff "could have known" facts to allege falsity and scienter

---

[12] Defendants' cases (Mot. at 26-27) are inapplicable. In *Lubbers* the plaintiff complained that a company failed to disclose an ongoing government investigation into its mortgage origination practices when the company had specifically told investors that it was ***then*** facing "[o]ngoing [government] investigations" into those very practices. *Lubbers v. Flagstar Bancorp. Inc.*, 162 F. Supp. 3d 571, 578-80 (E.D. Mich. 2016). In *Bank of Am.*, the risk disclosures were not misleading in light of the extensive information the market already had from multiple national news outlets regarding the potentiality and size of a lawsuit by AIG against the bank. *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 576-77, 579 (S.D.N.Y. 2013). Here, the market was unaware of *Inman* until Acadia belatedly revealed it. ¶¶174-175.

- 20 -

before July 10, 2023. Mot. at 24-25. That argument is flawed. Plaintiff "must have discovered sufficient facts to plead the misrepresentations and omissions, scienter, *and loss causation* elements *before* the statute of limitations began to run." *In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 278 (E.D.N.Y. 2023). "[A]nd only after a claim has accrued can the statute of limitations on that claim begin to run." *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 174-75 (2d Cir. 2011). Thus, the statute of limitations did not begin to run until at least July 12, 2023, when loss causation could be pled (*see* ¶¶174-176); Plaintiff's claim is timely.

Further, there is no "'uncontroverted evidence,'" *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 602 (N.D. Ohio 2004), showing Plaintiff should already have been aware of *Inman* given: (i) *Inman* is not named in any of Defendants' articles prior to the verdict; (ii) the articles only appear in local papers, *see Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 432, 435 (2d Cir. 2008); and (iii) Defendants denied the allegations. *See Gaynor v. Miller*, 273 F. Supp. 3d 848, 868 (E.D. Tenn. 2017); ¶68. Indeed, Defendants implicate questions of fact not ripe for resolution at this stage. *See Cosby v. KPMG, LLP*, 2018 WL 3723712, at *7-*8 (E.D. Tenn. Aug. 2, 2018); *CBL*, 2022 WL 1405415, at *15; *see also In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1186 (9th Cir. 2024). Defendants' cases are also inapt, as they either do not concern the statute of limitations or relate to *widely* known information.

"*Insurance.*" Defendants claim that "insured losses are immaterial." Mot. at 27. But Defendants ignore Plaintiff's allegations that Acadia's policies would not cover the Desert Hills litigations, especially because the damages in *Inman* were both uncapped (*i.e.*, in excess of coverage) and punitive (*i.e.*, an exception to the policy). ¶¶62, 126 & n.7; *see* Mot. at 4 (acknowledging that punitive damages "'may not be covered'"). Indeed, such a finding was likely, if not assured, given the New Mexico court's: (i) denial of Acadia's punitive damages summary

- 21 -

judgment motion; (ii) finding that Acadia destroyed evidence in bad faith; and (iii) related instruction to the jury on punitive damages. ¶¶61, 63-66, 165. Defendants themselves even point to awards in other tort litigation outstripping Acadia's $75 million policy. *See* Mot. at 5 (noting awards of $111 million and $217 million).[13]

### 3. Misleading Risk Disclosures

Defendants' purported "risk warnings" were themselves false and misleading, as courts "'have held that a risk disclosure can itself constitute a material misrepresentation when it presents as a risk an event that has already transpired.'" *In re Virtu Fin., Inc. Sec. Litig.*, 770 F. Supp. 3d 482, 517 (E.D.N.Y. 2025). The omission of an unlawful scheme renders a company's risk warnings misleading. *See In re FirstEnergy Corp. Sec. Litig.*, 2022 WL 681320, at *9, *12 (S.D. Ohio Mar. 7, 2022) (omission of bribery scheme rendered company's "risk factors" misleading).

