# EXHIBIT 29

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into among the United States of America, acting through the United States Department of Justice and on behalf of the Office of Inspector General of the Department of Health and Human Services ("OIG-HHS") and the Defense Health Agency ("DHA"), acting on behalf of the TRICARE Program, (collectively, the "United States"); Acadia Healthcare Company, Inc. ("Acadia"); and Franka Tirado, Brian J. Snyder, and Jamie Thompson (collectively, "Relators") (the United States, Acadia, and Relators are hereafter collectively referred to as "the Parties"), through their authorized representatives.

### RECITALS

A.      Acadia is a Delaware corporation with its principal place of business located in Franklin, Tennessee.  Acadia owns and operates inpatient behavioral health facilities throughout the United States, including The Pavilion at HealthPark, LLC, doing business as Park Royal Hospital ("Park Royal") in Ft. Myers, Florida; Riverwoods Behavioral Health, LLC, doing business as Lakeview Behavioral Health ("Lakeview") in Norcross, Georgia, and as Riverwoods Behavioral Health System ("Riverwoods") in Riverdale, Georgia; Ten Broeck Tampa, LLC, doing business as North Tampa Behavioral Health ("North Tampa") in Wesley Chapel, Florida; PHC of Michigan, LLC, doing business as Harbor Oaks Hospital ("Harbor Oaks") in New Baltimore, Michigan; and Seven Hills Hospital, LLC, doing business as Seven Hills Hospital ("Seven Hills") in Henderson, Nevada (collectively, the "Settling Facilities"); as well as Sonora Behavioral Health Hospital, LLC, doing business as Sonora Behavioral Health ("Sonora") in Tucson, Arizona; HMIH Cedar Crest, LLC, doing business as Cedar Crest Hospital and Residential Treatment Center ("Cedar Crest") in Belton, Texas; and Southwestern Children's Health Services, Inc., doing business as Oasis Behavioral Health ("Oasis") in Chandler, Arizona (collectively, the "Non-Settling Facilities") (the Settling Facilities and the Non-Settling Facilities

are hereafter collectively referred to as the "Facilities"). Through the Facilities, Acadia provides inpatient psychiatric and behavioral health services to individuals, including beneficiaries of federal healthcare programs.

B. Pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b), Relators filed the following *qui tam* actions (collectively, the "Civil Actions"):

i. On April 13, 2017, Franka Tirado ("Relator Tirado") and Brian J. Snyder ("Relator Snyder") filed a *qui tam* action in the United States District Court for the Middle District of Florida, captioned *United States and State of Florida ex rel. Tirado, et al. v. Park Royal Hospital, et al.*, Case No. 2:17-cv-201-FtM-99, against Park Royal and Acadia (the "*Tirado and Snyder* Complaint"). The *Tirado and Snyder* Complaint alleges, *inter alia*, that Park Royal and Acadia submitted or caused to be submitted false statements and claims to Medicare and Florida Medicaid because they admitted ineligible patients, billed for services not rendered, and kept patients longer than medically necessary. In the *Tirado and Snyder* Complaint, Relator Snyder also brought claims for retaliation under the False Claims Act, 31 U.S.C. § 3730(h) and Fla. Stat. § 448.102(3).

ii. On April 17, 2017, Jamie Thompson ("Relator Thompson") filed a *qui tam* action in the United States District Court for the Eastern District of Tennessee, captioned *United States, et al. ex rel. Thompson v. Acadia Healthcare Company, Inc., et al.*, Case No. 1:17-cv-99, which was later transferred to the United States District Court for the Middle District of Florida and assigned Case No. 2:18-cv-543-FtM-38CM, against Acadia, Riverwoods, and Lakeview (the "*Thompson* Complaint"). The *Thompson* Complaint alleges, *inter alia*, that Acadia, Riverwoods, and Lakeview submitted or caused to be submitted false statements and claims to Medicare and California, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Montana, Nevada, New Hampshire, New Jersey,

2

New Mexico, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia, and Washington Medicaid because they admitted ineligible patients, billed for services not rendered, and kept patients longer than medically necessary.  In the *Thompson* Complaint, Relator Thompson also brought claims for retaliation under the False Claims Act, 31 U.S.C. § 3730(h).

C.      Following notification of the Civil Actions and allegations, the United States and certain States, including, but not limited to, Florida, Georgia, Michigan, and Nevada, began investigating potential False Claims Act violations in connection with alleged conduct at additional inpatient behavioral health facilities owned and operated by Acadia, including North Tampa, Harbor Oaks, Seven Hills, Cedar Crest, Sonora, and Oasis.

