# Exhibit B

2026 WL 508962
Only the Westlaw citation is currently available.
United States Court of Appeals, Sixth Circuit.

IN RE: SOTERA HEALTH COMPANY
SECURITIES LITIGATIONS.
OAKLAND COUNTY EMPLOYEES'
RETIREMENT SYSTEM, et al., Plaintiffs-Appellants,

v.

SOTERA HEALTH COMPANY,
et al., Defendants-Appellees.

No. 25-3311
|
February 24, 2026

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE NORTHERN DISTRICT OF OHIO

Before: BATCHELDER, CLAY, and RITZ, Circuit Judges.

OPINION

ALICE M. BATCHELDER, Circuit Judge.

**\*1** Oakland County Employees' Retirement System brought this consolidated class action on behalf of all the other similarly situated shareholders against Sotera Health Company and numerous related parties for alleged securities misrepresentations. The plaintiffs appeal the district court's dismissal of their complaint for failure to state a claim. We **AFFIRM**.

**I.**

Defendants-Appellees (collectively "Sotera") include Sotera Health Company, several of its current and former executives, two private equity firms, several Sotera directors, and numerous credit unions and banks that served as underwriters and managers of Sotera's IPO. Sotera Health Company provides sterilization solutions, lab testing, and advisory services for the healthcare and pharmaceutical industries. Over half of the Company's revenue comes from its subsidiary, Sterigenics. Sterigenics sterilizes pharmaceutical products after the products have been wrapped in their final packaging. To accomplish this, Sterigenics places the product in a vacuum-sealed chamber and sterilizes

it with ethylene oxide gas ("EO") [1]—the world's most predominant sterilization agent. EO gas, according to the Company, is "commonly the only method available to safely and effectively sterilize" medical devices because "EO is compatible with many materials that cannot tolerate or are degraded by radiation or moist heat sterilization." This process is "an essential, and often government-mandated, step in the manufacturing process of healthcare products before they are shipped to end-users."

Nonetheless, as Sotera acknowledges, human exposure to EO increases the risk of cancer. Accordingly, Sotera is "subject to extensive regulatory requirements" addressing the filtering and use of EO. In August 2018, the United States EPA issued a National Air Toxics Assessment ("NATA") report revealing that people living near Sterigenics's facilities in Illinois, Georgia, and New Mexico had among the highest cancer rates in the country. Beginning in September 2018, hundreds of plaintiffs—primarily former employees and individuals who lived near a Sterigenics facility—filed suit against Sotera, alleging injuries caused by exposure to EO. Of particular relevance to this appeal are two cases that went to trial in 2022. First, a jury awarded Susan Kamuda over $350 million in damages against Sotera after Kamuda alleged that EO emissions around Sterigenics's Willowbrook, Illinois, facility caused her cancer. *Kamuda v. Sterigenics U.S.*, LLC, No. 18 L 10475 (Ill. Cir. Ct. Sept. 26, 2018). Second, two months after the *Kamuda* verdict, a jury in the same court reached a full defense verdict for Sterigenics in a similar case charging Sterigenics with causing cancer. *Fornek v. Sterigenics*, No. 2018 L 010744 (Ill. Cir. Ct. Nov. 18, 2022).

In November 2020, during the time between the initial flood of lawsuits in 2018 and the two trials in 2022, Sotera became a public company. Sotera disclosed the lawsuits in the prospectus attached to its initial public offering (IPO): "We are currently the subject of tort lawsuits alleging personal injury by purported exposure to emissions and releases of EO from our facility in Willowbrook and our facility in Atlanta." Sotera also acknowledged that "[a]dditional personal injury and property devaluation lawsuits may be filed in the future against [Sotera] relating to Sterigenics's[s] Willowbrook facility or other EO sterilization facilities." Although Sotera denied the allegations and stated its intention to "defend themselves vigorously" against the claims, it also explained that "there can be no assurance that we will be successful," and "[i]t is likely that we will be subject to other claims by similar groups of plaintiffs in the future relating to any of our current or former facilities." Sotera disclosed

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works. 1

the shutdown of its Atlanta facility due to negative regulatory findings. And Sotera noted that, due to the unquantifiable nature of class action litigation, "one or more adverse judgments could result in significant liability for us and have a material adverse effect on our business, financial condition and results of operations."