When read together, Acadia's risk disclosures created the misleading impression that there was a mere risk that the Company may occasionally be sued for unlawful detention, when in fact Acadia ***systematically*** subjected its psychiatric patients to medically unjustified detention. *See, e.g.*, ¶130 ("***If*** one or more of our facilities experiences an adverse patient incident . . . [t]here is ***a risk*** that one or more service users could be harmed by one or more of our employees, either intentionally, through negligence or by accident."); ¶133 ("We are also subject to claims for unlawful detention ***from time to time*** . . . ."). *See St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co., Inc.*, 2025 WL 2940714, at *6 (M.D. Tenn. Oct. 16, 2025); *In re Shoals Techs. Grp., Inc. Sec. Litig.*, 2025 WL 2795062, at *9 (M.D. Tenn. Sep. 30, 2025) (Crenshaw, J.).

---

[13] Defendants rely on *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 634 (S.D.N.Y. 2005), and *Levine v. NL Indus., Inc.*, 926 F.2d 199, 203 (2d Cir. 1991). Mot. at 27. But in those cases (unlike here) the losses at issue were fully indemnified.

- 22 -

Acadia's risk disclosures likewise created the misimpression that there was a risk the Company *may* face a significant claim, while failing to disclose that Acadia was already facing uncapped damages in *Inman* – where liability had already been decided. *See, e.g.*, ¶134 ("We are subject to medical malpractice lawsuits and other legal actions in the ordinary course of business. Some of these actions *may* involve large claims . . . ."). "'[T]o caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.'" *Zwick*, 2018 WL 2933406, at \*7; *see Acadia*, 2025 WL 2940714, at \*6; *Shoals*, 2025 WL 2795062, at \*9.

Courts have rejected Defendants' argument (Mot. at 20-21) that *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483 (6th Cir. 2015), bars risk warnings as actionable statements as a matter of law, because "the court in *Bondali* explicitly recognized that 'there may be circumstances under which [such] a risk disclosure might support Section 10(b) liability.'" *Weiner v. Tivity Health, Inc.*, 365 F. Supp. 3d 900, 909-10 (M.D. Tenn. 2019) (Crenshaw, J.). And, unlike the systemic issues here, *Bondali* turned on the fact that the omissions in that case were minor – just "eight batches of chicken." *Bondali*, 620 F. App'x at 491. Nor does *Kolominsky v. Root, Inc.*, 100 F.4th 675, 689 (6th Cir. 2024), counsel differently. That case held only that the statement at issue was not a "sham warning," not that risk warnings are *never* actionable. *See id.*

**D.      The Totality of the Allegations Support a Strong Inference of Scienter**

Scienter may be alleged two ways: "'[1] knowing and deliberate intent to manipulate, deceive, or defraud, and [2] recklessness.'" *Frank v. Dana Corp.*, 646 F.3d 954, 958-59 (6th Cir. 2011). Recklessness is "'highly unreasonable conduct which is an extreme departure from the standards of ordinary care.'" *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 549-50 (6th Cir. 1999).

"The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323-24 (2007) (emphasis in

- 23 -

original).  Moreover, "'[t]he inference that the defendant acted with scienter need not be irrefutable, i.e., of the "smoking-gun" genre, or even the "most plausible of competing inferences[.]"'"  *Weiner*, 365 F. Supp. 3d at 914.  "'[W]here two equally compelling inferences can be drawn, one demonstrating scienter and the other supporting a nonculpable explanation, *Tellabs* instructs that the complaint should be permitted to move forward.'"  *Id.* at 916 (quoting *Frank v. Dana Corp.*, 547 F.3d 564, 571 (6th Cir. 2008)).  A "'"draw"'" goes to the plaintiff.  *Id.*

### 1. Defendants' Involvement in the Fraud Establishes Their Contemporaneous Knowledge of the Scheme

***Defendants' Statements***.  Defendants' own detailed statements regarding their attention to the quality of care provided at Acadia facilities demonstrates that they were either aware of the problems described, or were reckless in not knowing.  Defendants' "tout[ing]" their "monitoring of the very areas in which [they] committed" the fraud provides strong evidence that Defendants knew or were reckless in not knowing that their statements were misleading.  *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 688 (6th Cir. 2004).  Thus, Defendants' "own public statements" about the quality of its services "go a long way toward overcoming" the scienter hurdle.  *See CCA*, 2017 WL 6442145, at *20; *Kyrstek v. Ruby Tuesday, Inc.*, 2016 WL 1274447, at *9 (M.D. Tenn. Mar. 31, 2016) (Sharp, J.) (finding scienter sufficiently pled where "[d]efendants' pre-class statements allegedly confirm that the Company was monitoring Lime Fresh's performance").