D.      The United States contends that Acadia submitted or caused to be submitted claims for payment to the Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395lll ("Medicare"); the Medicaid Program, 42 U.S.C. §§ 1396-1396w-5 ("Medicaid"); and the TRICARE Program, 10 U.S.C. §§ 1071-1110b ("TRICARE").

E.      The United States contends that it has certain civil claims against Acadia arising from the following conduct, which is referred to in this Agreement as the "Covered Conduct":

i.      Between January 1, 2014 and December 31, 2017, Acadia and Park Royal submitted or caused to be submitted false claims for inpatient behavioral health services provided to Medicare, Medicaid, and TRICARE beneficiaries at Park Royal resulting from Acadia and Park Royal's (i) admission of beneficiaries who were not eligible for inpatient treatment, (ii) failure to properly discharge beneficiaries when they no longer needed inpatient treatment, (iii) improper and excessive lengths of stay, (iv) failure to provide adequate staffing, training, and/or supervision of staff and prevent assaults, elopements, suicides, and other harm resulting from staffing failures, and (v) failure to provide inpatient acute care in accord with

3

federal and state regulations, including, but not limited to, failure to provide active treatment, to develop and/or update individualized assessments and treatment plans, to provide adequate discharge planning, and to provide required individual and group therapy.

ii.      Between January 1, 2014 and December 31, 2017, Acadia and North Tampa submitted or caused to be submitted false claims for inpatient behavioral health services provided to Medicare, Medicaid, and TRICARE beneficiaries at North Tampa resulting from Acadia and North Tampa's (i) admission of beneficiaries who were not eligible for inpatient treatment, (ii) failure to properly discharge beneficiaries when they no longer needed inpatient treatment, (iii) improper and excessive lengths of stay, (iv) failure to provide adequate staffing, training, and/or supervision of staff and prevent assaults, elopements, suicides, and other harm resulting from staffing failures, and (v) failure to provide inpatient acute care in accord with federal and state regulations, including, but not limited to, failure to provide active treatment, to develop and/or update individualized assessments and treatment plans, to provide adequate discharge planning, and to provide required individual and group therapy.

iii.      Between January 1, 2014 and December 31, 2017, Acadia, Lakeview, and Riverwoods submitted or caused to be submitted false claims for inpatient behavioral health services provided to Medicare, Medicaid, and TRICARE beneficiaries at Lakeview and Riverwoods resulting from Acadia, Lakeview, and Riverwoods's (i) admission of beneficiaries who were not eligible for inpatient treatment, (ii) failure to properly discharge beneficiaries when they no longer needed inpatient treatment, (iii) improper and excessive lengths of stay, (iv) failure to provide adequate staffing, training, and/or supervision of staff and prevent assaults, elopements, suicides, and other harm resulting from staffing failures, and (v) failure to provide inpatient acute care in accord with federal and state regulations, including, but not limited to, failure to provide active treatment, to develop and/or update individualized assessments and

4

treatment plans, to provide adequate discharge planning, and to provide required individual and group therapy.

iv. Between January 1, 2017 and December 31, 2017, Acadia and Harbor Oaks submitted or caused to be submitted false claims for inpatient behavioral health services provided to Medicaid and TRICARE beneficiaries at Harbor Oaks resulting from Acadia and Harbor Oaks's (i) admission of beneficiaries who were not eligible for inpatient treatment, (ii) failure to properly discharge beneficiaries when they no longer needed inpatient treatment, (iii) improper and excessive lengths of stay, (iv) failure to provide adequate staffing, training, and/or supervision of staff and prevent assaults, elopements, suicides, and other harm resulting from staffing failures, and (v) failure to provide inpatient acute care in accord with federal and state regulations, including, but not limited to, failure to provide active treatment, to develop and/or update individualized assessments and treatment plans, to provide adequate discharge planning, and to provide required individual and group therapy.

v. Between January 1, 2017 and December 31, 2017, Acadia and Seven Hills submitted or caused to be submitted false claims for inpatient behavioral health services provided to Medicare, Medicaid, and TRICARE beneficiaries at Seven Hills resulting from Acadia and Seven Hills's (i) admission of beneficiaries who were not eligible for inpatient treatment, (ii) failure to properly discharge beneficiaries when they no longer needed inpatient treatment, (iii) improper and excessive lengths of stay, (iv) failure to provide adequate staffing, training, and/or supervision of staff and prevent assaults, elopements, suicides, and other harm resulting from staffing failures, and (v) failure to provide inpatient acute care in accord with federal and state regulations, including, but not limited to, failure to provide active treatment, to develop and/or update individualized assessments and treatment plans, to provide adequate discharge planning, and to provide required individual and group therapy.