**\*2** Some of Sotera's leading officers made similar representations about the lawsuits to its investors. Sotera's CEO, Michael Petras, responded to a question about the EO litigation by stating: "Obviously, we're in litigation, so I can't get into a lot of details on this. But what I can tell you is we feel very comfortable about where we are in that litigation and the work that our teams are putting together in our defense. Ultimately, though, it's going to go in front of a trial jury, and there's risk that come[s] associated with that." Likewise, CFO Scott Leffler stated he was "proud of our track record of compliance going back many, many years across our facility network. But in many cases, we've gone above and beyond the emission disclosure requirements, and voluntarily disclosed emission information that wasn't even required under the regulatory regime."

In addition to the statements expressly addressing the lawsuits, Sotera's prospectus included a litany of disclaimers regarding the heavily regulated nature of the pharmaceutical industry, warnings about EO, and descriptions of its various services. The opening page of its prospectus states in large, bolded font: "Investing in our common stock involves a high degree of risk." Under the header, "Safety risks associated with the use and disposal of potentially hazardous materials, such as EO," Sotera explained that improper disposal of EO could result in "injury to ... the environment and human health, as well as possible disruptions, restrictions or delays in production, and have in the past and could in the future result in claims relating to such events." Sotera further detailed that while it strives to protect its interests through quality assurance programs, "we may not at all times be in full compliance and, as a result, could be subject to significant civil and criminal fines and penalties." Sotera also identified the cancer risk posed by EO and explicitly warned investors that "[p]otential health risks associated with exposure to EO under certain conditions subject us to the risk of liability claims being made against us by workers, contractors and others, including individuals who reside or have resided near our EO sterilization facilities and employees of our customers."

Despite the risks associated with EO, Sotera touted its "[e]xpertise and strong track record in highly regulated markets," "highly skilled" and trained workforce, and "operational discipline." Sotera noted: "We consistently meet and outperform regulatory emissions control requirements, although we have experienced instances of emissions exceeding applicable standards, none of which we believe were material." Sotera also explained that, "[t]o reduce the risk of noncompliance, we employ engineering and procedural controls and pollution control equipment, and undertake internal and external regulatory compliance audits at our facilities."

Plaintiffs-Appellants ("Oakland")—a collection of Sotera shareholders—include lead Plaintiffs Oakland County Employees' Retirement System, Oakland County Voluntary Employees' Beneficiary Association, and Wayne County Employees' Retirement System, along with other public-employee retirement funds. Oakland alleges that the *Kamuda* verdict revealed only the tip of the iceberg, and that Sotera has a history of failing to comply with EO safety procedures and purportedly had information factually contradicting that which it provided to investors. Oakland alleges various forms of Sotera's misconduct, including that, among other things:

- Sotera knew of (and concealed) the danger of EO for decades, lobbied to prevent the classification of EO as a "carcinogen," and encouraged employees to show National Institute for Occupational Health and Safety (NIOSH) officials only "records you want them to see."

- Sotera's permit to operate its Willowbrook facility was based on an unfulfilled promise in 1984 to perform EO testing. According to Oakland, after the Illinois Environmental Protection Agency (IEPA) warned Sterigenics's predecessor (Griffith Laboratories) that estimated EO emissions from the facility "appear[ed] to be several magnitudes higher than desirable," Griffith promised to perform EO testing but never did, and the IEPA subsequently issued a permit to operate the facility.