Osteen, in fact, told investors that Acadia was "***intently focused*** on fostering high levels of quality" (¶88), which remained a "top priority."  ¶¶83, 115; *see* §§II.A., IV.C.1.a.  Throughout the Class Period, Defendants stated they closely monitored the very topics at issue in the scheme, including: (i) admissions, *see, e.g.*, ¶156 ("We looked at any obstacles around admissions."), *id.* ("We're going to look really closely at admissions . . . ."); (ii) length of stay, *see, e.g.*, ¶158 ("As

- 24 -

we looked at [length of stay] . . . ."); and (iii) patient days, *see, e.g.*, ¶157 ("we tend to talk a lot about . . . patient days"), ¶159.

Moreover, Acadia claimed to have "rigorous internal controls" to identify and correct issues such as the falsification of medical records, overbilling, and pressuring employees to treat patients. ¶49; *see Acadia*, 2021 WL 195370, at *7 (defendants' knowledge of "patient admissions" and "quality control issues" supports scienter); *Winslow*, 2011 WL 7090820, at *23 (repeated assurances defendants "had their eyes on" problematic loans probative of scienter). It is implausible that Defendants were unaware of the issues described in the Complaint.

***Acadia's Denials and Conflicting Internal Reports***. Acadia's repeated denials "establish that [they] knew, or at least recklessly disregarded, the true facts." *Chamberlain*, 757 F. Supp. 2d at 713; *Bond*, 587 F. Supp. 3d at 668, 678 (attempts to "spin" revelation of the fraud are indicative of scienter because the defendants essentially "represented to the public that they had kept abreast of the underlying matters"); *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1338 (S.D. Fla. 1999) ("denials indicate that [defendants] were either sufficiently familiar with the facts, or severely reckless in not being familiar, to be in a position to issue a denial" of the alleged scheme).

In response to the September 1, 2024 *NYT* article, Acadia denied the reporting, falsely stating that "[t]he allegation that Acadia systematically holds patients longer than medically necessary is false." ¶¶36, 123, 178, 186. And, again, in response to the December 7, 2024 *NYT* report, Acadia falsely denied that "the company did not falsify medical records, overbill insurers or pressure employees to treat patients who weren't addicted to opioids." ¶124. These denials confirm Defendants either knew the true facts, or were severely reckless in not being familiar with them. Indeed, Defendants had prior knowledge of these articles (¶36), yet their denials were inconsistent with the "extent and scope of the problems" as reflected in regulatory records and the

- 25 -

recollections and internal documentation of the Company's own employees, further demonstrating their scienter. *See Psychiatric Sols.*, 2011 WL 1335803, at *53.[14]

### 2. The Fraud Concerned Acadia's Core Operation

"'[H]igh-level executives can be presumed to be aware of matters central to their business's operation.'" *Envision*, 2019 WL 6168254, at *22. "Core operations" are established when a company hold them out as such. *See Psychiatric Sols.*, 2011 WL 1335803, at *45, *57 ("[d]efendants' emphasis on these aspects of PSI's business reflects the importance of these factors"). In fact, courts have deemed quality of care to be a core operation for companies like Acadia, and that, by extension, scienter adequately pled. *See id*. at *57; *see also Envision*, 2019 WL 6168254, at *22 (scienter adequately pled based primarily on core operations); *Ghosn*, 510 F. Supp. 3d at 618 (same).

"Quality" remained a "core operation" at Acadia because, according to Defendants, it was "one of the ***most important*** things" (¶76), "***foundational*** to every aspect of the work," and "***key to driving*** outcomes and operational effectiveness." ¶¶72, 122; ¶106. Indeed, Duckworth admitted that "quality" was "a strong driver of . . . volume" (¶105), and the Company's SEC filings state that "[o]ur future growth will partly ***depend*** on our ability to maintain our reputation for providing quality patient care." ¶130. Moreover, given that its acute inpatient hospitals and clinics provided over 50% and 17% of Acadia's revenue, respectively (¶23), both segments are a "core operation." *See CCA*, 2017 WL 6442145, at *21 (source of 11% and 13% of a company's annual revenue central to its operations "by any meaningful definition of the term").