5

F.      Relators claim entitlement under 31 U.S.C. § 3730(d)(1) to a share of the proceeds of this Agreement.  Relators also claim entitlement under 31 U.S.C. § 3730(d)(1) and (2) to their reasonable expenses, attorneys' fees, and costs.

G.      Acadia and the Facilities deny the allegations contained in the Civil Actions and the United States' allegations contained in Paragraph E of this Agreement.  This Agreement is neither an admission of liability by Acadia or the Facilities nor a concession by the United States or Relators that their claims were not well-founded.

To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the above claims, and in consideration of the mutual promises and obligations of this Agreement, the Parties agree and covenant as follows:

**TERMS AND CONDITIONS**

1.      Acadia shall pay to the United States and the States of Florida, Georgia, Michigan, and Nevada $19,850,000.00 in the aggregate ("Total Settlement Amount"), plus interest on the Total Settlement Amount accruing at a rate of 4.125% per annum from May 15, 2024, through the date of payment.  The Total Settlement Amount shall be paid as follows:

a.      Within ten (10) days of the Effective Date of this Agreement (defined below), Acadia shall pay to the United States the sum of $16,663,918.00, of which $8,331,959.00 is designated as restitution, plus accrued interest as set forth in Paragraph 1 above ("Federal Settlement Amount"), by electronic funds transfer pursuant to written instructions to be provided by the Civil Division of the Department of Justice.

b.      Acadia shall pay the State of Florida the sum of $1,123,956.29, of which $561,978.14 is designated as restitution, plus accrued interest as set forth in Paragraph 1 above, pursuant to a separate written agreement with the State of Florida.

6

c. Acadia shall pay the State of Georgia the sum of $1,087,239.67, of which $543,619.84 is designated as restitution, plus accrued interest as set forth in Paragraph 1 above, pursuant to a separate written agreement with the State of Georgia.

d. Acadia shall pay the State of Michigan the sum of $509,265.24, of which $254,632.62 is designated as restitution, plus accrued interest as set forth in Paragraph 1 above, pursuant to a separate written agreement with the State of Michigan.

e. Acadia shall pay the State of Nevada the sum of $465,620.80, of which $232,810.40 is designated as restitution, plus accrued interest as set forth in Paragraph 1 above, pursuant to a separate written agreement with the State of Nevada.

2. Conditioned upon the United States receiving the Federal Settlement Amount and as soon as feasible after receipt, the United States shall pay $3,166,144.42 to Relators Tirado and Snyder by electronic funds transfer ("Relators' Share"). Relators Tirado and Snyder shall distribute the Relators' Share among Relators pursuant to their separate co-sharing agreement.

3. Relator Snyder's claims under 31 U.S.C. § 3730(h) and Fla. Stat. § 448.102(3) for retaliation, Relator Thompson's claims under 31 U.S.C. § 3730(h) for retaliation, and all Relators' claims under 31 U.S.C. § 3730(d) for expenses, attorneys' fees, and costs have been resolved pursuant to the terms of a separate written agreement between Acadia and Relators.

4. Subject to the exceptions in Paragraph 7 (concerning reserved claims) below, and upon the United States' receipt of the Federal Settlement Amount, the United States releases Acadia and the Settling Facilities (together, the "Acadia Releasees"), from any civil or administrative monetary claim the United States has for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; or the common law theories of payment by mistake, unjust enrichment, and fraud.

5. Upon the payment of the Total Settlement Amount, plus accrued interest due under Paragraph 1, all Relators, for themselves and for their heirs, successors, attorneys, agents, and assigns, fully and finally release the Acadia Releasees, and their officers, agents, and employees, from any and all claims (including for attorneys' fees, costs, and expenses of every kind and however denominated) that any or all Relators have asserted, could have asserted, or may assert in the future against the Acadia Releasees related to the Civil Actions or Relators' investigation and prosecution thereof.