**\*3** - Sotera failed to comply with its permit requiring "back vent" emissions controls from 2000 to 2004, knew of the increased emissions caused by the lack of back vents, urged employees to concoct an argument for "disconnecting back vents in the name of safety," and only installed back vents in plants where state law required them. [2]

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.   2

In January 2023, Oakland filed suit against Sotera, alleging that Sotera violated the Securities Exchange Act and the Securities Act by misrepresenting its regulatory compliance and potential for lawsuits during the class period. The "class period" began with Sotera's IPO on November 19, 2020, and ended on September 19, 2022—the date when "information from the Kamuda verdict alerted investors to the truth about Sotera's EtO operations." Pursuant to Federal Rule of Civil Procedure 12(b)(6), Sotera filed a motion to dismiss for failure to state a claim, alleging that Oakland did not adequately plead a Sotera violation of either the Exchange Act or the Securities Act under the heightened pleading standards of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). The district court applied those heightened pleading standards and dismissed Oakland's complaint after finding that Oakland did not adequately plead violations of either Act.

## II.

We review de novo the district court's dismissal of a complaint for failure to state a claim. *Lambert v. Hartman*, 517 F.3d 433, 438-39 (6th Cir. 2008). Generally, to survive a motion to dismiss for failure to state a claim, the plaintiff's complaint must allege facts sufficient "to state a claim to relief that is plausible on its face." *Royal Truck & Trailer Sales & Serv., Inc. v. Kraft*, 974 F.3d 756, 758 (6th Cir. 2020) (citation modified). But to the extent that Rule 9(b) applies, we review whether the plaintiff pleaded fraud or mistake "with particularity." Fed. R. Civ. P. 9(b). In making that determination, we "construe the complaint in the light most favorable to the plaintiff" and "accept [all] its allegations as true." *Kraft*, 974 F. 3d at 758.

## III.

On appeal, Oakland argues that the district court erred by dismissing its complaint for failure to state a claim. Finding no error, we affirm.

### A. Oakland failed to plead a Sotera violation of the Exchange Act.

Oakland brought claims under Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934. 15 U.S.C.A. § 78j(b). Section 10(b) states that it is "unlawful for any person ... [t]o use or employ, in connection with the purchase

or sale of any security ... any manipulative or deceptive device ... in contravention of such rules and regulations as the Commission may prescribe[.]" *Id.* The SEC created Rule 10b-5 under Section 10(b) of the Exchange Act, establishing that, under subsection (b), it is "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange" to "make any untrue statement of a material fact or to omit ... a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[.]" 17 C.F.R. § 240.10b-5(b). Rule 10b-5 also includes subsections (a) and (c), which do not require a material misrepresentation, but state that it is unlawful to (a) "employ any device, scheme, or artifice to defraud" or to (c) "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." *Id.* § 240.10b-5(a), (c). Oakland brought claims under both Exchange Act Rule 10b-5(b) and, separately, under Rule10b-5 (a) and (c).

**\*4** Allegations of securities fraud under Rule 10b-5 must meet the heightened pleading standards of Federal Rule of Civil Procedure 9(b) and the PSLRA. *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 548 (6th Cir. 1999). Combining these standards, a party must "state with particularity" both "the circumstances constituting fraud" and "facts giving rise to a strong inference" that the defendant acted with a fraudulent mind. Fed. R. Civ. P. 9(b); 15 U.S.C. § 78u-4(b)(2)(A).

### (1) Oakland's Rule 10b-5(b) Claim:

For a claim under Rule 10b-5(b), a plaintiff must allege "(1) a misrepresentation or omission; (2) of a material fact that the defendant had a duty to disclose; (3) made with scienter; (4) justifiably relied on by plaintiffs; and (5) proximately causing them injury." *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 668 (6th Cir. 2005). Because Oakland fails to plausibly allege the misrepresentation or omission of a material fact, its claim fails.

The materiality of a misrepresentation or a factual omission "depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Monroe*, 399 F.3d at 669 (citations omitted). In other words, "misrepresented or omitted facts are material only if a reasonable investor would have viewed the misrepresentation or omission as having significantly altered the total mix of information made available." *In re Omnicare, Inc.*

*Sec. Litig.*, 769 F.3d 455, 472 (6th Cir. 2014) (citation modified). The district court divided the allegedly false or misleading material statements into three categories: (1) permit and regulatory compliance; (2) pending litigation; and (3) EO-emissions and health and-safety initiatives. Oakland addresses only the first two categories on appeal.