---

[14]  Thus, Plaintiff's scienter allegations are not premised on mere "'access to'" information. Mot. at 17 (quoting *Pittman v. Unum Grp.*, 861 F. App'x 51, 55 (6th Cir. 2021)). *Pittman*, moreover, turned on the fact that, unlike here, the company actually made transparent disclosures. 861 F. App'x at 57.

It is therefore implausible that Defendants were unaware of the systemic quality of care issues that, by their own admission, were critical to Acadia's business. "Defendants cannot have their cake and eat it too." *Shoals*, 2025 WL 2795062, at *11. That is, Defendants "cannot, in one breath, claim that [they] placed a high priority on [patient] safety and then, in the next breath, plausibly suggest that perhaps [their] most important decision makers were simply unaware of the mountain of evidence made available to them on that very topic." *CCA*, 2017 WL 6442145, at *21; *Bond*, 587 F. Supp. 3d at 677 (noting it is "implausible" for a defendant "to have remained in the dark about so widespread an issue").

Defendants' counterargument, that "'fraudulent intent cannot be inferred merely from . . . alleged access to information'" (Mot. at 17), omits "the important corollary that 'high-level executives **can** be presumed to be aware of matters central to their business's operation,'" *CCA*, 2017 WL 6442145, at *21 (emphasis in original), and that there is "nothing obscure or arcane about fundamental issues such as systemic understaffing or failing to provide adequate medical care" that would prevent Defendants from knowing about them. *Id.*[15] Given the importance of Acadia's quality of care, Defendants' opposing inference (*see* Mot. at 13) of "ignorance" actually "supports [Plaintiff's] allegation of recklessness." *Ghosn*, 510 F. Supp. 3d at 617-18. The violations' widespread nature, across Acadia facilities in so many states, makes any competing inference that the violations are unrelated utterly implausible. *Tellabs*, 551 U.S. at 323-24.

---

[15] Defendants' cases (Mot. at 14) do not pertain to a systemic scheme within those companies' core operations. *See Plumbers Loc. No. 200 Pension Fund v. Wash. Post Co.*, 831 F. Supp. 2d 291, 297 (D.D.C. 2011) (concerning conduct at a second-level subsidiary); *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1042 (6th Cir. 2016) (concerning a fraud at an independent foreign business unit). And in *Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*, 2022 WL 989240, at *33 (W.D. Tenn. Mar. 31, 2022), the court actually found allegations probative of scienter, but decided the inference of non-fraudulent intent greater because, unlike here, the company acknowledged and sought to fix the problems alleged.

- 27 -

### 3. Divergence Between Defendants' Statements and Internal Reports

Defendants touted Acadia's "quality care" to investors. §§II.A., IV.C.1.a. Yet, based on interviews with over 100 current and former Acadia employees, internal Company documents, and state inspection reports, Acadia staffed its methadone clinics below industry guidelines and held psychiatric patients without medical necessity in order to inflate the Company's revenue and profit. §II.B.; ¶¶29, 32, 35. This divergence between Defendants' statements and Acadia's internal information supports Defendants' scienter. *See Psychiatric Sols.*, 2011 WL 1335803, at \*52.

### 4. Defendants' Attempts to Cover Up Wrongdoing

Further evidencing their scienter, Defendants instituted and maintained corporate policies and practices designed to conceal the true conditions at Acadia facilities from investors and the public: (i) courts have found Acadia engaged in a "nationwide" "pattern of . . . destroying evidence" and an "extensive scheme to destroy, deceive, and mislead" (¶146), including in *Inman* (¶¶65-66, 144); (ii) Acadia has maintained a draconian 30-day email deletion policy knowing it would result in the destruction of evidence (¶145), and failed to institute litigation holds in *Inman* and related cases (*id.*); (iii) the SEC found Acadia used employee agreements "that violated rules prohibiting actions to impede whistleblowers from reporting potential misconduct to the SEC" and "'required employees to waive their right to possible whistleblower monetary awards . . . severely imped[ing] the would-be whistleblowers from reporting potential securities law violations'" (¶148); (iv) Acadia failed to publicize and provide training for a corporate integrity agreement mandated disclosure program that would enable individuals to internally report concerns (¶¶149-151); and (v) Acadia falsified medical records to cover up wrongdoing (¶¶32, 34).