6. DHA expressly reserves authority to institute, direct, or maintain any administrative action seeking exclusion of the Acadia Releasees and/or their officers, directors, and employees, from the TRICARE Program under 32 C.F.R. §§ 199.9(f)(1)(i)(A)-(B) and (f)(1)(iii) (mandatory exclusion) and 32 C.F.R. §§ 199.9 (f)(1) and (f)(1)(iv)-(v) (permissive exclusion).

7. Notwithstanding the release given in Paragraph 4 of this Agreement, or any other term of this Agreement, the following claims and rights of the United States are specifically reserved and are not released:

    a. Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

    b. Any criminal liability;

    c. Except as explicitly stated in this Agreement, any administrative liability or enforcement right, including mandatory or permissive exclusion from Federal health care programs;

    d. Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

    e. Any liability based upon obligations created by this Agreement;

    f. Any liability of individuals;

8

g.   Any liability for personal injury or property damage or for other consequential damages arising from the Covered Conduct.

8.   Relators, for themselves and for their heirs, successors, attorneys, agents, and assigns, shall not object to this Agreement, and all Relators agree and confirm that this Agreement is fair, adequate, and reasonable under all the circumstances, pursuant to 31 U.S.C. § 3730(c)(2)(B), and that the Total Settlement Amount as allocated to each of the Settling Facilities and to Medicare, Medicaid, and TRICARE, as set forth in Attachment A to this Agreement, is also fair, adequate, and reasonable under all the circumstances.  Conditioned upon receipt of the Relators' Share paid to Relators Tirado and Snyder, Relators and their heirs, successors, attorneys, agents, and assigns fully and finally release, waive, and forever discharge the United States, its agencies, officers, agents, employees, and servants, from any claims arising from the filing of the Civil Actions or under 31 U.S.C. § 3730, and from any claims to a share of the proceeds of this Agreement and/or the Civil Actions.

9.   The Acadia Releasees waive and shall not assert any defenses that the Acadia Releasees may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action.

10.   The Acadia Releasees fully and finally release the United States, its agencies, officers, agents, employees, and servants, from any claims (including for attorneys' fees, costs, and expenses of every kind and however denominated) that the Acadia Releasees have asserted, could have asserted, or may assert in the future against the United States, its agencies, officers,

9

agents, employees, and servants, related to the Covered Conduct or the investigation or prosecution thereof.

11. The Acadia Releasees, and their officers, agents, and employees, fully and finally release Relators, their heirs, successors, attorneys, agents, and assigns, from any and all claims (including for attorneys' fees, costs, and expenses of every kind and however denominated) that the Acadia Releasees have asserted, could have asserted, or may assert in the future against Relators related to any of the conduct alleged in the Civil Actions and Relators' investigation and prosecution thereof.

12. The Total Settlement Amount shall not be decreased as a result of the denial of claims for payment now being withheld from payment by any Medicare contractor (e.g., Medicare Administrative Contractor, fiscal intermediary, carrier), TRICARE carrier or payer, or any state payer, related to the Covered Conduct; and the Acadia Releasees: (a) agree not to resubmit to any Medicare contractor, TRICARE carrier or payer, or any state payer any previously denied claims related to the Covered Conduct; (b) agree not to appeal any such denials of claims; and (c) agree to withdraw any such pending appeals.

13. The Acadia Releasees agree to the following:

a. Unallowable Costs Defined: All costs (as defined in the Federal Acquisition Regulation, 48 C.F.R. § 31.205-47; and in Titles XVIII and XIX of the Social Security Act, 42 U.S.C. §§ 1395-1395lll and 1396-1396w-5; and the regulations and official program directives promulgated thereunder) incurred by or on behalf of the Acadia Releasees, their present or former officers, directors, employees, shareholders, and agents in connection with:

(1) the matters covered by this Agreement;

(2)     the United States' audit(s) and civil investigation(s) of the matters covered by this Agreement;

(3)     the Acadia Releasees' investigation, defense, and corrective actions undertaken in response to the United States' audit(s) and civil investigation(s) in connection with the matters covered by this Agreement (including attorneys' fees);

(4)     the negotiation and performance of this Agreement; and

(5)     the payment Acadia makes to the United States pursuant to this Agreement and any payments that Acadia may make to any of the Relators, including for costs and attorney's fees

are unallowable costs for government contracting purposes and under Medicare, Medicaid, TRICARE, and the Federal Employees Health Benefits Program ("FEHBP") (hereinafter referred to as "Unallowable Costs").