Sotera—through its prospectus and leading officials—made numerous statements boasting its regulatory compliance and expressing optimism regarding its litigation. The thrust of Oakland's argument is that these statements contradict Sotera's history of regulatory noncompliance and therefore, Sotera misled investors by (1) making misrepresentations or (2) omitting to reveal its noncompliance with, and efforts to change, EO regulations. But taking each of Oakland's factual contentions as true, Oakland fails to plead with particularity facts indicating that Sotera made false or misleading compliance or litigation-based statements.

*(1) permit and regulatory compliance*

Sotera's generalized statements addressing its regulatory compliance constitute non-material opinion statements. "Determinate, verifiable statement[s]" are actionable under securities laws while statements reflecting "puffery" are not. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184 (2015). "[V]ague statements not subject to verification by proof are generally deemed non-actionable puffery." *Monroe*, 399 F.3d at 674. Statements of "general optimism and in defense of [the company's] products" and those of "self-praise and confidence in its future" constitute immaterial opinions. *Id.* at 671.

Oakland's complaint contains over 50 pages of allegedly false and misleading statements made by Sotera. But rather than being determinate or verifiable, Sotera's generalized statements project optimism regarding the company's ability to comply with regulations while also acknowledging its shortcomings. For example, Sotera accompanied its statement that it "consistently meet[s] and outperform[s] regulatory emissions control requirements" with the disclaimer that it has "experienced instances of emissions exceeding applicable standards." Likewise, Sotera explained that while it strives to protect its interests through quality assurance programs, "[it] may not at all times be in full compliance and, as a result, could be subject to significant civil and criminal fines and penalties." This is the common thread of Sotera's purportedly false or misleading statements—namely, Sotera makes a broad statement indicating a commitment to compliance while simultaneously recognizing its deficiencies.

**\*5** Moreover, Sotera's statements differ from the type of quantifiable statements this Court has found to be material. For example, in *Monroe*, we found that defendant's statement, "[w]e continually monitor the performance of all our tire lines, and the *objective data clearly reinforces our belief that these are high-quality, safe tires*," was material. *Monroe*, 399 F. 3d. at 671-72 (emphasis added). That was because "[a] reasonable juror could infer that the 'objective data' representation was a direct response to the lawsuits, or to the public challenges to the safety of Firestone's tires, or to both." *Id.* at 672. Conversely, Sotera never describes or mentions anything "objective," nor do its statements provide or refer to any specific data or processes which a reasonable investor could use to measure Sotera's compliance. *See Dailey v. Medlock*, 551 F. App'x 841, 849 (6th Cir. 2014) ("[T]his Circuit's precedent holds that a generic claim of legal compliance, absent any specifics, does not form the basis for a misrepresentation actionable under Rule 10b–5 and does not require the disclosure of allegedly illegal activities." (citing *Omnicare*, 583 F.3d at 945–47)). Other Circuits have addressed statements like Sotera's and found them to be "immaterial as a matter of law." *See, e.g.*, *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1321 (11th Cir. 2019) (finding defendant's statements that it was "devoting 'substantial resources' to its problems, with 'improved results,' as well as its boasts that it was taking a 'leading role' and making 'progress' toward compliance" were "precisely the sorts of statements ... deemed puffery and found immaterial as a matter of law"); *Emps.' Ret. Sys. v. Whole Foods Mkt., Inc.*, 905 F.3d 892, 902 (5th Cir. 2018) (concluding that "generalized statements about [defendant's] transparency, quality, and responsibility are the sort of puffery that a reasonable investor would not rely on").