This "[e]vidence that a defendant has taken steps to cover-up a misdeed is strong proof of scienter." *In re Nature's Sunshine Prods. Sec. Litig.*, 486 F. Supp. 2d 1301, 1310 (D. Utah 2007).

Defendants dismiss certain of these allegations as "unrelated." Mot. at 15. Yet all of the conduct alleged are means by which Defendants attempted to keep the alleged misconduct concealed.[16]

### 5. Related Litigation Is Probative of Defendants' Scienter

Acadia's settlement of the DOJ lawsuit in 2024 that alleged the same types of wrongful practices provides further support for Defendants' scienter. Either Acadia quickly settled the DOJ suit when it became aware of it, which supports a strong inference of scienter, *Helwig*, 251 F.3d at 552, or it did not, in which case the Company had "actual knowledge that [its conduct was] of the type being investigated, thus indicating that [d]efendants knew that those practices were being considered deceptive," which also supports scienter. *Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2021 WL 1316705, at *17 (M.D. Tenn. Apr. 8, 2021) (Richardson, J.).

Indeed, Defendants had been on notice regarding widespread problems with the quality of care **at Acadia** for years. *See Acadia*, 2021 WL 195370 (upholding similar allegations against Acadia and defendant Duckworth); *see also Psychiatric Sols.*, 2011 WL 1335803 (upholding similar allegations against a company founded by Acadia's former CEO). And Defendants' knowledge of a 2017 lawsuit and the 2020 DOJ settlement against Acadia's competitor, UHS – when Osteen worked there – based on the same types of conduct complained of herein further supports scienter. ¶¶152-154; *see AAC*, 2021 WL 1316705, at *18 (defendants' knowledge of outside criticism of the company's conduct probative of scienter).

### 6. Defendants Had Motive to Commit Fraud

Defendants were motivated to conceal patient welfare issues to avoid a reduction in volume – and thus Acadia's earnings – because their executive compensation was directly tied to the

---

[16] Unlike in *Pittman*, 861 F. App'x at 55 (Mot. at 15), the conduct here does not relate to an "entirely different course of conduct," but a unitary one – a sustained course of action designed to minimize, conceal, or destroy evidence that could reveal the true conditions at Acadia facilities.

- 29 -

Company's financial performance. From top to bottom, Acadia incentivized profits over patient care. The ***majority*** of Defendants' compensation – over $21 million during the Class Period – was "pay for performance" based on financial results, not patient care. ¶¶167-171. Such "pay for performance" compensation tied "directly" to "reported financial results" supports an inference of scienter. *In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 736-38 (S.D. Ohio 2006). Courts have repeatedly found that similar motive allegations support scienter. *See id.* (citing cases); *FirstEnergy*, 2022 WL 681320, at *21; *Chamberlain*, 757 F. Supp. 2d at 711.

Defendants also incentivized Acadia's methadone clinic directors with bonuses, not to provide quality patient care, but to increase patient enrollment at a time when the Company was simultaneously cutting clinic staff. ¶¶46-47; *see Acadia*, 2021 WL 195370, at *7 ("compensation structures designed solely to reward short-term profit at the expense of patient care" support scienter inference). Such compensation is therefore not "[r]outine," as Defendants contend (Mot. at 16), and, moreover, the compensation was tied directly to the very metrics (EBITDA and revenue) that Plaintiff alleges Defendants sought to inflate. *See* ¶¶167-169.[17]

In sum, the Complaint sufficiently pleads scienter based on the totality of the circumstances. Defendants incorrectly claim that Plaintiff does not plead any of the nine "*Helwig*" factors. Mot. at 14-15, 17. The Complaint pleads at least four – Nos. 2, 5, 6, and 9. *See* §§IV.D.2.-3., 5.-6.; *Helwig*, 251 F.3d at 552. Regardless, the *Helwig* factors are non-exhaustive, and even if they were absent, their absence would "not meaningfully detract from a strong inference of scienter." *Strougo v. Tivity Health, Inc.*, 551 F. Supp. 3d 839, 851 (M.D. Tenn. 2021) (Crenshaw,

---

[17] Defendants' case (Mot. at 16), *Pittman*, 861 F. App'x at 57, likewise noted that a bonus can be probative of scienter where is it tied to the fraudulent metrics at issue.