b.      Future Treatment of Unallowable Costs:  Unallowable Costs shall be separately determined and accounted for by the Acadia Releasees, and the Acadia Releasees shall not charge such Unallowable Costs directly or indirectly to any contracts with the United States or any State Medicaid program, or seek payment for such Unallowable Costs through any cost report, cost statement, information statement, or payment request submitted by the Acadia Releasees or any of their subsidiaries or affiliates to Medicare, Medicaid, TRICARE, or FEHBP.

c.      Treatment of Unallowable Costs Previously Submitted for Payment:  The Acadia Releasees further agree that, within 90 days of the Effective Date of this Agreement, they shall identify to applicable Medicare and TRICARE fiscal intermediaries, carriers, and/or contractors, and Medicaid and FEHBP fiscal agents, any Unallowable Costs included in payments previously sought from the United States, or any State Medicaid program, including,

11

but not limited to, payments sought in any cost reports, cost statements, information reports, or payment requests already submitted by the Acadia Releasees or any of their subsidiaries or affiliates, and shall request, and agree, that such cost reports, cost statements, information reports, or payment requests, even if already settled, be adjusted to account for the effect of the inclusion of the Unallowable Costs. The Acadia Releasees agree that the United States, at a minimum, shall be entitled to recoup from the Acadia Releasees any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously submitted cost reports, information reports, cost statements, or requests for payment.

Any payments due after the adjustments have been made shall be paid to the United States pursuant to the direction of the Department of Justice and/or the affected agencies. The United States reserves its rights to disagree with any calculations submitted by the Acadia Releasees or any of their subsidiaries or affiliates on the effect of inclusion of Unallowable Costs on the Acadia Releasees or any of their subsidiaries or affiliates' cost reports, cost statements, or information reports.

d.      Nothing in this Agreement shall constitute a waiver of the rights of the United States to audit, examine, or re-examine the Acadia Releasees' books and records to determine that no Unallowable Costs have been claimed in accordance with the provisions of this Paragraph.

14.     This Agreement is intended to be for the benefit of the Parties only. The Parties do not release any claims against any other person or entity, except to the extent provided for in Paragraph 15 (waiver for beneficiaries paragraph), below.

15.     The Acadia Releasees agree that they waive and shall not seek payment for any of the health care billings covered by this Agreement from any health care beneficiaries or their

12

parents, sponsors, legally responsible individuals, or third-party payors based upon the claims defined as Covered Conduct.

16.     Upon receipt of the Total Settlement Amount described in Paragraph 1 above, the United States will promptly prepare and file a notice of partial intervention for purposes of settlement in each of the Civil Actions, which will be accompanied by a Notice of Dismissal executed by the United States and counsel for Relators in each case pursuant to Rule 41(a)(1), as follows:

a.     Dismissal of the *Tirado and Snyder* Complaint shall be: (i) with prejudice as to the United States, Florida, and Relators Tirado and Snyder as to the Covered Conduct; (ii) with prejudice as to Relators Tirado and Snyder as to all other claims in the *Tirado and Snyder* Complaint; and (iii) without prejudice to the United States and Florida as to all other claims in the *Tirado and Snyder* Complaint.

b.     Dismissal of the *Thompson* Complaint shall be: (i) with prejudice as to the United States, Florida, Georgia, Michigan, Nevada, and Relator Thompson as to the Covered Conduct; (ii) with prejudice as to Relator Thompson as to all other claims in the *Thompson* Complaint; and (iii) without prejudice as to the United States, Florida, Georgia, Michigan, and Nevada as to all other claims in the *Thompson* Complaint.

17.     Each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

18.     Each Party and signatory to this Agreement represents that it freely and voluntarily enters into this Agreement without any degree of duress or compulsion.

13

19. This Agreement is governed by the laws of the United States. The exclusive jurisdiction and venue for any dispute relating to this Agreement is the United States District Court for the Middle District of Florida. For purposes of construing this Agreement, this Agreement shall be deemed to have been drafted by all Parties and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

20. Except as noted in Paragraph 3 above, this Agreement constitutes the complete agreement between the Parties. This Agreement may not be amended except by written consent of the Parties.

21. The undersigned counsel represent and warrant that they are fully authorized to execute this Agreement on behalf of the persons and entities indicated below.

22. This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

23. This Agreement is binding on the Acadia Releasees' successors, transferees, heirs, and assigns.

24. This Agreement is binding on each of the Relators' successors, transferees, heirs, and assigns.

25. All Parties consent to the United States' disclosure of this Agreement, and information about this Agreement, to the public.