When making investment decisions, a reasonable investor would not rely on or regard as significant Sotera's statements that it was generally compliant with regulations because the statements are untethered from anything measurable or verifiable. *Monroe*, 399 F. 3d at 670-71 (finding that defendant's statements explaining its "full confidence" in its tires and boasting its "global consistent quality" and "high regard among automakers for our strengths in product quality" were not actionable under Rule 10b-5 despite the defendant's product failures). Sotera's statements are, therefore, the type of non-determinate "loosely optimistic statements" not reasonably relied upon by investors, especially when read in conjunction with the express disclaimers in its prospectus that it "may not at all times be in

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.                4

full compliance." *See Zaluski v. United Am. Healthcare Corp., 527 F.3d 564, 573 (6th Cir. 2008).*

Nor does Oakland adequately plead that Sotera's compliance statements were false or misleading. Oakland does not identify a single specific regulation or permit that Sotera allegedly violated. While Oakland correctly notes that the *Kamuda* trial revealed no evidence that Griffith (Sterigenics predecessor) complied with permit testing requirements at the Willowbrook facility, this merely shows that no records of such testing (or the lack thereof) could be found. And this makes sense, as Griffith's alleged commitment to perform EO testing occurred in 1984—over 35 years before the beginning of the class period. This does not result in an inference that Sotera violated a permit, much less that it has a *history* of regulatory noncompliance. *See Gregory v. Shelby County, 220 F.3d 433, 446 (6th Cir. 2000)* (noting that courts need not credit "unwarranted factual inferences"). Oakland also points out that Sotera may have been in noncompliance with a "back vent" requirement for four years, but concedes that Sotera eventually complied with those requirements after a regulatory change. Oakland also cites a 2010 lawsuit in the Netherlands against Sterigenics where the court found that Sterigenics violated local regulations. As of May 2023, Sterigenics was apparently still involved in the appeal process. But alleging a short period of noncompliance at two facilities does not qualify as a particularized allegation that Sotera's generalized statements about its history of compliance were false or misleading. And it bears emphasis that Sotera never represented that it was perfectly compliant but expressly stated that "we may not at all times be in full compliance."

Oakland also appears to pursue an omission theory, contending that Sotera "failed to disclose several important qualifying facts" surrounding its compliance-based statements. According to Oakland, these "qualifying facts" include Sotera's history of purported regulatory noncompliance, safety failures, and efforts to change EO regulations. But a reasonable investor would not view the alleged Sotera omissions as "having significantly altered the total mix of information made available" because Sotera had *already revealed* the essence of those alleged omissions. *In re Omnicare, 769 F.3d at 472* (quotation omitted). Sotera revealed the risk of EO, that it was subject to significant regulation surrounding its EO use, that it may not always be compliant with those regulations, that it was the subject of lawsuits concerning its EO use, and that it may not win those lawsuits. Accordingly, Sotera's purported omissions

were not material. *Id.* ("Misrepresented or omitted facts are material only if a reasonable investor would have viewed the misrepresentation or omission as having significantly altered the total mix of information made available." (citation modified)).

*(2) pending litigation*

**\*6** Sotera expressed cautious optimism regarding its ongoing litigation. Sotera did not admit that its facilities caused cancer, affirmed its general compliance with permits, and explained that it would "vigorously defend" against the lawsuits. According to Oakland, Sotera's statements regarding its lawsuits were overly optimistic and misleading because Sotera was not compliant with its permits and therefore, was aware that it was subject to liability for that noncompliance. But Oakland's argument hinges on the incorrect assumption that because after the issuance of the IPO Sotera lost one trial regarding its EO usage, all the company's litigation-based disclosures must have been false, and Sotera must have known so when the IPO was issued. And Sotera never represented guaranteed litigation success or immunity from litigation. In fact, it did the opposite. For example, Sotera's prospectus explained that "there can be no assurance that [Sotera] will be successful" in defending the litigation, and "one or more adverse judgments could result in significant liability for us and have a material adverse effect on our business[.]" Sotera further noted that even if it "compl[ied] with applicable laws and regulations," it could *still* be liable because "an adverse judgment or outcome may occur based on other applicable laws or principles of common law, including negligence and strict liability[.]"

Therefore, Sotera's litigation statements are inactionable for the same reasons as its compliance statements—they were not material. *See Omnicare, 575 U.S. at 184, 186* (explaining that a CEO could not be liable for a false statement after saying, "I believe our marketing practices are lawful" or "we believe we are obeying the law" because "all she expressed was a view, not a certainty, about legal compliance" and the plaintiffs did "not contest that [defendant's] opinion was honestly held").