4906-7970-2645.v7

J.); *Bond*, 587 F. Supp. 3d at 676 ("nothing wrong with choosing not to" acknowledge the *Helwig* factors); *FirstEnergy*, 2022 WL 681320, at *18 ("not a checklist of required showings").

Indeed, this Court has often found scienter adequately alleged without a formal *Helwig* factor analysis, or where most of the factors are absent. *See, e.g.*, *Acadia*, 2021 WL 195370, at *7 (no *Helwig* analysis); *Ghosn*, 510 F. Supp. 3d at 618 (same); *Envision*, 2019 WL 6168254, at *22 (primarily based on one factor); *see also CCA*, 2017 WL 6442145, at *20-*21 (two factors).

### 7.     Defendants Knowingly or Recklessly Misled Investors by Concealing *Inman*

By the time Acadia issued its Form 10-K on February 26, 2021, Defendants knew that default judgment on all liability issues had been entered against it in *Inman* and that the New Mexico court denied Acadia's summary judgment motion wherein it sought to avoid punitive damages. ¶¶126-128. Despite this, and ASC 450's disclosure requirements (¶128(a)), Defendants failed to disclose *Inman* and the related Desert Hills litigation until the massive damages verdict. ¶¶68, 166. This knowing and reckless (in)action demonstrates Defendants' scienter. ¶165; *see SAIC*, 818 F.3d at 96 (scienter adequately pled where company knew of, but did not disclose, legal liability); *Snap*, 2018 WL 2972528, at *5 (same, for a lawsuit); *In re Silver Wheaton Corp. Sec. Litig.*, 2016 WL 3226004, at *11 (C.D. Cal. June 6, 2016) (that "defendants knew or had reason to suspect that a [tax] reassessment was possible . . . yet took no efforts to incorporate that fact into [company] financial statements" supports a "'strong' [scienter] inference").

Defendants' suggestion that their ASC 450 violation cannot support scienter because it requires "'judgment calls'" (Mot. at 28) is not credible. Given that (i) the *Inman* court had entered default judgment; and (ii) the Company was facing uncapped damages, it was obvious there was "a reasonable possibility" of a material loss, triggering a duty to disclose under ASC 450. ¶128(a); *see PR Diamonds*, 364 F.3d at 684 ("obvious [GAAP] violations" can give rise to inference of

- 31 -

scienter).  Where, like here, a company knows of a liability and the attendant risk of potentially material penalties, but fails to disclose them, the allegations support a "**reckless** disregard of a known or **obvious** duty" – even if the exposure is unquantified.  *See SAIC*, 818 F.3d at 96.[18] Defendants' contention that Plaintiff must "plead facts showing that the size of the verdict was known in advance" (Mot. at 29) is incorrect.  *See SAIC*, 818 F.3d at 94 (scienter adequately pled based on company's "awareness of a[n unquantified] possible material claim").

Defendants' assertion that there are no allegations that they knew of such information (Mot. at 29) is wrong.  Acadia and its former CEO **were defendants** in *Inman*, and, as early as January 2020, Acadia falsely characterized the allegations surrounding the Desert Hills litigation as unsubstantiated (despite Garcia's guilty plea) and denied that Acadia had any connection to the case (despite the conduct occurring through a wholly-owned Acadia subsidiary), demonstrating Defendants' knowledge and deceit.  *See* ¶¶54, 56, 68, 166; §II.D.1.; *City of Fort Lauderdale Police & Firefighters' Ret. Sys. v. Pegasystems Inc.*, 683 F. Supp. 3d 120, 132 (D. Mass. 2023) ("A false denial of [a lawsuit's] claims' merit" indicative of scienter); *CBL*, 2022 WL 1405415, at *13. Further, between January and June 2021, Inman deposed Acadia officers, including its general counsel, two chief risk officers, and a corporate designee.  ¶165.  Defendants' own cases acknowledge that a company "faced with significant legal claims related to its core business in one market in which the company operated would presumably be known to senior executives at the