26. This Agreement is effective on the date of signature of the last signatory to the Agreement ("Effective Date of this Agreement"). Facsimiles and electronic transmissions of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

**UNITED STATES OF AMERICA**


DATED: _____ BY: _____
SARAH ARNI
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
United States Department of Justice


DATED:_____ BY: _____
LINDSAY SAXE GRIFFIN
Senior Litigation Counsel
United States Attorney's Office
Middle District of Florida


DATED: _____ BY: _____
SUSAN E. GILLIN
Assistant Inspector General for Legal Affairs
Office of Counsel to the Inspector General
Office of Inspector General
United States Department of Health and Human Services


DATED: _____ BY: _____
SALVATORE M. MAIDA
General Counsel
Defense Health Agency
United States Department of Defense

# UNITED STATES OF AMERICA

DATED: _____ BY: _____

SARAH ARNI
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
United States Department of Justice

DATED: 9/23/24 BY: _____

LINDSAY SAXE GRIFFIN
Senior Litigation Counsel
United States Attorney's Office
Middle District of Florida

DATED: _____ BY: _____

SUSAN E. GILLIN
Assistant Inspector General for Legal Affairs
Office of Counsel to the Inspector General
Office of Inspector General
United States Department of Health and Human Services

DATED: 09/18/2024 BY: _____
BLEY.PAUL.NICHOLAS.1099873821
Digitally signed by BLEY.PAUL.NICHOLAS.1099873821
Date: 2024.09.18 16:20:28 -04'00'

SALVATORE M. MAIDA
General Counsel
for Defense Health Agency
United States Department of Defense

15

## UNITED STATES OF AMERICA

DATED: _____  BY: _____
                                SARAH ARNI
                                Senior Trial Counsel
                                Commercial Litigation Branch
                                Civil Division
                                United States Department of Justice

DATED: _____  BY: _____
                                LINDSAY SAXE GRIFFIN
                                Senior Litigation Counsel
                                United States Attorney's Office
                                Middle District of Florida

DATED: 09/19/24  BY: SUSAN GILLIN _____
                   *Digitally signed by SUSAN GILLIN. Date: 2024.09.19 08:50:22 -04'00'*
                                SUSAN E. GILLIN
                                Assistant Inspector General for Legal Affairs
                                Office of Counsel to the Inspector General
                                Office of Inspector General
                                United States Department of Health and Human Services

DATED: _____  BY: _____
                                SALVATORE M. MAIDA
                                General Counsel
                                Defense Health Agency
                                United States Department of Defense

15

**DEFENDANT ACADIA HEALTHCARE COMPANY, INC.**

DATED: 9-23-24          BY: _____
                               BRIAN P. FARLEY
                               Executive Vice President, General Counsel and Secretary
                               Acadia Healthcare Company, Inc.


DATED: 9-23-24          BY: _____
                               THOMAS H. BARNARD
                               Counsel for Acadia Healthcare Company, Inc.

16

## RELATORS TIRADO AND SNYDER

DATED: 9/19/24    BY: _____
FRANKA TIRADO

DATED: 9/19/24    BY: _____
BRIAN J. SNYDER

DATED: 9/20/2024    BY: _____
JANEL QUINN
Counsel for Relators Tirado and Snyder

**<u>RELATOR THOMPSON</u>**

DATED: 9/18/2024          BY: _____
Jamie Clark Thompson (Sep 18, 2024 17:50 EDT)
JAMIE THOMPSON


DATED: 9/18/2024          BY: _____
RENÉE BROOKER
Counsel for Relator Thompson


DATED: 9/18/2024          BY: _____
EVA GUNASEKERA
Counsel for Relator Thompson

**ATTACHMENT A**

| Facility | Total | Medicare | Medicaid | TRICARE |
|---|---|---|---|---|
| Riverwoods/Lakeview | $6,456,494 | $3,998,324 | $2,156,240 | $301,930 |
| Park Royal | $6,663,280 | $5,177,345 | $1,420,964 | $64,971 |
| North Tampa | $4,088,299 | $1,794,711 | $977,443 | $1,316,145 |
| Harbor Oaks | $1,091,000 | $0 | $1,074,770 | $16,230 |
| Seven Hills | $1,550,927 | $681,685 | $742,747 | $126,495 |