Moreover, Sotera's litigation statements are independently inactionable for another reason. The PSLRA contains a safe harbor provision that protects "forward-looking" statements from liability if they are either (1) accompanied by meaningful cautionary language or (2) not made with "actual knowledge" of falsity. 15 U.S.C. § 78u-5(c). The PSLRA defines a "forward-looking" statement as, among other things, "any statement of the assumptions underlying

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

or relating to" a company's financial statements, future plans, or future economic performance. *Id.* § 78u-5(i)(1). Because Sotera's litigation statements relate to the company's future plans and performance, they are forward looking. And because Sotera (1) surrounded its statements with cautionary language and (2) Oakland failed to plead that Sotera made them with known falsity, the safe harbor protects them under either prong.

First, Sotera surrounded its statements with cautionary language. Meaningful cautionary language includes "important factors that could cause actual results to differ materially from those in the forward-looking statement." *Id.* § 78u-5(c)(1)(A)(i). While Sotera explained that it intended to "vigorously defend" against the lawsuits, it made clear in the same paragraph that "one or more adverse judgments could result in *significant liability* for us and have a *material adverse effect* on our business, financial condition and results of operations." (emphasis added). Similarly, although Sotera's CFO addressed the litigation by saying "we feel very strongly about the strength of our position," he also said in the same breath, "each one of these is going to be a jury trial, and it's going to be up to the jury to make the final determination." And Sotera's CEO responded to a question about the EO litigation by explaining that while he was "comfortable about where we are in that litigation," success was not guaranteed because "[u]ltimately ... it's going to go in front of a trial jury, and there's risk that come[s] associated with that." There are numerous additional examples where Sotera cabins its statements with comparable cautionary language.

Second, even if meaningful cautionary language had not accompanied Sotera's forward-looking statements, Oakland does not plead with particularity any facts supporting the notion that Sotera had "actual knowledge" of falsity when making its litigation-based statements. *See* 15 U.S.C. § 78u-5(c) (requiring "actual knowledge" of falsity). Oakland provides no support for its blanket assertion that Sotera "knew that the evidence in the personal injury cases would show Sotera was willfully not compliant with permits and was not committed to safety." In fact, the results of the personal injury cases show the opposite. Although Sotera lost the *Kamuda* trial, it won the *Fornek* trial. And even if Oakland could offer support for the proposition that Sotera knew the trials would reveal its safety failures, that *still* does not prove Sotera made its litigation-based statements with "actual knowledge" of falsity. Indeed, Sotera could have anticipated valid defenses to the lawsuits, such as procedural errors or lack of causation.

Therefore, the PSLRA's safe harbor protects Sotera's forward-looking litigation statements.

### (2) Oakland's Rule 10b-5(a) and (c) Scheme-Liability Claim:

**\*7** Oakland also brought a scheme-liability claim [Count Two] under Rule 10b-5(a) and (c). The district court dismissed Oakland's Rule 10b-5(a) and (c) claim using the same analysis as it had applied to the Rule 10b-5(b) claim and found that Oakland "failed to plead an actionable material misrepresentation or omission with particularity as required by Fed. R. Civ. P. 9(b)." Oakland is correct insofar as it now appears to argue that the court should have differentiated between its Rule 10b-5(b) and Rule 10(b)-5(a) and (c) claims. Indeed, "scheme-liability claims under Rule 10b-5(a) and (c) are separate from misrepresentation-and-omission claims under Rule 10b-5(b)." *Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*, 83 F.4th 514, 533 (6th Cir. 2023); *see* R. 59 PageID. 1935 (district court order) ("This analysis will address only the first element of this test as it applies to both Counts One and Two."). Rule 10b-5 subsection (b) requires an untrue statement of material fact while subsections (a) and (c) do not. *See* 17 C.F.R. § 240.10b-5.