---

[18]  By contrast, in Defendants' cases (Mot. at 27, 29), the companies were either not facing any known liabilities at the time of their alleged misstatements, or they timely disclosed the liability. *See In re Citigroup Sec. Litig.*, 2023 WL 2632258, at *3, *19 (S.D.N.Y. Mar. 24, 2023); *In re Tenet Healthcare Corp. Sec. Litig.*, 2017 WL 11638941, at *6-*7 (N.D. Tex. Dec. 20, 2017); *Bank of Am.*, 980 F. Supp. 2d at 586 (potential claim at issue not filed); *White v. H&R Block, Inc.*, 2004 WL 1698628, at *2-*3,*12-*13 (S.D.N.Y. July 28, 2004) (claims disclosed).  And *Lumen* (Mot. at 28) did not concern the non-disclosure of a lawsuit.  In fact, the referenced lawsuit pertained to a ***different*** company, not the defendant.  *See In re Lumen Techs., Inc. Sec. Litig. II*, 2025 WL 978229, at *19-*21 (W.D. La. Mar. 14, 2025).

company." *ServiceMaster*, 2022 WL 989240, at *34. Defendants' claim that there are no knowledge allegations is not credible; any suggestion Defendants did not know of *Inman* is absurd.

That Acadia disclosed a boilerplate "risk" of litigation (Mot. at 28), is meaningless when it knew of actual litigation probable to result in a massive judgment against the Company involving **uncapped** punitive damages. Indeed, those disclosures were themselves misleading. §IV.C.3. And given that damages were uncapped, Defendants' claim that there are no allegations surrounding the "magnitude" of the potential award (Mot. at 29) is wrong, especially given their acknowledgment of damages awards that stretch beyond their insurance into the hundreds of millions of dollars (*see id.* at 5), and is further undermined by the fact that ASC 450 requires disclosure even if the loss cannot not be "reasonably estimated." ¶135(a); *SAIC*, 818 F.3d at 94.

Defendants' suggestion that the lack of a financial "'restatement'" negates any GAAP violation is misplaced. Mot. at 29. Whether an auditor approved of the (non)disclosures merely "raises fact issues that cannot be resolved on a motion to dismiss." *Am. Serv. Grp.*, 2009 WL 1348163, at *51.[19] Given Defendants' knowledge, the most plausible inference is that Defendants intentionally or recklessly concealed *Inman* until the jury verdict forced them to disclose it.

### E. Plaintiff Adequately Alleges Loss Causation

"[L]oss causation is not subject to the heightened pleading standards of Rule 9 or the PSLRA, but instead the notice pleading standard of Rule 8." *Shoals*, 2025 WL 2795062, at *12. Alleging loss causation is thus "'not meant to impose a great burden upon a plaintiff,' but to 'provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.'" *Ohio Pub. Emps. Ret. Sys.*, 830 F.3d at 384.

---

[19]   *Fidel v. Farley*, 392 F.3d 220, 231 (6th Cir. 2004), *Podraza v. Whiting*, 790 F.3d 828, 838 (8th Cir. 2015), and *In re Boeing Sec. Litig.*, 40 F. Supp. 2d 1160, 1177 (W.D. Wash. 1998) (Mot. at 29), do not concern the non-disclosure of a lawsuit.

- 33 -

Plaintiff alleges a series of partial disclosures that each caused Acadia's stock price to fall. ¶¶173-191. "[N]othing more is required." *Shoals*, 2025 WL 2795062, at *12; *In re Envision Healthcare Corp. Sec. Litig.*, 2022 WL 4551876, at *10 (M.D. Tenn. Sep. 29, 2022) (Campbell, J.). Indeed, Defendants do ***not*** dispute loss causation is adequately plead for the September 1, 2024 *NYT* article. *See St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co., Inc.*, 2022 WL 4598044, at *9 (M.D. Tenn. Sep. 30, 2022) (Campbell, J.) (refusing to shorten class period where defendants failed to show a "'complete lack of price impact'" from the alleged misstatements).