Nonetheless, Oakland's scheme-liability claim fares no better than its Rule 10b-5(b) claim. This Circuit has recently "defined the elements required to state a claim for scheme liability under Rules 10b-5(a) and (c)" by relying on the Second Circuit's rule: "To state a scheme liability claim, a plaintiff must show: (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *ServiceMaster*, 83 F.4th at 525 (quotation marks omitted) (quoting *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021)). So, although a plaintiff can bring a scheme-liability claim separate from a Rule 10b-5(b) claim, the plaintiff must still, much like pleading a misrepresentation under Rule 10b-5(b), plead "that the defendant committed a deceptive or manipulative act." *Id.* There is "considerable overlap among the subsections of the Rule[.]" *Lorenzo v. Sec. & Exch. Comm'n*, 587 U.S. 71, 72 (2019). And because Oakland fails to sufficiently plead that Sotera engaged in a deceptive or manipulative act in connection with a securities sale—largely for the same reasons it fails to plead a misrepresentation—any conflation by the district court of subsection (b) with subsections (a) and (c) does not undermine the propriety of its dismissal of Oakland's scheme-liability claim. *See*

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works. 6

*ServiceMaster*, 83 F.4th at 533 ("Although scheme-liability claims under Rule 10b-5(a) and (c) are separate from misrepresentation-and-omission claims under Rule 10b-5(b), [plaintiff] relies on the same factual circumstances to make out both claims in this case."). Indeed, the only class-period "scheme" misconduct that Oakland alleges is generally the same misconduct underlying their misrepresentation claims. Oakland did not plead facts indicating that Sotera knowingly engaged in a deceptive or manipulative act in connection with the sale of its securities.

### B. Oakland failed to plead a Sotera violation of the Securities Act.

Oakland contends that the district court erroneously applied Rule 9(b)'s heightened pleading standard to their claims under Sections 11 and 12(a)(2) of the Securities Act of 1933. 15 U.S.C.A. §§ 77k, 77*l*. They are incorrect.

Although fraud is not an element of a claim under Sections 11 or 12(a)(2) of the Securities Act, we apply Rule 9(b)'s pleading standard to claims that sound in fraud. *Kolominsky v. Root, Inc.*, 100 F.4th 675, 683 (6th Cir. 2024). Therefore, "when fraud pleadings under Section 10(b) of the 1934 [Exchange] Act employ the same facts as a 1933 [Securities] Act Section 11 claim or 12(a)(2) claim, we can assume that the complaint sounds in fraud." *Id.* "Of course, when a 1933 [Securities] Act plaintiff brings a Section 11 or 12(a)(2) claim that does *not* rely on one unified course of fraudulent conduct but, rather, carefully distinguishes the fraud claims from other claims, then we apply the Rule 8(a) pleading standard to those non-fraud claims." *Id.* All of Oakland's claims sound in fraud.

**\*8** First, Oakland's pleading of its Securities Act claims as sounding in negligence is not dispositive of the applicability of Rule 9(b). *See Kolominsky*, 100 F. 4th at 684 (noting that "a party's disclaimer that it is not pleading fraud will not defeat our application of Rule 9(b)"). Second, as in *Kolominsky*, Oakland's claims "were all grounded in *one* fraudulent course of conduct relying on *one* set of facts, alleging that [Sotera] made materially false and misleading statements and omissions." *See id.* The portions of Oakland's complaint addressing its Exchange Act and Securities Act claims mirror each other and use many of the same examples of purported misconduct, several of which facially sound in fraud. *See, e.g.*, R. 24 (Complaint), PageID. 610 (alleging that Sotera "actively sought to suppress regulator and public knowledge of EtO's carcinogenic properties"). *Compare, e.g.*, R. 24 (Complaint), PageID. 500 (Exchange Act) (stating that "[w]e deny these allegations and are vigorously defending

against these claims"), *with* R. 24 (Complaint), PageID. 612 (Securities Act) (stating that "[w]e deny these allegations and are vigorously defending against these claims").

Oakland also contends that even if Rule 9(b) applies to its Securities Act claims in general, the Rule 8 pleading standard applies to defendants Klee, Petrella, and the Underwriters because they were named only in the Securities Act claims and "were not accused of fraud." But Oakland accuses defendants Klee and Petrella of being "liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offerings." Likewise, Oakland accuses the Underwriter defendants of being liable "for untrue and materially misleading statements or omissions in the IPO Offering Materials and SPO Offering Materials." These "untrue and materially misleading statements" are the same statements Oakland uses against the rest of the Sotera defendants. And Oakland pleads no facts differentiating these defendants from the others. Because Oakland relies on one unified set of alleged misconduct for its Exchange Act and Securities Act claims against *all* defendants, Rule 9(b)'s pleading standard applies to all of Oakland's Securities Act claims. *See Kolominsky*, 100 F. 4th at 684.