Defendants instead contend that the September 27 and October 18, 2024 announcements of various government investigations can never be corrective "as a matter of law." Mot. at 23. But the disclosure of government investigations, when part of a series of partial disclosures, like here, are "corrective" for the purposes of pleading loss causation. *See Norfolk Cnty.*, 877 F.3d at 696 (noting "the announcement of an SEC investigation," in addition to a corrective disclosure, can be sufficient); *Chamberlain*, 757 F. Supp. 2d at 717 (announcement of a DOJ investigation followed by a *Wall Street Journal* article on the same subject constituted a corrective disclosure).

This is especially appropriate where, like here, the investigations are undisputedly related to the fraud (¶¶38-39, 41-42, 179, 182), and Acadia continued to deny any wrongdoing. ¶¶36, 49; §II.D.; *see Norfolk Cnty.*, 877 F.3d at 692 (upholding series of partial disclosures where followed by denials of wrongdoing by the company); *Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.,* 769 F.3d 313, 323-25 (5th Cir. 2014) (upholding a series of partial disclosures, including a news article and subsequent announcement of SEC and DOJ investigations, amid denials by the company).[20]

---

[20] *Almost Fam.*, 2012 WL 443461, at *13, and *Meyer v. Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013) (Mot. at 23), are therefore inapposite, as in those cases, unlike here, there was no adequately alleged revelation of fraud in addition to the disclosure of a government investigation.

- 34 -

Defendants assert that the disclosures related to the Q3 and Q4 2024 earnings did not reveal a scheme, only "disappointing results." Mot. at 23. But courts routinely uphold such allegations where, as here, the "disappointing results" relate to the fraud. *See Franchi*, 633 F. Supp. 3d at 1082 (rejecting argument that disclosures of disappointing financial results "did not reveal any prior misrepresentation"); *Acadia*, 2021 WL 195370, at *2 (partial corrective disclosures included ones revealing "deteriorating performance" and misses to "revenue and earnings targets"); *Envision*, 2019 WL 6168254, at *11, *25 (missed financial guidance upheld as corrective); *Cosby*, 2018 WL 3723712, at *6-*7 (announcement of an "operating loss" corrective). And, here, Defendants do not dispute that those results relate to the fraud; they agree that the "negative publicity" connected to the alleged wrongdoing impacted the results. ¶¶185, 188; Mot. at 23-24.

### F. Plaintiff Adequately Alleges Control Person Claims

Because Plaintiff sufficiently alleges primary violations under §10(b), Defendants' lone §20(a) argument (Mot. at 30) is "nullifie[d]." *See Strougo*, 551 F. Supp. 3d at 853.

## V. CONCLUSION

Defendants' Motion to Dismiss should be denied in its entirety.[21]

DATED: November 7, 2025

Respectfully submitted,

ROBBINS GELLER RUDMAN
 & DOWD LLP
CHRISTOPHER M. WOOD (BPR #032977)
JERRY E. MARTIN (BPR #20193)

Christopher M. Wood (254908)

/s/ Christopher M. Wood
CHRISTOPHER M. WOOD

---

[21] If the Complaint is found lacking in any respect, Plaintiff respectfully requests the opportunity to move for leave to amend. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."); *Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002).

- 35 -

200 31st Avenue North
Nashville, TN  37203
Telephone:  615/244-2203
cwood@rgrdlaw.com
jmartin@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
SAM S. SHELDON
DARRYL J. ALVARADO
J. MARCO JANOSKI GRAY
TING H. LIU
T. ALEX B. FOLKERTH
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
darrenr@rgrdlaw.com
ssheldon@rgrdlaw.com
dalvarado@rgrdlaw.com
mjanoski@rgrdlaw.com
tliu@rgrdlaw.com
afolkerth@rgrdlaw.com

Lead Counsel for Lead Plaintiff

BISHOP PARTNOY LLP
FRANK PARTNOY
1717 K Street, NW Suite 900
Washington, DC  20006
Telephone:  202/787-5769
Frank@bishoppartnoy.com

Counsel for Lead Plaintiff

- 36 -