Applying that standard, we conclude that Oakland failed to plead actionable misstatements or omissions under the Securities Act. Sections 11 and 12(a)(2) of the Securities Act contain "parallel provisions" that prohibit the issuer of a security from (1) including untrue statements of material fact or (2) failing to include material facts necessary to cure misleading statements in its registration statement, prospectus, or any other statement. *Kolominsky*, 100 F. 4th at 684; *see* 15 U.S.C.A. §§ 77k, § 77*l*. Companies must "make 'full and fair disclosure[s] of information' connected to a public offering." *Kolominsky*, 100 F.4th at 684 (citation omitted). "[T]he ultimate inquiry depends on what a reasonable investor would conclude about a statement or prospectus." *Id.* at 685.

While it is true that Oakland's "Complaint contains more than 50 pages of allegedly false and misleading statements, the dates upon which those statements were made, and the location of each statement," for the same reasons outlined under the Exchange Act analysis, we conclude that Oakland does not plead facts indicating that Sotera made an untrue statement of material fact or failed to cure a misleading statement. For example, Oakland points to Sotera's statements that it has "significant technical expertise," has a "strong track

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

record in highly regulated markets," "consistently meet[s] and outperform[s] regulatory emissions control requirements," and "employ[s] engineering and procedural controls." But Oakland does not plead with particularity that Sotera did *not* have technical expertise, did *not* consistently meet or outperform regulations, or did *not* employ engineering and procedural controls. Rather, Oakland's argument boils down to this: in light of the *Kamuda* verdict and what Oakland believes is decades of Sotera misconduct, the aforementioned Sotera statements certainly cannot be true. Indeed, the following excerpt from Oakland's complaint aptly summarizes the "Sotera is bad" argument: "In truth, Sotera and its predecessors were aware of the carcinogenic risk that EtO posed to the surrounding communities since at least the early 1980s, yet chose not to employ adequate and effective EtO emissions control systems at its sterilization facilities and often subverted whatever control systems the Company did have[.]"

**\*9** Few of Sotera's statements are specific or verifiable enough to be even potentially materially false. And to the extent that Oakland alleges Sotera misled investors through its statements (or lack thereof), the company consistently provided an abundance of curative disclaimers that should have negated any unwarranted investor optimism. We must read Sotera's statements expressing its ability to comply with regulations or succeed in litigation in conjunction with the fact that Sotera disclosed the risk caused by EO, provided a litany of disclaimers explaining the implications of that risk, repeatedly acknowledged its non-perfect compliance with EO regulations, and expressed a tempered optimism regarding its then-ongoing litigation while acknowledging its susceptibility to future lawsuits. For these reasons and those outlined under the Exchange Act analysis, Oakland does not plead with particularity that Sotera made material misrepresentations regarding its IPO.

## IV.

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

**All Citations**

Not Reported in Fed. Rptr., 2026 WL 508962

## Footnotes

1      The parties use "EO" and "EtO" interchangeably to refer to the sterilization agent used by Sotera. For purposes of this opinion, we refer to it as "EO" gas.

2      The *Kamuda* verdict came nearly two years after Sotera released its IPO. To the extent Oakland appears to imply that the results of the *Kamuda* verdict should have been communicated to investors, it is wrong. A company does not

     have a duty to amend its IPO to account for events occurring after the IPO's release. *See Kolominsky v. Root, Inc.*, 100 F.4th 675, 682, 686 (6th Cir.) (rejecting plaintiff's argument that defendant "had a duty to update investors" regarding changes to information provided in the IPO and explaining that defendant "had no duty to update [its past statements] even if less favorable results might have been predictable").

**End of Document**      © 2026 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.